IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,              :

    *Plaintiff,*                              :

    v.                                     :    **Civil No. RDB-11-2961**

KERNAN HOSPITAL,                       :

    *Defendant.*                              :
                             :

...o0o...

## OPPOSITION TO DEFENDANT'S MOTIONS

Table of Contents

| | | |
|---|---|---|
| I. | Procedural Posture | 1 |
| II. | Facts | 1 |
| | A. Introduction | 1 |
| | B. The Complaint | 3 |
| | C. The Uncontradicted Evidence | 9 |
| III. | Argument | 21 |
| | A. Standard of Review under Rule 56 | 21 |
| | B. ECF Paper 10: Kernan's Motion for Summary Judgment | 26 |
| |     1.    The Complaint Alleges, and the Uncontradicted Facts Establish, Falsity | 26 |
| |         a.    There is a dispute of fact as to whether the four charts in Paragraph 29 are miscoded | 26 |
| |         b.    This is not a false certification case | 31 |

| | | | |
|---|---|---|---|
| | c. | Kernan's query forms were leading, violating AHIMA guidelines | 33 |
| | d. | Kernan did in fact violate the AHA Coding Clinic Requirements | 37 |
| 2. | | The Complaint Alleges, and the Uncontradicted Facts Establish, Scienter | 39 |
| | a. | Kernan proposes a level of intent that the FCA explicitly rejected | 39 |
| | b. | The miscoded charts are objective facts, not matters of opinion | 44 |
| 3. | | Count III: Breach of Fiduciary Duty | 46 |
| C. | | ECF Paper 6: Kernan's Rule 9(b) Motion | 47 |
| IV. | | Conclusion | 50 |

I. <u>Procedural Posture</u>

The defendant, Kernan Hospital ("Kernan"), filed two separate motions.  One is a

motion to dismiss pursuant to Rule 9(b).  ECF paper 6.  This motion should be denied

because the Complaint meets the requirements of Rule 9(b).

The second styles itself as a motion to dismiss, but includes evidentiary material

that is outside the recognized exception for the inclusion of evidentiary material in a

motion to dismiss.  Rule 12 converts such a motion into a motion for summary judgment.

Accordingly, as we show below, because the allegations of the Complaint state a claim

and because the evidence of record even at this early stage of the case supports each

allegation, the Court should deny Kernan's motion.

II. <u>Facts</u>

A. <u>Introduction</u>

Kernan systematically upcoded by inappropriately adding malnutrition as a

secondary diagnosis for a significant percentage of its patients.  The use of malnutrition

codes as a secondary diagnosis for the patients at issue was false.  It was false because the

patients were not malnourished.  It was also false because applicable coding standards

prohibited the use of malnutrition codes.  Kernan reported these false secondary

diagnoses to the Maryland Health Service Cost Review Commission ("HSCRC") when it

transmitted data about its patients to the HSCRC.  The HSCRC used the data that Kernan

transmitted about the secondary diagnoses, including the malnutrition diagnoses, to

calculate the severity of Kernan's case mix.  The severity of the case mix determined

Kernan's compensation, with the compensation level rising as the case mix became more

complex.  Thus, Kernan made its case mix appear worse than it was by falsely reporting

malnutrition as a secondary diagnosis.  Federal health insurance programs compensated

Kernan by paying the rates set by the HSCRC.  When Kernan upcoded and caused the

HSCRC to set higher rates than were warranted, Kernan caused the various federal health

insurance programs to pay more than they should have.

Kernan intended this result.  Kernan reacted to new rules from the HSCRC, which

made secondary diagnoses financially important, by training its staff about malnutrition as

an important and common secondary diagnosis.  This training sensitized physicians to

Kernan's goal to increase compensation by using malnutrition diagnoses.  Having

sensitized the staff physicians to the importance of malnutrition, Kernan then caused a

Clinical Documentation Specialist ("CDS") to review each and every chart while the

patient was still admitted for any evidence that might be as suggestive of malnutrition as

other conditions.  The CDS queried the physician not about all the possible syndromes to

which the laboratory value might have pointed, but only to malnutrition or, often, "Protein

Malnutrition."  Physicians would frequently agree with the query and write the diagnosis

in the chart.  When the chart reached the coders after the patient was discharged, the

coders found "Protein Malnutrition" written in the chart.  The coders used a computer

program to code, and the words "Protein Malnutrition" produced the ICD-9 code for the

worst possible kind of malnutrition, Kwashiorkor defined as: "Protein-calorie malabsorption or malnutrition of children, characterized by tissue wasting, dehydration and subcutatneous fat depletion; may occur with infectious disease; also called infantile atrophy." Exhibit E ¶ 15. Kernan then suspended its coder's professional judgment about whether the contents of the medical chart supported the ICD-9 code. Kernan required coders to follow without question the computer program that produced false and inaccurate results, the diagnosis of Kwashiorkor based on a stray laboratory value.

Kernan put this system in place and took none of the industry-recognized steps to monitor for quality control. Kernan undertook no audits of the query system. Kernan did no monitoring of its coding of secondary diagnoses, even though such monitoring would have shown that the coding of Kwashiorkor increased from zero cases in 2004 to nearly 300 in 2007. As a result of Kernan's false diagnoses and attendant false claims, Kernan defrauded the federal insurance payors of hundreds of thousands of dollars.

### B. The Complaint

The Complaint alleges all of these facts.

In 2005, the HSCRC changed the rules relating to hospital compensation, moving to a system that was a more individualized assessment of the conditions of each patient admitted for care and treatment. ECF paper 1 (Complaint) ¶ 13. This system was known as the APR-DRG system. Id. It captured the principal (or admitting) diagnosis, as well as all applicable secondary diagnoses. Id. The HSCRC intended that hospital coders

capture the true level of severity for the patient so that the hospital's compensation would accurately cover the costs associated with that patient population. Id. "Hospitals report their case mix through the coding that they apply to each patient. Each hospital will code the applicable diagnoses pursuant to the ICD-9-CM. The hospital's case mix is the result of the coding decisions applying the ICD-9-CM to each patient, for all patients with inpatient stays. The aggregate of these coding decisions divided by the number of patients yields the hospital's case mix index." Id.

The 2005 APR-DRG system differed from the previous system. Under APR-DRG, a hospital's case mix was determined by a more individualized assessment of the conditions of each patient admitted for care and treatment. The system looked to the principal diagnosis, the main reason the patient was admitted to the hospital, and also captured each applicable secondary diagnosis in a manner that defined the severity of the diagnosis on a scale of 1 to 4, with 4 being the most severe. The interaction of these principal and secondary diagnoses provided a fuller clinical profile of the patient. The more challenging the patient's clinical profile, the greater the level of severity assigned to that patient by the APR-DRG system. Id. ¶ 13.

Thus, in 2005 and in the years afterwards, these APR-DRG rules changes placed a premium on hospitals adding secondary diagnoses to each patient's coding profile. "The more applicable secondary diagnoses that the hospitals successfully entered into the patient's profile, the more complex that patient would appear. As the level of complexity

4

of the hospital's patient population increased, the case mix would accordingly change and would lead to greater compensation for the hospital in the coming year." Id. ¶ 14.  In this way, by making secondary diagnoses more important the APR-DRG system gave hospitals the incentive to capture as many secondary diagnoses as possible.

Kernan reacted aggressively to the new system, recognizing that its self interest lay in capturing as many secondary diagnoses as it could.  This was the motive or scienter behind the submission of false claims at issue in this case.  Kernan trained its staff about the financial impact of secondary diagnoses.  Kernan also singled out malnutrition for attention and trained the staff that malnutrition and Kwashiorkor were common diagnoses associated with many other conditions.  Id. ¶ 15.  Kernan targeted malnutrition, and specifically Kwashiorkor, as a means of increasing the severity of its case mix.  Id.  This effort succeeded, as the coding of Kwashiorkor took off in response to APR-DRG, rising from an incidence rate of zero cases in 2004 to 281 in 2007.  Id. ¶ 17.  Other malnutrition codes used by Kernan also experienced a "sudden and extreme increase."  Id.

The Complaint alleges that the coding of malnutrition was false for a large number of these patients.  The government commissioned a review of Kernan's medical charts where malnutrition was included as a secondary diagnosis.  Id. ¶ 18.  That review found instances where the patient was, in fact, not malnourished.  Id.  That review also found instances where applicable coding principles precluded the use of malnutrition codes.  Id. The government's review "determined that 23% of the cases in which Kernan Hospital

5

coded malnutrition as a secondary diagnosis were inappropriate, either because the patient

was not in fact malnourished or because Kernan Hospital coded malnutrition in the face

of conflicting, incomplete or ambiguous information in the chart." Id.

The Complaint identified specific examples of false claims. Patient M.M. was not

malnourished but was coded for malnutrition nonetheless. Id ¶ 29.A. So too with Patient

A.B., who was coded for Kwashiorkor inappropriately. Id. ¶ 29.B. The Complaint

identified two other patients for whom Kwashiorkor was inappropriately coded. Id. ¶

29.C. and 29.D. The Complaint also identified several instances where a malnutrition

code was employed as a secondary diagnosis even though the medical evidence in the

chart did not support the use of that code. Id. ¶¶ 30 A.-C., 31.

In addition to the allegations that established Kernan's specific intent, the

Complaint alleged facts that established Kernan's deliberate disregard and reckless

indifference to accurate and proper coding. Kernan employed a nurse as a Coding

Documentation Specialist ("CDS"). Id. ¶ 19. The CDS reviewed the medical charts and

searched for evidence of stray laboratory values, values that were as consistent with

multiple syndromes and disease processes as with malnutrition. Id. Laboratory values in

these charts, as for example the pre-albumin values referenced in the Complaint, were

consistent with other syndromes and disease processes as well as malnutrition, and yet

Kernan's CDS queried the physician about malnutrition, often using the term "Protein

Malnutrition." Id. The CDS did not ask the physician about other possible syndromes or

6

conditions. Nor did the CDS ask the questions in an open ended way. The CDS injected the concept of malnutrition. Thus, the CDS query was leading, in derogation of applicable industry standards. The CDS wrote the preferred diagnosis on a post-it style sticky note and attached it to the chart. Id. The physician, having been trained on the importance of secondary diagnoses in general, and Kwashiorkor and malnutrition in particular, frequently agreed with the CDS' query, and wrote the requested diagnosis in the chart. Id. ¶ 19, 20. In many instances, as set forth in the Complaint, this lead the physicians to falsely add "Protein Malnutrition" as a secondary diagnosis. The entire process was then obscured as the sticky note was disposed of, making the chart appear as though the physician had independently diagnosed malnutrition.

As the Complaint alleges, the writing of the words "Protein Malnutrition" was significant. Id. ¶ 20. The Kernan coders saw the words "Protein Malnutrition" and entered them into a computer program which translated them into "Kwashiorkor," the highest and most extreme form of malnutrition known. Id. Kernan expected its coders to follow the computer and to use the Kwashiorkor code without independently reviewing the medical file to determine if the chart contained evidence that supported the use of that extreme code. Id. In this way, as alleged in the Complaint, Kernan could elevate a chart with nothing more than a low pre-albumin score (a laboratory value frequently observed in post-surgical patients) into a chart supposedly reflective of the most extreme form of malnutrition. Id. ¶¶ 19-21. Kernan put the elements of this system in place: training of

7

physicians to be attentive to queries about secondary diagnoses; teaching the physicians about the financial ramifications of secondary diagnoses; freeing the CDS to issue queries based on inconclusive and contradictory information; permitting the CDS to issue leading queries that asked the doctor to write "Protein Malnutrition" in the chart; causing the coders to abandon their independent judgment and blindly follow the computerized coding system that equated "Protein Malnutrition" with "Kwashiorkor." Id.

This system lead to the submission of false claims and it required deliberate indifference for Kernan to permit the system to operate as it did for year after year without inquiry or audit. The system also deprived the coders of their independent obligation to "exercise coding judgment about the codes they assign and the quality of the evidence that supports a code." Id. ¶ 22. It is inappropriate, false and fraudulent for a hospital to instruct coders to suspend that independent judgment and code the most severe form of malnutrition as a default irrespective of the quality of the evidence in the medical chart. Id. Kernan knew that its coders were expected to follow the computer blindly, automatically selecting the most serious code out of a list of possible codes. Id. This expectation removed an important check point and allowed the reporting of false diagnoses – the upcoding – to pass directly into the medical record and hence to the HSCRC.

Query processes should be audited. Kernan's were not. "No effort was made by Kernan to determine how often queries issued, how often various topics were queried, the

response rates, and the rates of agreement.  In short, there was no effort at quality control, in complete violation of AHIMA standards and guidelines."  Id. ¶¶ 26-27.

In short, Kernan's scheme trained staff to the need for maximizing revenue through the addition of false secondary diagnoses.  It then implemented this scheme through a flawed query process that, coupled with the restrictions on coder's independence, resulted – as intended – in the inclusion of malnutrition and Kwashiorkor as diagnoses where the patient was not malnourished.  Kernan then turned a blind eye to the false results the scheme generated, deliberately ignoring the spiking use of Kwashiorkor as an ICD-9 code, a code that prior to 2005 had not been a part of Kernan's case mix.

### C. The Uncontradicted Evidence

Undisputed evidence supports the Complaint.

The HSCRC's adoption of the APR-DRG system in 2005 is a matter of public record and a fact about which Kernan raises no issue.

Kernan's response – a "Clinical Documentation Improvement (CDI) Program" that included the new query system, including Kernan's decision to emphasize the coding of Kwashiorkor as a secondary diagnosis – is well documented.  CDI training materials from Kernan instructed that Kwashiorkor is a common level 4 secondary diagnosis.  Exhibit A, Martha Green deposition exhibit 19, at KH000099.  Level 4 is the most severe form of secondary diagnosis and has the greatest impact on the case mix and reimbursement as it

is the most likely code to increase the severity level for that individual patient. Kernan repeatedly instructed that Kwashiorkor, a disease unknown in the United States, was a "Common Level 4 Diagnosis." Id. See also Exhibit A, Green deposition exhibit 22, at KH000165 (same).

Kernan's CDI program manuals – manuals that Kernan used to train its staff – also repeatedly emphasized Kwashiorkor as a common Level 4 secondary diagnosis. "The following are lists of secondary conditions and procedures that 'potentially' impact severity level assignment." Exhibit G at KH000280. Kernan listed common level 2, 3 and 4 diagnoses, with Kwashiorkor included as one of the "Common Level (4) Diagnoses." Id. at KH000285 (also listing Nutritional Marasmus and Severe Malnutrition). The list for "Common Level (3) Diagnoses" includes Protein Calorie Malnutrition." Id. at 000284. Excerpts from these manuals show how Kernan trained staff that for various specific disciplines, Kwashiorkor and other severe forms of malnutrition, including Protein Malnutrition, were common secondary diagnoses. Exhibit H at KH000538-000539 (Respiratory/Pulmonary); KH000687,000698, 000690 (Gastroenterology); KH000788-000796 (Endocrinology & Nephrology); KH000871 (Trauma & Orthopedic Surgery); KH000902-000907 (Hematology & Oncology); KH000934, KH000937-000938 (General Surgery & Urological Surgery); KH001061 (Psychiatry).

Kernan trained staff about the financial impact of these coding decisions. Exhibit

A, Green deposition exhibit 17, at KH000015-000019 (project planning guide with scheduled training).  "$$$ will be allocated to those hospitals that treat the sickest patients."  Exhibit A, Martha Green deposition exhibit 22, at KH000154; Exhibit A, Green deposition exhibit 23, at KH000200.  Kernan was clear in its training: "*Every* diagnosis may impact."  Exhibit A, Green deposition exhibit 21, at KH000137 (original emphasis).  This instruction was repeated verbatim more than once.  Exhibit A, Martha Green deposition exhibit 23, at KH000200.  Training that occurred six months before the implementation of the APR-DRG system put a dollar value of $2,050,000 per quarter on the "value of concurrent MD responses," the responses that physicians would make to the CDS' queries while the patient was still admitted.  Exhibit A, Martha Green deposition exhibit 21, at KH000146.  The target was $3,750,000.  Id.  Kernan intended to advise physicians through report cards of the "lost value of [that physician's] non-responses," with the example from training showing the lost value for that particular physician estimated at $250,000.  Id. at KH000147.  This training described the CDI process – the query process alleged in the Complaint – using charts so that physicians could understand their role, that they could expect to receive queries and that Kernan would issue report cards on their responsiveness.  Id. at KH000144-145, 000147.  This training was repeated on December 21, 2004 and on January 6, 2005 nearly verbatim.  See Exhibit B at KH000187, 000194; Exhibit D, at KH000126-000129.  Kernan plainly recognized that physicians needed training not only in the new query process but also in its financial

impact. Exhibit C at KH000067 ("This education and focus to the physicians will answer the physician question of 'what's in it for me.'"). Kernan gave the doctors a "Doc Pocket Tool" for easy reference, designed to remind the physician at this rehabilitation hospital of the import of the DRGs and their coding of secondary diagnoses and also reminding them that "Malnutrition, severe" (which coded to Kwashiorkor) was a "Common Level 4 Severity DXs for Rehabilitation Patients." Exhibit A, Martha Green deposition exhibit 15, at KH000010-0000014.

Kernan calculated the dollar amounts it expected to and did receive from this new system. Exhibit A, Green deposition exhibit 20, at KH000215. Kernan estimated the impact of expanded coding and the Clinical Documentation Improvement processes (i.e. the new query system) at $1 million. Id. Financial considerations were much on the mind of Kernan's officers and directors. Id. at KH000211 (Power Point slide: "Financial Rationale for CDI"). A "Query Variance Report" showing "the financial impact of the CDI Program for each query," where "variance" meant "the financial difference associated with the DRG change as a result of a negative query response," found that for the period 2005-2008 negative physician responses to Nurse Sewell's malnutrition queries cost Kernan $652,861.38. Exhibit A, Green deposition exhibit 5, at KH000045. Another report tracked total reimbursement associated with Kwashiorkor from 2003 through 2007, showing it rising from zero to $1,727,037 in 07/2005-06/2006 and to $5,074,152 in 07/2006-06/2007. Exhibit A, Green deposition exhibit 6, at KH000021-

000024.

Kernan implemented the query system. The Clinical Documentation Specialist ("CDS"), Ann Sewell, was a nurse tasked with looking at each medical record. <u>Exhibit A</u>, Martha Green deposition at 24, 36. Nurse Sewell was directed that when she saw "an abnormal lab" she should "query the physician." <u>Exhibit A</u>, Martha Green deposition at 25. She had a list of "lab values to look for to query the physician on [for malnutrition]." <u>Exhibit A</u>, Martha Green deposition at 46-47; <u>see</u> <u>also</u> <u>Exhibit H</u> at KH00795 (list of laboratory values). If that lab value appeared in the chart, Nurse Sewell was directed to query the physician about malnutrition. <u>Exhibit A</u>, Martha Green deposition at 47.

> Q. So if the chart came to her and it had a lab value that [Kernan's consultant] said was indicative of malnutrition, it would have been appropriate for her to query the doctor if that was the only information --
>
> A. Correct.
>
> Q. – in the chart?
>
> A. If that was the only information in the chart because that's how she was taught.

<u>Exhibit A</u>, Martha Green deposition at 47-48. Nurse Sewell would leave the query on a sticky post-it note in the medical chart, asking the doctor if he agreed with her diagnosis of "Protein Malnutrition" from that stray laboratory value. <u>See</u> Kernan's Sealed Exhibit D at "Kernan-MR 000364." The physician would see Nurse Sewell's sticky note on the chart and would write the diagnosis – Protein Malnutrition – in the record. <u>Exhibit A</u>, Martha Green deposition at 29-31. Generally, this would all occur while the patient was

13

still hospitalized.

The chart would reach the coding staff sometime after the patient was discharged. The coder would see the words "Protein Malnutrition" in the chart. Kernan expected the coder to enter those words into the computer. Exhibit A, Martha Green deposition at 100-101. The computer would generate the ICD-9 code: 260. Id. ICD-9 code 260 is labeled "Kwashiorkor." Ordinarily, a coder is expected to exercise independent judgment to assure that the code the computer suggests is appropriate. Exhibit E ¶ 15. Ordinarily, therefore, a coder would be expected to see the name of this code – "Kwashiorkor" – and ask himself "what's that?" and then use the tools that the computer embeds in the program to see if it bears any relation to what appears in the chart. Exhibit E ¶ 15. Ordinarily, the coder would use those tools to look up "Kwashiorkor" and realize it is a disease of infants in Africa, and move on to another ICD-9 code that accurately described the condition documented in the chart. Exhibit E ¶ 16. And yet, Kernan specifically relieved coders of that important function to independently question if the chart supported that coding level. Exhibit A, Martha Green deposition at 99-108:

> Q. Are you telling me that if the doctor puts protein malnutrition in the chart the coder automatically goes to Kwashiorkor, is that your testimony?
>
> A. Yes. Because that's the code it's telling her to use.
>
> Q. You're telling me that the coder is not to use his or her discretion to determine whether protein malnutrition could fit any of these other [ICD-9] categories?

      A. No.  She's not a doctor.  All she's doing is – coders have guidelines that they go by, the coding guidelines.  They have – they cannot code – they have to code what the doctor documents.

      Q. Do you believe that Kwashiorkor is the same thing as protein malnutrition?

      A. I don't know.

      Q. Do you have coding tools, coding protocols that establish that Kwashiorkor is the same [as] protein malnutrition?

      A. No.

Id. at 104-105; see also Exhibit E ¶ 16.

Tools existed in the very program that the Kernan coders used that would have told

them that "Kwashiorkor" was a disease of children in Africa.  Exhibit K at 3-12, ¶¶ 7, 8.

The Coding Operations manager at the Mayo Clinic explains in great detail how the

computer program Kernan used contained resources that would give the coder

"Instructional notes," "Tips," and "Clinical indicators" that described "Kwashiorkor."

Id., ¶ 7.

      Coders are expected to assign codes to the highest level of detail available. Coders must review all fourth and fifth digit categories if they are found within that disease category and based upon the documentation. (Referenced from ICD 9 CM Coding Guidelines).  In Exhibit 13, page KH 001709 there is an instructional note. The coder is expected to review and reference any and all instructional notes assigned to a code for additional information. As you can see when code 260 is identified there are other code categories for the coder to review. 261, 262, 263.  If "Kwashiokor" was not specified in the documentation the coder should have assigned code 263. The documentation MUST state "Kwashiokor" in order for it to be coded with 260.

15

Exhibit K, ¶ 7.

The "Smart Tip" button would have given the coder the following:



Pressing the tab "Clinical Indicators" would have given the coder similar information:



However, Kernan instructed its coders not to use these tools.  <u>Supra</u> at 14-15.  As

the Coding Operations manager from the Mayo Clinic testified, this was inappropriate:

> It is my opinion, based on the Kernan HIM Director's deposition transcript,
> that she inappropriately instructed coders to ignore tools at their disposal in
> the computer system they were using that would have caused the coders to
> question the use of ICD-9 code 260 unless the word "Kwashiorkor" was
> present in the medical chart.

<u>Exhibit K</u> ¶ 7.

The irony is that when – in response to a subpoena served by the HHS Inspector

General in the middle of 2009 – Kernan's HIM Director actually went and looked at the

definition of "Kwashiorkor," she was shocked.  <u>Exhibit A</u>, Martha Green deposition at

105.  Coding of Kwashiorkor at Kernan fell to near zero shortly thereafter.

Martha Green is and was the Kernan Director of Health Information Management.

<u>Exhibit A</u>, Martha Green deposition, at 7-10.  She supervised the CDS, Nurse Sewell, and

the coders.  <u>Id</u>. at 13-15; <u>see also id</u>. exhibit 3.  She ostensibly supervised the query

system.  Ms. Green was a member of the Maryland Health Information Management

Association, the Maryland chapter of the American Health Information Management

Association.  <u>Exhibit A</u>, Martha Green deposition at 34.  Ms. Green did not monitor the

query process.  Not until Kernan received a subpoena from the HHS Inspector General in

the middle of 2009 did Ms. Green begin to look at the query system.  Thus, before the

subpoena, she did not audit the query process.  She did not review the activities of her

CDS in issuing queries or in the CDS review of files.  She received no reports about the

18

query process. She was not aware that the query process could or should be audited. She had no meetings with her coders or the CDS about the query process. Her senior management showed no interest in the query process, as they required no reports or information from her about it. Exhibit A, Martha Green deposition at 31, 34, 37-38, 41, 43, 53, 69.

Ms. Green was herself effectively divorced from the query process. She was not involved in the selection of the consultant when Kernan was preparing for APR-DRG. She was not involved in any of the training sessions and appears to have been exposed to none of those training materials. Exhibit A, Martha Green deposition at 127-146. She recognized AHIMA as an authoritative source, Exhibit A, Martha Green deposition at 35, but had not implemented its recommendations about audits. Exhibit A, Martha Green deposition at 145; Exhibit E ¶ 17. And while Kernan itself recognized that leading queries were inappropriate and a source of upcoding, Exhibit C at KH000084 ("Queries that appear to lead the physician to provide a particular response could lead to allegations of inappropriate upcoding"), when confronted at deposition with a query form that the consultant gave Kernan to use, Ms. Green conceded that it was leading. Exhibit A, Martha Green deposition at 87.

The system worked. Data produced by Kernan in the limited discovery to date establishes that Kernan quickly became the leader in Maryland for the billing of

Kwashiorkor as a secondary diagnosis.  One Kernan report showed the billing for

Kwashiorkor and other levels of malnutrition increased dramatically after 2005:

|  | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Kwashiorkor | - | 3 | 104 | 281 |
| Nutritional Marasmus | - | 1 | 6 | 6 |
| Oth Severe Malnutrition | 1 | - | 2 | 7 |
| Malnutrition Mod Degree | 1 | 2 | 32 | 75 |
| Malnutrition Mild Degree | - | 1 | 22 | 82 |
| Protein-Cal Malnut Nec | - | 2 | - | - |
| Protein-Cal Malnut Nos | 23 | 89 | 144 | 85 |

Exhibit A, Martha Green deposition, exhibit 6, at 1.  Another Kernan report compared

Kernan with other Maryland hospitals, demonstrating that the figures above for

Kwashiorkor (104 in 2006; 281 in 2007) outpaced every other Maryland hospital:

| Kwashiorkor Cases by Year | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Kernan | 0 | 3 | 104 | 281 |
| Mercy | 2 | 2 | 1 | 1 |
| Greater Baltimore Medical Center | 10 | 11 | 4 | 11 |
| Sinai Hospital | 2 | 8 | 7 | 13 |
| Hopkins Bayview | 4 | 8 | 5 | 9 |
| Hopkins Hospital | 17 | 10 | 1 | 3 |
| Maryland General | 17 | 12 | 7 | 23 |
| Univ. of Maryland | 23 | 4 | 12 | 52 |

See Exhibit A, Martha Green deposition, excerpts from exhibit 7, at 1.

These numbers skyrocketed even though Kernan experienced no change in its case

mix:

> Q. Would it be accurate for me to say that from your standpoint the
> case mix at Kernan remained essentially the same from 2005 to 2008?

> A. I would think so.

Exhibit A, Martha Green deposition at 69-70.

## III. Argument

### A. Standard of Review Under Rule 56

The standard of review applicable to a motion to dismiss under Rule 12(b)(6) does

not apply because Kernan has attached the medical records of certain patients to the

motion and has argued that they establish, as a matter of uncontradicted fact, that the

coding was not false.  Rule 12(d) provides that under these circumstances the Court

should consider the motion as one for summary judgment.

Summary judgment principles are well established.  Summary judgment shall be

granted "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Rule 56(a); Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).  In order to survive a "properly supported motion for

summary judgment," the non-moving party has the burden to prove "the existence of a

genuine issue of material fact." Turner v. Adaltis U.S.A., Inc., 2005 U.S. Dist. LEXIS

31537, at *4 (D. Md.).  A fact is determined to be material, "if when applied to the

21

substantive law, it affects the outcome of the litigation." Premier Parks, Inc. v. Baltimore Gas & Elec. Co., 37 F. Supp. 2d 732, 734 (D. Md. 1999); see also Feldman's Med. Ctr. Pharm., Inc. v. CareFirst, Inc., 2011 U.S. Dist. LEXIS 123129, at *17 (D. Md.). To support the assertion that a fact is "genuinely disputed," the party must cite "'to particular parts of materials in the record,'" which include, but are not limited to, depositions, affidavits, and documents. Feldman's Med. Ctr. Pharm., Inc., 2011 U.S. Dist. LEXIS 123129 at *19 (citing Fed. Rule Civ. Pro. 56(c)). Further, where the non-moving party has the burden of proof, it is that party's "responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial." Pitter v. Cmty. Imaging Partners, Inc., 735 F. Supp. 2d 379, 389 (D. Md. 2010). The court's role is then "not to 'weigh the evidence and determine the truth of the matter,'" but "to determine whether 'there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be resolved in favor of either party.'" Feldman's Med. Ctr. Pharm., Inc., 2011 U.S. Dist. LEXIS 123129 at *18 (citing Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986)).

Kernan nonetheless argues that Rule 12(b)(6) standards apply, invoking a line of authority that Kernan says permits the consideration of "official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed." ECF paper 10, at 19 n.9, citing, Withhohn v. Fed. Ins. Co., 164 Fed. App'x 395, 396 (4th Cir. 2006).

Kernan posits that since the Complaint here "makes reference to the medical records of particular patients ... this Court may properly consider those records without converting this motion into one for summary judgment." E.g., ECF paper 10, at 19 n.9.

This rule should not extend to the medical records of the four patients referenced in paragraph 29 of the Complaint. This Court is familiar with this issue. The documents to be considered "must 'be central or integral to the claim in the sense that its very existence, and *not the mere information it contains*, gives rise to the legal rights asserted.'" Makowski v. Bovis Lend Lease, 2011 U.S. Dist. LEXIS 27883, at *4 (D. Md.)(Bennett. J.)(original emphasis), citing and quoting, Walker v. S.W.I.F.T. SCRL, 517 F. Supp. 2d 806, 806 (E.D. Va. 2007). Accord Fisher v. Maryland Department of Public Safety and Correctional Services, 2010 U.S. Dist. LEXIS 68772, at *6-*12 (D. Md.)(Motz, J.):

> [D]ocuments attached to the motion to dismiss may be considered, "so long as they are integral to the complaint and authentic. ... To be considered, an attached document must "be central or integral to the claim in the sense that its very existence, and *not the mere information it contains*, gives rise to the legal rights asserted."

Id. At *6 - *7 (original emphasis). "For instance, courts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that 'constitute the core of the parties' contractual relationship' in a breach of contract dispute." Id. At *7. See also Scott v. Nuvell Financial Services,

LLC, 789 F. Supp. 2d 637, 640 n.4 (D. Md. 2011)(Motz, J.)(newspaper classified advertisements not integral, although central issue was a public sale).

Generally speaking, the exceptions apply when a motion to dismiss attaches pleadings or the docket from a previous case, e.g., Pol v. Federal Reserve Bank, 2009 WL 4017164, at *2 (W.D.N.C.); Oren v. Verizon Communications, 224 F.R.D. 527, 529 (D. Me. 2004), EEOC charges and administrative EEOC materials, e.g. Fisher, 2010 U.S. Dist. LEXIS 68772, at *11-*12; Huggins v. North Carolina Dep't of Admin., 2011 WL 3917372, at *3 (E.D.N.C.), settlement agreements, e.g., Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 34 (1st Cir. 2001), public records, Withhohn, 164 Fed. App'x at 396, and contract documents, Makowski, 2011 U.S. Dist. LEXIS 27883, at *5-*6. This is not an exhaustive catalog of instances where courts have addressed different kinds of documents offered with motions to dismiss.

The government's research has, however, disclosed no instance where medical records were so offered, let alone accepted. Nor has the government's extensive but admittedly not completely exhaustive research disclosed an instance where medical records that required expert testimony were so accepted on a motion to dismiss. As in a medical malpractice case, the medical records here require expert interpretation because they involve diagnosing malnutrition and determining if coding Kwashiorkor was appropriate under the circumstances, matters that lay jurors will not be in a position to independently evaluate. Medical malpractice cases are legion, and experts opine as to

whether the medical records evidence or establish the cause of action. So to with personal injury cases where the medical records may arguably establish no causation as a matter of law or no injury, elements of the very tort. And yet we find no judicial decisions accepting medical records on motion in such cases.

The medical records here constitute evidence, but they are not "integral" in the way that the decided cases envision. In the instant case, the false claims occurred, as the Complaint alleges, in the fiscal year after the HSCRC set Kernan's reimbursement rate. Complaint ¶ 12. Every claim for reimbursement that Kernan made in the later year based on the false data from the earlier year is false. Kernan transmitted the false information about its case mix to the HSCRC after the coding took place. The medical records were not transmitted to the HSCRC. They resided at Kernan and were themselves only one part of Kernan's scheme, along with documents relating to the query process. Like query process documents, the medical records are evidence of the scheme, and a comparison of them to the coding is essential to finding improperly coded charts. But the records themselves are not "integral" in the sense envisioned by the exception for which Kernan vies; their very existence does not give rise to the legal rights at issue. It is difficult to see what evidence could not be attached to a motion to dismiss if Kernan's proposed application of this rule were to prevail.

Because the motion attaches materials outside the Complaint and not integral to it, the motion should be considered as one for summary judgment under Rule 12(d).

B. <u>ECF Paper 10: Kernan's Motion for Summary Judgment</u>

Kernan argues that it should prevail for two overall reasons.  Kernan argues that, as a matter of uncontradicted law and fact, falsity cannot be established.  ECF paper 10, at 6-16.  Kernan then argues that there is no evidence legally sufficient to support a finding of scienter under the False Claims Act.  <u>Id</u>. at 16-25.

We take these sets of arguments in turn.

1. The Complaint Alleges, and the Uncontradicted
<u>Facts Establish, Falsity</u>

a. There is a dispute of fact
as to whether the four charts
<u>in Paragraph 29 are miscoded</u>

A centerpiece of Kernan's argument is that, as a matter of uncontradicted fact, it correctly coded Kwashiorkor for the patients identified in the Complaint at paragraph 29.  ECF paper 10, at 20-25.  Kernan has attached the medical charts for these four patients as to whom the Complaint alleges specific falsities.  Complaint, ¶29A. - D.  Kernan then presents lawyer argument that supposedly rebuts the Complaint's allegations of falsity.

Multiple problems attend Kernan's presentation.  First, the examples are just that, examples.  The Complaint alleges that the government's review found an error rate of 23% (the percentage of false diagnoses of malnutrition).  That error rate was arrived at by reference to the government's medical and coding expert's review.  The results of that review are attached.  <u>Exhibit E</u> ¶ 9.  The government shared this information with Kernan

long before filing suit.  Thus, even if Kernan's lawyer argument was correct and undisputed, Kernan fails to rebut the allegation that 23% of its claims were false.

Second, the four examples that Kernan discusses are not even all of the examples cited in the Complaint.  The Complaint details other examples of cases where malnutrition codes were inappropriately used.  Complaint ¶ 30.

Turning to the medical records, the government's expert – Helen Walker, M.D. – has reviewed the defense arguments and has rebutted them.  Dr. Walker's curriculum vitae is attached as an exhibit to her affidavit.  Exhibit E.  She obtained her degree as a medical doctor in 1984 from the University of Maryland School of Medicine.  She practiced internal medicine from 1987 - 2001.  She is also an expert in hospital coding and has served as a consultant to hospitals in that regard since 2002.  Her combination of medical expertise and coding expertise makes her uniquely qualified to opine about the coding issues in this case.

Dr. Walker's affidavit discusses each of these four cases that Kernan has isolated for criticism.  She maintains that the coding in these instances was improper.  Exhibit E, ¶¶ 5-8.

As regards Patient I. R.:

> Kernan states that protein malnutrition was made from low albumin and protein levels and that the patient was prescribed nutritional supplements. The patient was treated with protein supplements at discharge (beneprotein). The diagnosis of protein malnutrition was not made until

27

discharge and the condition not treated until after discharge. Since it was not evaluated, monitored or treated during the admission it is not a significant secondary diagnosis.

The diagnosis of malnutrition is questioned since it cannot be diagnosed from lab results alone. A problem focused history and physical exam are crucial in making this diagnosis. Since the labs were never repeated, they may have been spurious results; this also indicates that malnutrition was not monitored during the admission.

The patient was prescribed nutritional supplements at discharge but not during the admission.  Malnutrition was not treated during the admission.

Since there was no nutrition consult, malnutrition was not evaluated during the admission.

As regards Patient Y. W.:

Kernan states: (1) that protein malnutrition was diagnosed with low calcium and prealbumin levels and edema; (2) Patient was prescribed nutritional supplements; (3) Malnutrition was evaluated, tested, monitored and treated.  It is not clear how the diagnosis of malnutrition was made without a nutritionally focused history or physical exam.  The diagnosis of malnutrition has to be questioned if it was made from a single low prealbumin. The low prealbumin was most likely related the patient's recent trauma. The calcium was most likely low due to the recent blood transfusion and not to malnutrition.

The patient had trace edema noted by the physician in the right leg. This is to be expected after a fracture. Edema in a patient with malnutrition would be bilateral.

Malnutrition was not treated. The patient was placed in a regular diet and there were no orders for nutritional supplements.

28

<u>Malnutrition was not monitored. The prealbumin
(which is what the physician used to make this diagnosis) was
not repeated</u>.

<u>Malnutrition was not evaluated. No nutrition consult
was done</u>.

<u>The coder should have queried the physician for
whether malnutrition should be listed since it was not
included in the Discharge summary</u>.

As regards patient A. B.:

Kernan argues that protein malnutrition was evaluated,
tested, monitored and treated.  <u>However, this condition was
not documented until after discharge and then in response to a
leading query.  If the physician had not documented protein
malnutrition in the medical record during the admission, then
it could not have been evaluated, tested, monitored or treated</u>.

The physician requested a dietary consult on 6/28/07
but does not specify why the consult was needed in either the
order or in his progress note that day.  The patient had both
diabetes and a stroke, which would also warrant a nutritional
evaluation.

A nutritional assessment is done 6/29/07, states that
patient is at high nutritional risk and states: "MD notes protein
malnutrition".  The physician never specified in writing why
the nutritional assessment was needed. The statement "MD
notes protein malnutrition" is not true as there is no
documentation in the chart by the physician that the patient
has protein malnutrition (except for the post discharge query).

It is true that the dietician placed the patient on
nutritional supplements and follows up with the patient.  This
would be expected in patients with diabetes and who have had
a stroke.

29

The patient did have a decubitus ulcer. This patient was immobile with a Braden score of 11; in addition was incontinent of urine and feces. A Braden score of 11 indicates that the patient is at a high risk for developing a decubitus ulcer. The decubitus ulcer was likely related to poor nursing care not poor nutritional status.

The coder suggested the diagnosis of protein malnutrition based on one low prealbumin. A sole abnormal lab may be a spurious value and would not be listed. This should have been confirmed before assigning a diagnosis to it.

Query: confirmed dx of protein malnutrition. The query was leading and should not have been allowed.

As regards Patient M. M.:

Kernan contends that protein malnutrition was evaluated, tested, monitored and treated. Malnutrition was not evaluated. The nutrition consult on 1/3/2008 was specifically to educate the patient about a diabetic diet and not to evaluate for malnutrition.

The prealbumin was monitored, it was repeated once.

Malnutrition was not treated during the admission or at discharge. The nurse practitioner on 1/3/08 stated: "protein malnutrition. Will not add supplements due to uncontrolled diabetes". The discharge diet was for 2000Kcal (protein not added).

Although I do not believe that protein malnutrition exists in this patient, there is consistency with the physician's documentation of the condition. The physician did note protein malnutrition in the Progress notes, the DC Summary, and the DC instructions. It could be argued that since the prealbumin was repeated, the condition was monitored.

In my opinion the coder should have written a query because there is conflicting documentation in the record. The

30

> coder should have questioned the existence of protein
> malnutrition when it was not treated during the admission or
> at discharge and that the nutrition consult did not include an
> evaluation for malnutrition.

Exhibit E, ¶¶ 5-8 (emphasis added).

Thus, the Court has before it expert testimony from a qualified physician and coding expert that Kernan improperly coded Kwashiorkor as a secondary diagnosis on these four charts. Such was the basis for the plaintiff's allegations. Those allegations state a claim. Where, as here however, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. Rule Civ. Pro. 12(d). In the absence of any expert opinion for the defense, the Court should deny the motion. Even if the defense provided an expert opinion in its reply, the Court should still deny the motion because there would still be a genuine issue of fact as to the falsity of the claim that these patients had Kwashiorkor.

### b. This is not a false certification case

Kernan devotes pages to the argument that the Complaint fails to allege falsity because "the Complaint does not allege that Kernan was expressly required to comply with [AHIMA and AHA Coding Clinic industry] standards as a prerequisite to payment of any claims." ECF paper 10, at 7-8, 6-12. "The Complaint contains no reference to any specific Medicare, Medicaid, or Tricare statute, regulation or contractual term that even mentions these standards, let alone that requires hospitals to comply with them." Id. at 8.

Kernan argues that its non-compliance with non-binding standards cannot establish falsity of the claims.  Id.

This is not an express or implied certification case.  The falsity lay in Kernan's reporting to the Maryland HSCRC that patients who did not suffer malnutrition were in fact suffering from Protein Malnutrition or Kwashiorkor.  Kernan created false records, the record of secondary diagnoses that it reported to the HSCRC.  The records were false because the patients who Kernan represented suffered from malnutrition in fact were not malnourished, did not have Kwashiorkor, or should have not been so coded.

The Complaint alleges that the information submitted was false: the patients either did not suffer from malnutrition or the applicable coding principles precluded the use of the code under those circumstances.  Supra at 5-6 (citing Complaint ¶¶ 18, 19 & 30).  The Complaint also alleges that Kernan wanted its physicians and coders to increase the use of malnutrition codes, including Kwashiorkor.  Supra at 4-5 (citing Complaint ¶¶ 14 & 15).  As it happens, uncontradicted evidence, described at length above, supports the allegations.  Supra at 9-21.

It breaks no new legal ground to allege that one who submits false information to authorities charged with setting rates to reimburse hospitals for their costs meets the test for falsity and may be liable under the False Claims Act and related common law theories.  Thus, entities required to submit cost reports to Medicare may be found to have submitted false claims when they upcode or include unrelated costs.  See, e.g., United States v.

32

<u>Bourseau</u>, 531 F.3d 1159 (9th Cir. 2008).  Bourseau, for example, owned and operated a psychiatric hospital that participated in the Medicare program.  Medicare reimbursed hospitals such as these on the basis of cost reports.  The program paid the participating hospital on an interim basis and used the cost report to determine and adjust Medicare's final liability after the year had concluded and the true costs were known.  <u>Id</u>. at 1162. The government sued Bourseau for including non-allowable costs on his cost reports. The Ninth Circuit held that the inclusion of non-allowed or inflated costs on a cost report constituted a false claim.  <u>Id</u>. at 1164-1165 (citing cases).  <u>Accord</u> <u>United States ex rel. A+ Home Care, Inc. v. Medshares Management Group, Inc.</u>, 400 F.3d 428, 446-447 (6th Cir. 2005)(fraudulent employee pension expenses included on Medicare cost reports); <u>United States ex rel. Morris v. Crist</u>, 2000 U.S. Dist. Lexis 21912 (S.D. Ohio)(inclusion of costs related to for-profit enterprise in the DRG bill to Medicare constituted a false claim).  Reporting false information on the cost report or other billing statement will satisfy the falsity element.

<blockquote>c.   Kernan's query forms were leading,<br><u>violating AHIMA guidelines</u></blockquote>

Kernan next argues that as a matter of uncontradicted fact it "did not violate AHIMA guidelines."  ECF paper 10, at 12.  Kernan writes: "The government's own allegations demonstrate that Kernan's query process was neither leading nor presumptive, and did not run afoul of AHIMA's guidelines."  <u>Id</u>. at 12-13.

Record evidence undercuts Kernan's argument.  The record contains two query forms for malnutrition.  Kernan's own Director of Health Information Management admitted under cross examination that one is leading.  <u>Exhibit A,</u> Martha Green deposition at 87 (discussing deposition exhibit 9).  The form she admitted is leading reads:

> Dear Dr. _____:     Date _____
>
> Nutrition notes support clinical criteria of malnutrition for this patient.  <u>If the patient has malnutrition,</u> please document it.
>
> Please document the patient's specific type of malnutrition, if it exists, such as:
>
> Kwashiorkor
> Nutritional marasmus
> Severe malnutrition
> Protein calorie malnutrition

The form referenced in the Complaint is similar.  It reads:

> Clinical evidence indicates the patient has one or more of the conditions noted below.  If you believe the patient has any of these conditions, please document the diagnosis in the patient's progress notes.
>
> Condition:  ___Protein Malnutrition___
>
> Clinical Evidence: __Prealbumin 13 6/27/07__

Complaint ¶ 19.  There is no functional difference between "Nutrition notes support clinical criteria of malnutrition for this patient" and "Clinical evidence indicates the patient has one or more of the conditions noted below."  It is a surprise to hear Kernan admit that one is leading but attempt to maintain that the other is not.  In any case, both

are a very far cry from that which AHIMA and experts in the field – e.g., the Coding

Operations manager at the Mayo Clinic – offer as examples of non-leading forms:

> The following clinical indicators are in the medical record:
> BMI: _____
> Ratio of BMI to IBW _____
> Body Weight Status _____%
> Change in Body Weight Status
> Percentage change in body weight _____ over a period of _____
> Dietary intake:
> Albumin:
> Prealbumin:
> Documented physical findings:
> Stress indicators:
> Please indicate what diagnosis best correlates with these findings:
> Cachexia
> Nutritional Risk
> Malnutrition, severity unknown
> Malnutrition, mild
> Malnutrition, moderate
> Malnutrition, severe, not otherwise specified
> Marasmus
> Kwashiorkor - note - rare in the United States
> Another medical diagnosis:
> Other:
> Cannot be determined.

Exhibit K, at 13, ¶ 9 (note the inclusion of choices "Cannot be determined" and "Other");

accord  Exhibit I at 5-6 (same); Exhibit J at 5 (same).  The difference between the neutral

language ("The following clinical indicators are in the medical record") and the directive

language Kernan used ("Clinical evidence indicates the patient has one or more of the

conditions noted below") establishes that Kernan's forms were leading.

In addition to the language of the form, the Complaint alleges that although the laboratory values Nurse Sewell was told to look for were consistent with many syndromes, Nurse Sewell was directed to query physicians about malnutrition. Complaint ¶ 19. Government experts have testified that querying on malnutrition from one laboratory value such as albumin or pre-albumin, which is consistent with multiple syndromes, injects a new diagnosis and is leading for that reason as well. As Dr. Walker explained:

> 10. Albumin and Pre-Albumin are acute phase proteins. The advent of the inflammatory process – including infection, trauma, surgery, burns and other wounds – elicits the acute phase response. During this acute phase response, these proteins decline and are called negative acute phase reactants. <u>Multiple studies fail to demonstrate a relationship between nutritional status and serum protein levels.</u> Declining intake does not correlate with declining serum protein levels, nor does increased nutritional intake result in improved values. Low levels of albumin and pre-albumin are indicators of morbidity and mortality, and increased levels may reflect the improvement in the overall clinical status of the individual. The focus of nutritional care should be on risk factors like unintended weight loss, undernutrition, declining food/fluid intake and slow wound healing.

> 11. <u>Pre-albumin is a negative acute phase reactant and is consistent with a number of possible causes. Infection is a possible cause. Trauma is a possible cause. Surgery is a possible cause.</u>

> 12. <u>It is not appropriate to use a laboratory value such as a low pre-albumin to query the physician about malnutrition because the low pre-albumin value is equally consistent with other causes than malnutrition. To select malnutrition instead of these other possible causes is an artificial choice.</u> This is especially the case in a rehabilitation hospital such as Kernan where many if not most patients are recovering from recent surgical procedures, which procedures themselves can be responsible for the low pre-albumin value. <u>Querying the physician about malnutrition in such a</u>

circumstance inappropriately singles out one cause over others and violates
AHIMA standards.

  13. I have reviewed the two malnutrition query forms that are in the
record. ... AHIMA guidelines are not to use leading query forms. The form
at Kernan-MR 000364 is leading and violates AHIMA guidelines because it
is leading as it suggests only the desired diagnosis and tells the physician
that the diagnosis is supported by clinical evidence but only includes a sole
prealbumin level.

Exhibit E ¶¶ 10-13 (emphases added).  Kernan's motion does not defend Nurse Sewell's

practice of querying about malnutrition when the laboratory values point to multiple

causes.

  Instead of putting information to the physician about all these syndromes, and

permitting the physician to choose from the myriad of other potential secondary

diagnoses, Kernan's CDS nurse, Nurse Sewell, selected "Protein Malnutrition" and wrote

it on the form, a form that said: "Clinical evidence indicates the patient has one or more

of the conditions noted below."  To select one diagnosis, omitting others, and to present it

in that authoritative manner to a physician sensitized to Kernan's desire to code for

malnutrition, is leading.  It injects a preferred diagnosis.  It violates AHIMA.  It creates a

false medical record.

d. Kernan did in fact violate the
AHA Coding Clinic Requirements

  Kernan argues that as a matter of uncontradicted fact it "did not violate AHA

Coding Clinics."  ECF paper 10, at 14-16.  Kernan hinges its argument on its lawyer's

interpretation of one word in the relevant AHA Coding Clinic: "should."  Id. at 15.  The

37

applicable Coding Clinic applies to situations where the record before the coder is

inconsistent because while the discharge summary is silent about the relevant diagnosis,

evidence in the chart might suggest that the syndrome was evaluated, monitored or

treated.  In such a circumstance, the AHA's authoritative stance is that "the physician

should be asked whether the diagnosis should be added."  Kernan would have it, based on

nothing more than its counsel's argument, that "should" does not mean "should."  Id. at

15-16.  To accept Kernan's argument that "should" does not mean a query needs to issue

would require the Court to accept an interpretation that is at odds with the allegations of

the Complaint and require findings of fact.

As it happens, the only evidence of record on this point undermines Kernan's

argument.  The government's expert has testified that Kernan's counsel's interpretation of

this Coding Clinic is wrong:

> 14. I understand that Kernan has argued in its motion to dismiss that
> it did not violate the AHA Coding Clinics.  I disagree.  According to
> Coding Clinics, when the discharge summary does not include a diagnosis
> that has been mentioned in the body of the medical record and the
> documentation of that diagnosis is not clear or consistent then it is the
> coder's responsibility to query to physician to determine whether that
> diagnosis should be included in the final diagnostic summary.  In several of
> Kernan's charts, the diagnosis of protein malnutrition was documented only
> once in the progress notes and was not mentioned the discharge summary or
> elsewhere in the Medical Record.  This represents inconsistent
> documentation.  In these cases it was the coder's responsibility to have
> queried the physician before listing protein malnutrition.

Exhibit E ¶ 14.

### 2. The Complaint Alleges, and the Uncontradicted Facts Establish, Scienter

#### a. Kernan proposes a level of intent that the FCA explicitly rejected

Turning to scienter, Kernan argues that the Complaint fails to allege facts legally sufficient to establish scienter. ECF paper 10, at 16-17. "There is no allegation that anyone, including any of Kernan's coders, knowingly misrepresented the physician's opinion regarding the presence of malnutrition as documented in the patient's medical chart." ECF paper 10, at 18 (emphasis & footnotes omitted).

Specific intent is not the standard. The False Claims Act provides that "For purposes of this section – (1) the terms "knowing" and "knowingly" -- ... (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). Kernan's argument sets too high a bar.

Kernan's liability rests on the scheme it put in place in response to the HSCRC's adoption of the APR-DRG system that took effect in 2005. Kernan recognized that it could increase its reimbursement by capturing additional false secondary diagnoses. Kernan trained physicians and staff about the importance – the financial importance – of capturing secondary diagnoses. Kernan employed a CDS, Nurse Sewell, and charged her with reviewing every medical chart. Kernan gave Nurse Sewell a list of laboratory values and told her to issue a query on malnutrition if she saw one of those values in the chart. Kernan did not, however, tell Nurse Sewell to ask the physician about all potentially

39

applicable syndromes to which the laboratory value pertained; Kernan singled out Protein

Malnutrition due to its dramatic effect on reimbursement, giving Nurse Sewell a query

form that it admits was leading.  The Kernan physicians frequently did exactly as Kernan

intended, and wrote Protein Malnutrition in the chart.  When the chart reached the coding

staff sometime later, the staff were instructed to type the words Protein Malnutrition into

a computer program that generated ICD-9 code 260, the most extreme form of

malnutrition in existence: Kwashiorkor.  Kernan then ensured that the coders would not

alter this result by relieving the coders of their professional obligation to ensure that the

documentation supported that extreme level of coding.

Kernan intended each of these steps.  It intended that the physicians be alert to

queries about malnutrition.  It intended that Nurse Sewell issue queries based on

laboratory values that were consistent with other syndromes, and gave her leading forms

to use.  In this way, Kernan consciously tailored the physician's choice to a diagnosis that

the patient did not have.  Kernan intended that the coders use the computer system that

yielded the highest ICD-9 code in response to the words Protein Malnutrition and

intended that the coders not look past those words to see if the documentation in the chart

supported the code.

Having put this system in place, Kernan then failed to check whether the data it

generated bore any reasonable relation to reality and, separate and apart from Kernan's

intentional steps described above, this failure of quality control constitutes deliberate

disregard and reckless indifference, meeting the False Claims Act's scienter standards in

this way as well. No audits of the query process occurred. The HIM Director did not

monitor the coders or the CDS. No one else in Kernan's management filled that void.

Government experts have testified that the failure of Kernan's HIM Director to

exercise quality control violated applicable professional and ethical standards. According

to the Coding Operations manager at the Mayo Clinic, coding managers should monitor

the ICD-9 codes. Kernan's usage of ICD-9 code 260 was spiking dramatically, from zero

in 2004 to nearly 300 in 2007, but no one at Kernan paid any attention to it:

> 4. I have reviewed the transcript of the deposition of the Kernan
> Hospital ("Kernan") Director of Health Information Management. Based on
> that testimony, I am of the opinion that important aspects of coding
> supervision were not taking place at Kernan. A supervisor of coding staff
> at a hospital such as the Mayo Clinic or Kernan cannot possibly review the
> coding for every chart and should not be expected to. The supervisor,
> therefore, must audit the staff in various ways. There are a number of ways
> to do this. AHIMA recommendations about auditing are considered
> authoritative. It is apparent to me from the Kernan HIM Director's
> testimony that no auditing was being done of the query process. This is a
> significant lapse.

> 5. One way of auditing is to monitor the usage of various codes. It
> should be possible to obtain a report that shows the incidence of usage for
> the various ICD-9 codes. A report such as this would show that the
> malnutrition codes were at various levels at various times. Over the
> months, the report would for Kernan have shown that the usage of ICD-9
> code 260 was spiking unusually. Any code that goes from zero to
> significant double digits without some change in the hospital's catchment
> area or patient base should be looked at. A significant spike is an indication
> of a potential problem.

> 6. There was evidence of an unusual and significant spike in the use
> of ICD-9 code 260 at Kernan. The increase that the data show should have

41

alerted Kernan management to investigate. The failure to note that change and investigate was a significant lapse.

Exhibit K ¶¶ 4-6.

According to the Director of Health Information Management at National

Rehabilitation Center in Washington, D.C, the Kernan Director of HIM did not

appropriately monitor the coders and violated professional and ethical standards:

> 4. ... From my review of the transcript of the deposition of the Kernan HIM Director, I am of the opinion that these functions were not being effectively performed. The HIM Director at Kernan did not monitor the coders or the CDS appropriately. She was not involved in the day-to-day operation of the coding process. She therefore had no personal and contemporaneous knowledge of the manner in which the Kernan coders were coding medical charts. She also did not adequately monitor the query process.

> 5. ... It is my opinion that the Health Information Management Director that has oversight of the Clinical Documentation Specialist (CDS) functions should ensure that the clinical documentation professional(s) adhere to the following ethical standards. The Health Information Management Director should create or evaluate the documentation in the health record to ensure it is clear, concise, and complete so that accurate and appropriate diagnosis codes are assigned. The Kernan Director of HIM, according to the statements in the deposition transcript, was not acting consistently with these ethical standards.

Exhibit F ¶¶ 4-5 (emphasis added).

Another government expert, Helen Walker, M.D., also agrees that AHIMA

standards require auditing of the query process and that Kernan failed in this completely.

> 17. AHIMA requires that the query process be audited to ensure compliance. AHIMA states in the Practice Brief on Query Guidelines that queries should be reviewed to ensure that they are not leading and do not introduce new information into the medical record. Codes added with

42

inappropriate queries should be removed and those records re-coded. This
audit process should occur quarterly and include a representative samplings
of each query. It was the HIM manager's responsibility to have established
an internal monitoring program for writing queries. It was also her
responsibility to have reviewed the queries to ensure that they were
compliant with AHIMA's guidelines. In her failure to do so, Ms Green
violated AHIMA's code of ethics in engaging in negligent coding practices.

Exhibit E, ¶ 17.  See also Exhibit I at 8 (AHIMA 2001 guidelines about auditing the

query process); Exhibit J at 6-7 (AHIMA 2008 guidelines).

These allegations about the complete failure of quality control also meet the

standard under the False Claims Act for deliberate disregard and reckless indifference.

Those who exercise no quality control do so at their peril.  See, e.g., United States v.

Krizek, 111 F.3d 934 (D.C. Cir 1997).  Dr. Krizek was a psychiatrist.  His wife, Blanka

Krizek, worked in his office and did the billing.  The district court found Dr. Krizek liable

for submitting claims documenting impossibly large amounts of time.  The CPT codes

that Dr. Krizek used were time dependent; if one added up the amount of time Dr.

Krizek's bills said he was spending seeing patients, it exceeded 21 hours on some days.

The district court held Blanka Krizek and Dr. Krizek liable for this false billing.  On

appeal, Dr. Krizek argued that he was not liable because he had delegated authority to

submit claims to his wife.  The D.C. Circuit held that he was no less liable and that his

complete lack of supervision satisfied the intent standard for the False Claims Act.

Accord, United States v. Stevens, 605 F. Supp. 2d 863, 868-869 (W. D. Ky.

2008)(summary judgment granted for plaintiff where physician did not know what codes

43

were being billed for services and took no steps to ensure the billing was correct); United

States v. Mack, 2000 U.S. Dist. Lexis 17367, at *23-24(S.D. Texas)(reckless disregard

shown where physician failed to hire full time billing staff, train part time staff, "or even

to read or require his staff to read the Manual which embodied the contractual

reimbursement agreement" with Medicaid.).  Krizek, Stevens and Mack articulate no

novel proposition of law.  One who submits claims but fails to do the bare minimum

required to ensure the claims are accurate meets the Ostrich-style standard of the False

Claims Act: deliberate ignorance and reckless disregard.

b. The miscoded charts are objective
facts, not matters of opinion

Kernan argues that it should not be held liable for honest mistakes or differences

of opinion. Kernan argues that there was no "objective falsehood." ECF paper 10, at 17.

Kernan also argues that "In this case, Kernan's coders could not reasonably classify as

true or false the medical opinion of a treating physician who determined malnutrition was

present in his or her patient." ECF paper 10, at 17.

There is an objective falsehood if the patient does not suffer from malnutrition.

There is also an objective falsehood if the coder uses a code that is unwarranted because

there is conflicting information in the chart, a question that is subject to answer upon

audit (either by Kernan, had it ever chosen to do an audit, or – as here – by the

government after the fact).  If a coder were to code a diagnosis in the face of conflicting,

inconsistent or ambiguous documentation in the chart, this is objectively determinable and

44

objectively wrong.  And just such a conflict exists here – according to the Complaint (see

supra at 7-8) and according to plaintiff's experts – where the hospital requires the coder to

use ICD-9 code 260 when the words "Protein Malnutrition" are in the chart.  ICD-9 code

260 is labeled "Kwashiorkor."  A coder who sees that should look up the definition of

"Kwashiorkor" and realize that this is not your garden-variety protein malnutrition.  See

supra at 15-18.  There is a conflict; it needs resolution.  This is an objective matter, and

not the subject of opinion:

> 15. One of the basic rules of coding is that further research is done if
> the title of the code suggested by the index clearly does not identify the
> condition correctly.  Protein malnutrition codes to ICD-9 code 260
> "Kwashiorkor".  A description of kwashiorkor follows the code title and
> states: "Nutritional edema with dyspigmentation of skin and hair".  This is
> further defined in the 2008 ICD-9-CM tabular index under code 260 as
> "Protein-calorie malabsorption or malnutrition of children, characterized by
> tissue wasting, dehydration and subcutatneous fat depletion; may occur with
> infectious disease; also called infantile atrophy".  Coders have independent
> obligations to review the documentation in the chart before coding
> diagnoses.  If there is conflicting, inconsistent or ambiguous information in
> the chart, the coder should not code the diagnosis but should query the
> physician.  Even where there is no conflict, if there is a diagnosis listed for
> which no supporting documentation appears in the body of the medical
> record, the physician should be consulted before assigning a code.

> 16. I have reviewed the deposition transcript of the Kernan HIM
> Director.  The Kernan HIM Director's instruction to coders to use ICD-9
> code 260 whenever the words "Protein Malnutrition" appeared violated
> each of these principles articulated above in paragraph 15.  It lead to a
> situation where a chart that had conflicting and inconsistent information
> could be coded – based solely on a low pre-albumin laboratory value – as
> having the highest form of malnutrition.  In addition, one of the basic rules
> of coding was ignored when the coders did not do further research to
> ascertain the validity of coding protein malnutrition as "kwashiorkor."  It

violates coding principles for an HIM Director to suspend coders' judgment in this way.

Exhibit E, ¶¶ 15-16.  These files were objectively, determinably and verifiably false. Opinion has nothing to do with it.

### 3. Count III: Breach of Fiduciary Duty

In Count III, the Complaint alleged that Kernan had a fiduciary duty by virtue of its place in the "three-way relationship" between the patient, itself and the federally funded health care program.  Complaint ¶¶ 44-46.  The Complaint alleged that Kernan breached this fiduciary duty.  Complaint ¶ 49.  The federal health care benefits programs were accordingly harmed when Kernan's breach caused them to pay Kernan more than Kernan was properly owed had the information been true.  Complaint ¶ 50.  These allegations meet the test that the Court of Appeals has articulated for breach of fiduciary duty.  Alleco v. Harry & Jeanette Weinberg Foundation, Inc., 340 Md. 176, 192, 665 A.2d 1038, 1046 (1995).  Kernan does not contend that the Complaint fails to allege the elements of the cause of action.

Kernan argues that the cause of action does not exist as a free standing cause of action for money damages.  ECF paper 10, at 26-27.  The Complaint here, however, is also in equity.  As Kernan aptly notes: "Kann and its progeny do not obliterate the possibility of a separate cause of action for breach of fiduciary duty in an action seeking equitable relief."  ECF paper 10, at 26, quoting, Wasserman v. Kay, 197 Md. App. 586, 631, 14 A.3d 1193, 1219 (2011).  Equitable remedies lie in this case under Count III.  The

Complaint, while it seeks a damages award under Count III, also seeks disgorgement and imposition of a constructive trust. Complaint, at 25-26, ¶¶ F, G. Count III states a cause of action for equitable remedies.

### C. Rule 9(b)

Kernan argues that the Complaint should be dismissed because it fails to satisfy Rule 9(b)'s heightened pleading standard "because it fails to identify any specific claims submitted to the government or the dates on which the claims were submitted." ECF paper 6, at 7. "The Complaint identifies numerous medical records alleged to have been miscoded, either because Kernan failed to comply with non-binding industry standards published by the AHIMA and/or AHA ... or because 'kwashiorkor' was coded as a secondary condition 'when the medical record did not justify it' ... but not a single actual false claim is identified anywhere in the Complaint." Id. ("The Complaint does not identify any specific claims actually submitted to the government or any dates any claims were submitted.").

To use false information in one fiscal year to set a rate for payment in a later fiscal year states a claim under the False Claims Act. The Complaint alleges that Kernan's compensation for in-patient services was a function of its case mix for the prior year. In that prior year, Kernan reported false secondary diagnoses of malnutrition to the Maryland HSCRC, the rate-setting body. Those falsely reported diagnoses factored into the rate that the HSCRC set for later years. Complaint ¶ 11.

47

The false information here was the false diagnoses of malnutrition and Kwashiorkor. The Complaint identifies specific instances where Kernan falsely coded malnutrition. Id. ¶¶ 29-31. The Complaint alleged that 23% of the instances of malnutrition were false. Id. ¶ 32. The Complaint alleges that claims based on rates established by these data were false and fraudulent. Id. ¶ 11. The submission of information on cost reports to Medicare constitutes the provision of false information that lays the basis for false claims. See, e.g., supra at 33, citing, Bourseau, 531 F.3d at 1162-1164; United States ex rel. A+ Home Care, Inc., 400 F.3d at 446-447.

Kernan next argues that the Complaint fails to satisfy Rule 9(b) because it fails to identify "any specific employee of Kernan Hospital alleged to have been involved in the submission of any false claims." ECF paper 6, at 9, citing, United States ex rel. Dugan v. ADT Security Services, Inc., 2009 WL 3232080, * 14 (D. Md). The purpose of Rule 9(b) against a corporate defendant is, among other things, to give the defendant notice of the identity of the persons involved in the fraud. Id. To that end, Judge Chasanow in Dugan cited authority requiring a plaintiff to specify the "identity and/or role of the individual employee involved in the alleged fraud." Id. The Complaint in this case identifies the employees by role: the Clinical Documentation Specialist, the coders and the persons who supervised them. Complaint ¶¶ 19-21. The complaint made it clear that the problem lay with the Clinical Documentation Specialist and the coding staff, all of which are allege to reside in the Health Information Management ("HIM") Department. The Complaint

apprises Kernan of the persons alleged to have been involved in the submission of false information.

The Complaint does not name these persons.  It could have.  Kernan's HIM director testified as to the identity of these persons at deposition.  Kernan's litigation counsel and in-house counsel from the Office of General Counsel for the University of Maryland Medical System attended that deposition and no doubt have a copy of the transcript.  Exhibit 3 to that deposition identified the coders and the Clinical Documentation Specialist.  The deponent, the Director of HIM, testified that she directly oversaw these persons and that she expected them to code Kwashiorkor when the computer program yielded that code, irrespective of the evidence in the medical chart. Exhibit A at 99-105.  Kernan's Director of HIM testified that even though she had no idea what Kwashiorkor is or that it was the same as "Protein Malnutrition," she expected coders to follow the computer to code Kwashiorkor when the words "protein malnutrition" were in the chart because the computer produced a drop-down series of choices with Kwashiorkor at the top of the list.  Id. at 102-104.  Kernan is well aware of the persons involved in this.  They are Martha Green, Kernan's Director of HIM; Ann Sewell, the Clinical Documentation Specialist, and the coding staff identified on Green deposition exhibit 3.  There is no surprise for Kernan.

Kernan argues that the Complaint fails to satisfy Rule 9(b)'s requirement "to detail the content of any false representations."  ECF paper 6, at 10.  The Complaint alleges that

Kernan gave the HSCRC false information about the secondary diagnoses that applied to

its patients and that the HSCRC used that information to set Kernan's reimbursement rate

for the next fiscal year.  The Complaint recited four instances of false information in

Paragraph 29, and thirteen more in Paragraphs 30 & 31.  The Complaint alleges that the

government audit developed an error rate of 23%, in other words, that Kernan improperly

coded malnutrition as a secondary diagnosis in 23% of the charts in the sample the

government audited.  The government's evidence supports the allegation.

IV. Conclusion

     The motions should be denied.

                    Respectfully submitted,

                    Rod J. Rosenstein
                    United States Attorney

By:_____
                    Allen F. Loucks
                    Assistant United States Attorney
                    36 South Charles Street
                    Fourth Floor
                    Baltimore, Maryland 21201
                    (410) 209-4800