USA VS. KERNAN HOSPITAL

DEPOSITION OF MARTHA GREEN

SEPTEMBER 22, 2011

ART MILLER & ASSOCIATES
PHONE  410-494-8300
FAX  410-385-1883
www.artmiller.com

                    IN THE MATTER OF


- - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,          :

                                   :

                                   : DCN NO.:

             vs.                   : H 37 1598

                                   :

KERNAN HOSPITAL,                   :

                                   :

                                   :

- - - - - - - - - - - - - -

                            Baltimore, Maryland

                  Thursday, September 22, 2011

Deposition of:

                  MARTHA GREEN,

called for oral examination by counsel for United

States, pursuant to notice, at the offices of

United States Attorney's Office District of

Maryland, 36 South Charles Street, 4th Floor,

Baltimore, Maryland, before Sylvia L. Jacobs,

Court Reporter, of Art Miller and Associates, a

Notary Public in and for the State of Maryland,

beginning at 9:35 a.m., when were present on

behalf of the respective parties:

Page 2

1   APPEARANCES:
2
3
4   On behalf of United States of America:
5        ALLEN F. LOUCKS, ESQUIRE
6        United States Attorney's Office
7        District of Maryland
8        36 South Charles Street
9        4th Floor
10       Baltimore, Maryland  21201
11       (410) 209-4883
12
13
14
15  On behalf of Kernan Hospital University of
16   Maryland Medical System:
17       RAY M. SHEPARD, ESQUIRE
18       Smith, Gildea & Schmidt, LLC
19       600 Washington Avenue, Suite 200
20       Towson, Maryland  21204
21       (410) 821-0070
22
23
24
25

Page 3

1   APPEARANCES:  (Continued)
2        On behalf of University of Maryland
3         Medical System:
4        SANDRA H. BENZER, ESQUIRE
5        Office of the General Counsel
6        110 South Paca Street
7        2nd Floor, PP-2-S-155
8        Baltimore, Maryland  21201
9        (410) 328-2023
10
11
12  ALSO PRESENT:
13       Hillary DeVol
14
15             * * * * *
16
17
18
19
20
21
22
23
24
25

Page 4

1              C O N T E N T S
2
3   EXAMINATION BY:                 PAGE
4     Counsel for United States of America     6
5
6   GREEN DEPOSITION EXHIBITS: *          PAGE
7   1  Employee List              13
8   2  Health Information Management Department
9      Organizational Chart         15
10  3  Organizational Chart         15
11  4  CDI Report Card              49
12  5  Report                  56
13  6  Trending of Malnutrition and Respiratory
14     Failure              71
15  7  Cases by Year            73
16  8  HSCRC Case Mix Data          73
17  9  Malnutrition note            99
18  10 Rehabilitation Staff Meeting 6/16/08   109
19  11 E-mail dated 3/24/05         115
20  12 Interview Questions          116
21  13 Computer printout            117
22  14 ICD-9 code book              133
23  15 Orthopedic Surgery DOC Pocket Tool     140
24  16 Laboratory Report            142
25

Page 5

1   EXHIBITS:  (Continued)            PAGE
2   17 Kernan Hospital CDI Project Planning
3      Guide               149
4   18 Proposal for Severity Readiness Assessment
5      Services 6/25/04            151
6   19 HP3 training documents      153
7   20 APR Readiness Assessment Results   155
8   21 Preparing for APR-DRGs 6/22/04     163
9   21-A Preparing for APR-DRGs 6/22/04     164
10  22 Introduction to Severity Draft 9/8/04  172
11  23 Introduction to Severity 9/30/04    173
12  24 Preparedness for Severity       173
13
14  (* Exhibits retained by counsel for the United
15        States of America.)
16
17
18
19
20
21
22
23
24
25

d432362f-11e7-42eb-a42b-55bc22e6801c

Page 6

P R O C E E D I N G S
1   WHEREUPON,
2              MARTHA GREEN,
3   called as a witness, and having been first duly
4   sworn, was examined and testified as follows:
5        EXAMINATION BY COUNSEL FOR UNITED
6   STATES OF AMERICA
7   BY MR. LOUCKS:
8        Q   Would you please state your name for
9   the record?
10       A   Martha A. or Ann Green.
11       Q   Ms. Green, my name is Allen Loucks; I'm
12  an assistant U.S. attorney here in Baltimore.
13  Have you given a deposition before?
14       A   Yes.  It's been a while, though, and
15  they actually came out to the hospital.  It's been
16  a long time.
17       Q   Okay.  So --
18       A   And it was just basically about a
19  record, to testify to the record.
20       Q   So you're familiar with the general
21  ground rules then, I guess.
22       A   Uh-huh.
23       Q   One ground rule is you need to answer
24  yes or no.

Page 7

1        A   Okay.
2        Q   I'll try to remind you.  And second and
3   most important is if I ask a question that doesn't
4   make sense to you for any reason please let me
5   know.
6        A   Okay.
7        Q   We'll fix it, okay?
8        A   Uh-huh.
9        Q   What is your present position?
10       A   I'm the director of the Health
11  Information Management Department or HIM.
12       Q   Okay.  How long have you been the
13  director of HIM?
14       A   Since 1996.  '96.  Sorry.  1996, but
15  I've been at the hospital for 32 years.
16       Q   Would you give me a brief rundown of
17  what your history at the hospital has been?
18       A   My history?
19       Q   Yeah.  Your employment history.
20       A   My employment?
21       Q   Yes.
22       A   Well, I first went there in 1974.  Yes,
23  1974, as a medical transcriptionist where I stayed
24  for two and a half years doing medical
25  transcription.

Page 8

1        I left and I went to a place called
2   Delta Dictation out in Columbia where I did
3   transcription, medical transcription.
4             And then in 1977, yeah, 1977 a position
5   opened in medical records for a medical
6   transcriptionist.
7        Q   At Kernan?
8        A   At Kernan.  So I applied for it and got
9   the position.  I did transcription there up
10  until -- I probably did transcription for about
11  five years, and then I was made supervisor of
12  transcription.
13            And then in 1996-'97, I can't remember
14  the exact year, but the director of medical
15  records retired at the point and was asked who
16  could run the day-to-day functions until, you
17  know, they hired someone else, and she volunteered
18  me to run the day-to-day functions.
19            So at that point I was put as the
20  coordinator of medical records.  And then, I'm not
21  sure how many years after that, I stayed as a
22  coordinator.  They moved me up to manager.  I went
23  back to school, received my RHIT, my
24  certification, and then I was made director.
25       Q   Okay.  When we started you said you

Page 9

1   were director from 1996 --
2        A   Well, I said --
3        Q   -- so you're dating that from when you
4   became coordinator?
5        A   Yeah.  Because I was doing all the
6   functions of a director.  I just didn't have the
7   --
8        Q   -- the title?
9        A   -- the title, yeah.
10       Q   You became coordinator in '96 or '97.
11  Then you became the manager I think you said.
12       A   Uh-huh.
13       Q   Yes?
14       A   Yes.  Oh, I'm sorry.  Thank you.  Yes.
15       Q   Do you recall what date it was you
16  became the manager?
17       A   No, I don't.  I'm sorry.
18       Q   That would be manager of HIM?
19       A   Do I remember the date I became
20  manager?
21       Q   When you became manager, was it manager
22  of HIM?
23       A   Oh, yes.  I've always stayed in medical
24  records.  I'm sorry.
25       Q   Okay.  Specifically with respect to

3 (Pages 6 to 9)

d432362f-11e7-42eb-a42b-55bc22e6801c

1  your title, though, manager of HIM?
2      A   Yes, manager of HIM.
3      Q   You mentioned a certification, the
4  RHIT?
5      A   Right.  Registered health information
6  technologist.
7      Q   When was that?
8      A   I'm sorry.  Let me think.  Six years
9  ago.
10     Q   Okay.  2005?
11     A   Yes.  About 2005.  Somewhere around
12  2005.
13     Q   Okay.  And when did you acquire the
14  title of director of HIM?
15     A   Soon after 2005 --
16     Q   Okay.
17     A   -- because they wanted me to go back
18  and get my RHIT.
19     Q   What are your duties as director of
20  HIM?
21     A   Well, I oversee the coding.  I oversee
22  transcription.  I do the budget.  I do anything
23  that has to do with accounts that our accounting
24  department wants me to look into.  Reviewing
25  records.  I do audits on records, chart audits for

1  compliance with Joint Commission.  I'm the
2  compliance officer for the hospital, as well as
3  security officer.  Oh, my gosh.  I'm trying to
4  think of everything.  I'm responsible for updating
5  the physician database with their NPI and MedChi
6  numbers.  I work very closely with our admissions
7  departments in ensuring that the accounts are
8  registered in correctly so our coders can get the
9  charts coded.  Let me see.  Did I say the budget?
10     Q   You did.
11     A   I did say budget.
12     Q   Okay.  Let's -- how many people do you
13  supervise presently?
14     A   Fifteen.
15     Q   How many of those people are involved
16  in coding?
17     A   Let's see.  I have two full-time
18  inpatient coders, one full-time outpatient coder,
19  and a per diem outpatient coder.  We're just
20  getting ready to hire a new per diem outpatient
21  coder.
22     Q   Let's see if I can make this a little
23  easier.  Okay.
24         MR. LOUCKS:  Let's go off the record
25  for a minute.

1         (Pause in the proceedings.)
2         (Deposition Exhibit No. 1 marked for
3          identification and retained by
4          counsel.)
5      Q   Let me show you what we've marked as
6  Exhibit No. 1.
7      A   Uh-huh.
8      Q   This was produced to us in response to
9  the subpoena, and my question is:  Are these
10  individuals who worked in coding at Kernan
11  Hospital?
12     A   They were at the time, yes.
13     Q   These where people that you supervised?
14     A   Yes.
15     Q   Are any of these people still presently
16  employed as coders?
17     A   Yes.
18     Q   Who?
19     A   Elana Michenzi, Kathleen Habershon and
20  Enver Mullin.  Jewel we're getting ready to hire
21  back, though.  It's now Jewel Williamson.  It was
22  Tomlin.  She's an outpatient coder.  She was doing
23  some inpatient coding at the time.
24     Q   Okay.  So the folks -- and those names
25  all in the -- they're sort of boxed off, if you

1  will.  Do you see what I mean?  And then above
2  that there's -- well, let me do it this way.
3  There's Mae Cain, Debra Washington, Cecelia Lange
4  and Kim Adams.
5      A   Uh-huh.  Correct.
6      Q   Do you see those names?  Those
7  individuals used to work for you in coding?
8      A   Yes, they did.
9      Q   And they do not any longer?
10     A   No.
11     Q   Are there other people that you recall
12  who worked in coding who are no longer employed at
13  Kernan who are not identified on this list?
14     A   No.
15     Q   So this would represent anybody who
16  worked in coding from 1996 to the present?
17     A   Correct.  Yes.
18         (Deposition Exhibit No. 2 marked
19          for identification and retained by
20          counsel.)
21     Q   Let me show you exhibits --
22         MR. SHEPARD:  Do you want these back?
23         MR. LOUCKS:  Just make a stack over
24  there.
25         MR. SHEPARD:  Okay.

1       MR. LOUCKS:  That's probably the
2   easiest thing.
3       Q   Let me show you Exhibit 2.
4       A   Uh-huh.
5       Q   And we can do three at the same time, I
6   think.
7       (Deposition Exhibit No. 3 marked for
8       identification and retained by
9       counsel.)
10      Q   These purport to be organizational
11  charts.  Do you agree with that?
12      A   Yes.
13      Q   Are these accurate organizational
14  charts?
15      A   Exhibit 2, I now have a supervisor of
16  the file room.
17      Q   Okay.
18      A   That's the only thing that's changed.
19  And the file room reports -- most of the file room
20  duties report to the supervisor of the file room.
21  So the inpatient, outpatient coding, CDI,
22  transcription all report directly in to me.
23      Q   So each of the coders reports directly
24  to you, but now you've got a supervisor of the
25  file room?

1       A   Yes.
2       Q   Exhibit 3 appears to show that; is that
3   correct?
4       A   Yes.  Only some of these people in here
5   are no longer employed.
6       Q   People in the file room?
7       A   Yes.  People in the file room and also
8   coding.  There are two people that are no longer
9   employed in coding.
10      Q   Which ones are they?
11      A   Arlene Ludwig.  She was a per diem, and
12  Jewel Tomlin.
13      Q   That's the one you're hiring back?
14      A   We're hiring her back, correct.
15      Q   Good.
16      MR. SHEPARD:  Move to the stack?
17      MR. LOUCKS:  Yep.  Thank you.
18      Q   Okay.  What I'd like to ask you now
19  about is coding and how coding works.  How do --
20  and maybe the best way to get into this is to ask
21  you how is it that the coders do their job?  What
22  to you expect of the coders?  And if there's a
23  difference the people between inpatient or
24  outpatient maybe you could describe that for me
25  too.

1       A   Sure.  I'll start with the inpatient
2   coding.  The inpatient coders are expected to code
3   anywhere from 10 to 12 rehab charts per day, which
4   is probably a little bit less than other
5   hospitals, but they also have what's called a FEM,
6   Functional Independent Measure that has to be
7   filled out on all rehab patients.  And what
8   they're basically doing is they're -- after they
9   code the chart, they pull up the FEM form, and
10  they have to fill in the diagnosis on the FEM
11  form.
12      Q   How do they review a chart?  Go through
13  the process for me of how you expect one of these
14  inpatient coders to review a chart.
15      A   Now or back then because things have
16  changed now that we're on the EMR.
17      Q   I'm interested in the time from about
18  2004-2005 --
19      A   Okay.
20      Q   -- to the present.
21      A   The charts would be picked up by our
22  file room daily.  They would go to the unit and
23  they would pick up the discharge charts from the
24  previous day.
25      Q   Uh-huh.

1       A   They would bring them back, and we have
2   a bin in the department, and the charts would be
3   assembled and then put in the bin for the coders.
4   And then they would take one out, and they usually
5   start with the history and physical, looking at
6   the history and physical and looking at any
7   transfer notes from the other facility to
8   determine what's happening, what's going on with
9   the patient, why did the patient come to Kernan.
10  So then they start going through the record.  With
11  the paper, they would manually go through the
12  record.
13      They look at the H&P.  They look at the
14  progress notes.  They look at any labs, and the
15  only reason why they're looking at labs would is
16  to make sure they're there because they don't know
17  how to read labs.  They're making sure that the
18  information is there.
19      Q   They're not expected to know how to --
20      A   No.
21      Q   -- read or interpret the lab --
22      A   No.
23      Q   -- results?
24      A   No.  Only our clinical documentation
25  specialist would do that.

Page 18

1      Then they would -- if the patient had a
2  procedure done, they would look at the operative
3  report, and they would also look at the anesthesia
4  record and post-anesthesia record.
5      Q   And are they -- they're working on a
6  clean slate in terms of nobody else has looked at
7  these files in terms of figuring out how to code
8  them yet?
9      A   Correct.  They're the first.  They
10 immediately go to them.
11     Q   Okay.  How long do you expect it will
12 take a coder to do this process?
13     A   We figured out between 15 and 20
14 minutes a chart.
15     Q   Okay.
16     A   Somewhere around there to go completely
17 through the chart, 15 to 20 minutes.
18     Q   Okay.  And so they enter the coding
19 into a database?
20     A   They enter it into our encoder, which
21 at that time it was QuadraMed Quantim, our
22 encoder.
23     Q   Encoder?
24     A   Yeah.  It's called e-n-c-o-d-e-r,
25 encoder.

Page 19

1      Q   And?
2      A   And then they would do what we call
3  abstract the record, and that's looking for
4  specific data that HSCRC says that we have to
5  capture on patients, like the discharge
6  disposition, the admit source.
7      Q   Okay.
8      A   So --
9      Q   What is QuadraMed?
10     A   QuadraMed is the company that --
11     Q   They developed --
12     A   -- they developed --
13     Q   -- the encoder program?
14     A   Correct.
15     Q   Okay.  And, actually, it was called
16 Quantim, Q-u-a-n-t-i-m.
17     Q   Okay.  So the coders enter this
18 information into the encoder program?
19     A   Correct.
20     Q   And --
21     A   By using the ICD-9 book, the coding
22 books and the coding guidelines because there are
23 separate books that you use.  You've got your
24 ICD-9, and then you've got your coding guidelines.
25 So you have to check both.

Page 20

1      Q   Which coding guidelines do the coders
2  use?
3      A   AHIMA, American --
4      Q   -- Health Information --
5      A   -- Health Information.  No.  No, not
6  that one.
7          THE COURT REPORTER:  Whoa.  Wait a
8  minute.
9      Q   We do need to go one at a time.
10     A   Oh, okay.
11     Q   I'll try to do better at that.
12     A   Sorry.  I'm going too fast.
13     Q   Let me ask it this way.
14     A   Yes.
15     Q   What are the resources that the coders
16 have at their disposal to code these cases?
17     A   They have ICD-9, CPT and the coding
18 guidelines, AHA.  Sorry.  Coding guidelines.
19 American Health Association coding guidelines.
20     Q   How about Coding Clinics?
21     A   And Coding Clinics.  Now, a lot of that
22 stuff is already -- was built into the QuadraMed
23 system, so they could launch the coding guidelines
24 from in there.  They could launch the CPT codes,
25 but we had books too.

Page 21

1      Q   Okay.  And the end result of this
2  coding process is to generate essentially a bill?
3      A   Correct.  Yes.
4      Q   What is the expectation for when that
5  bill would go out?
6      A   We like to see the charts coded within
7  24 to 48 hours.  Now, that differs at the end of
8  the month.  We need to make sure that all the
9  charts are coded by the fifth business day of the
10 next month.
11     Q   Okay.  And the bills go out as soon as
12 the charts are coded?
13     A   No.  There's a seven day bill hold.  So
14 we have seven days before the bill drops.
15     Q   Why is that?
16     A   Because they hold the bill to wait for
17 late charges, charges that are coming in from
18 therapy and the other different departments.
19 We're all manual.
20     Q   Okay.  Is the process essentially the
21 same for the outpatient?
22     A   Pretty much the same.  They're using --
23 the outpatient coders use the same system.  They
24 have access to the same coding materials, yes.
25 Except that their charts are not -- they're out --

6 (Pages 18 to 21)

1  our outpatient coders, some of our outpatient
2  coders were on-site.  Some of them were off-site.
3  We had -- I have an outpatient coder that's in
4  Texas, and I have one outpatient coder that's in
5  West Virginia.
6      Q   Okay.  All right.  So then you
7  mentioned the CDIs.  What are the CDIs?
8      A   Well, the CDS.
9      Q   Yes.
10     A   The clinical documentation specialist,
11  and we had one.  That was it.
12     Q   Who was that?
13     A   That's Ann Sewell.
14     Q   How does she spell her last name?
15     A   S, as in Sam, e-w-e-l-l.
16     Q   Okay.  She's still employed?
17     A   Yes.
18     Q   When did she come on?
19     A   She came on -- well, she's been at the
20  hospital for years.  She was actually employed
21  over at -- what was the hospital that closed and
22  moved to Kernan?  I can't remember.  Any way, she
23  came over from that hospital and worked in the
24  quality department.
25     Q   When did she begin as a CDS?

1      A   In 2005.
2      Q   Is she the only CDS at Kernan from 2005
3  to the present?
4      A   No.  We hired another one, Starmain
5  Reagen, R-e-a-g-e-n.  She's been with us as a CDS
6  for probably about a year and a half, and she's
7  leaving.  She's moving back to Florida.
8      Q   Okay.  Why is she leaving?
9      A   She has a house in Florida.
10     Q   Are these two folks, Ann Sewell and
11  Starmain Reagen the only two CDSs at Kernan since
12  2005?
13     A   No.  We had someone named Lori.  And to
14  tell you the truth, I can't remember her name.
15  She was not there long.  She was there less than
16  six months.
17     Q   Okay.
18     A   She did not meet the requirements.
19     Q   Was she closer to 2005, or was she more
20  --
21     A   Oh, no.  This was recent.
22     Q   Recent.  Okay.
23     A   This was within the last -- this has
24  been within the last two years.
25     Q   Got it.  Have we now got all the CDSs?

1      A   Yes.  That's it.
2      Q   And the CDSs are responsible for what?
3      A   When the patient is admitted to Kernan,
4  they go up on the unit.  They review all the
5  transfer records from the previous hospital.
6      Q   The CDSs go to the unit.  I'm with you.
7      A   They review the record.  They have a
8  worksheet that they use that they are jotting down
9  information that they see in the record.  They're
10  looking for diagnosis, any procedures that the
11  patient may have had at the other hospital.  So
12  they're reviewing the record for documentation
13  requirements.
14     Q   Okay.  And do they get involved in
15  coding?
16     A   Yes.  They work directly with the
17  coders.  They don't code, but they -- the coders
18  they -- we're set up a little bit different.  Our
19  coders and our clinical documentation specialists
20  sit in the same room.  So they'll come back, Ann
21  will review the record, and she will -- if she has
22  questions about certain diagnosis she will talk
23  with the coders about, you know.  They'll just
24  talk about what's going on clinically with the
25  patient because the coders aren't clinicians.

1  She's our clinician so they work together.
2      Q   Is she an R.N. or an M.D.?
3      A   She's an R.N.
4      Q   Queries get issued, yes?
5      A   Yes.
6      Q   Describe that process for me, please.
7      A   While Ann is reviewing the records --
8  now, back then because I'll tell you -- back then
9  we had these query slips that HP3 supplied us when
10  they did our training.  So if Ann saw an abnormal
11  lab or she wasn't sure of a diagnosis, say, the
12  physician wasn't specific enough, we needed
13  clarification on a diagnosis then Ann would query
14  the physician by putting it on the query slips,
15  sticking it to the chart and then when the
16  physician did his daily rounds he would answer the
17  query and he would agree or disagree with it.
18     Q   And he would take the sticky note
19  off -- would he document it on the sticky note or
20  document it in the chart?
21     A   Sometimes they would document on the
22  sticky note, but a lot of times because they
23  didn't stick too good to the charts they would be
24  misplaced or they weren't on the charts when we
25  picked them up, but they would document in the

Page 26

1 progress note section of the record --
2     Q    And by sticky note --
3     A    -- if they agree.
4     Q    And by sticky notes you mean
5 something --
6     A    Like a Post-it note.  Uh-huh.
7     Q    Okay.  Ann was the individual who was
8 initiating the queries?
9     A    Yes.
10     Q    And she was initiating the queries from
11 2005 to the present?
12     A    Yes.
13     Q    She would have initiated all the
14 queries from 2005 to the present, except for those
15 that Starmain Reagen and Lori might have also
16 initiated?
17     A    Correct.  Yes.
18     Q    Fair for me to say that Ann initiated
19 the vast majority of all --
20     A    Yes.
21     Q    -- the queries?
22     A    Yes.
23     Q    And you indicated that it was back then
24 that query slips were used, leaving me to suspect
25 that maybe the process has changed.

Page 27

1     A    Yes.  When we went to the EMR.  When we
2 went to the electronic medical record, we now have
3 to put the queries in the EMR.
4     Q    When did you go to the electronic
5 medical record?
6     A    Almost three years ago.  About two and
7 a half years ago.
8     Q    2009?  2008?
9     A    2008.
10     Q    So --
11     A    Yes.
12     Q    -- presently -- okay.  So what I'd like
13 you to do is focus first on the back then --
14     A    Okay.
15     Q    -- process and walk me through how a
16 query would be made and what the process would be
17 in coding for that.
18     A    Okay.  Sure.  So after she reviewed the
19 records, if she had a query she would put the
20 query on the Post-it note, leave it for the
21 physician.  She would go back up the next day and
22 see if he answered the query.
23     Q    Where would she leave the note?
24     A    On the medical record.
25     Q    And then she'd leave the medical

Page 28

1 record --
2     A    I'm sorry.  That would be concurrently.
3     Q    I understand.
4     A    So concurrently this is going on.
5     Q    Yeah.  We're talking all concurrently
6 now, right?
7     A    Right.
8     Q    Was there any retrospective review
9 done?
10     A    The only retrospective review was when
11 we would have our quarterly chart audits, and the
12 auditor would say we need clarification on this
13 diagnosis.  Then we would do retrospective
14 querying.
15     Q    Let's hold that aside for the moment.
16     A    Okay.
17     Q    I want to keep with you the concurrent
18 process you were describing.
19     A    Uh-huh.
20     Q    The sticky note goes on the chart.  And
21 how is this communicated to the doctor that
22 there's a question?
23     A    They were trained.  When HP3 came out
24 and trained us, we were told -- we had a -- we got
25 all the physicians together, and told them this is

Page 29

1 where the query slips would be.
2     Q    Bad question.  Is the doctor -- does
3 Ann send the doctor an e-mail?
4     A    No.
5     Q    Does Ann leave the doctor a note that
6 there's a question in the chart?  Does she go hunt
7 down the doctor on the ward and present him with
8 the chart?  How is it physically done that the
9 query is communicated to the doctor?  I understand
10 it's written on a sticky note in the chart --
11     A    Correct.
12     Q    -- but then how does the doctor know to
13 go to the chart to look at the sticky note?
14     A    Because it was put on the front of the
15 chart.
16     Q    On the front of the chart?
17     A    On the front of the chart inside --
18     Q    Okay.
19     A    -- on the front of the chart, the face
20 sheet.
21     Q    Okay.
22     A    So when the physician did his rounds
23 and he'd open up the chart, there would be the
24 Post-it note there.
25     Q    And he's going to look at the chart

Page 30

1  again because it's a concurrent query?
2      A    Correct.
3      Q    Got it.
4      A    And then he would know to -- well, when
5  we were in the middle of training, we told them
6  that if they agreed with the query then to go into
7  the progress note and do their documentation
8  there.  Some of the physicians didn't write on the
9  query agree or disagree or whatever, so Ann would
10 go to the progress notes to see if the
11 documentation was there.
12     Q    Ann would keep a record of the queries
13 she had made?
14     A    Yes.  Well, not really the query.  I
15 can't say that.  It would be -- what happened
16 after -- okay.  So she does her query.  She's
17 working off of these -- her worksheet.  She'd
18 bring her worksheet down to the department, and
19 then we'd have what's called the CDI monitor.
20     Q    I'm with you.
21     A    So she would enter the patient's name,
22 medical record number, account number all of that
23 information in there.  And then she would -- the
24 system wasn't specific enough where she could type
25 the query.  It would be, like, chest pain or, you

Page 31

1  know, just a generic type thing in the CDI
2  monitor.  So she would put in there what she
3  queried for.
4      Q    CDI monitor was the system where she
5  kept a record of the queries that she had made?
6      A    Yes.
7      Q    Okay.
8      A    And the responses, of course.
9      Q    And the responses?
10     A    Uh-huh.
11     Q    Does that system still exist?
12     A    We still have the system.
13     Q    Okay.  You can run reports from that
14 system?
15     A    Well, they never taught us how to run
16 reports.  We never on a daily basis ran any
17 reports.  The only thing we knew was we just put
18 the information in and that was it.  It wasn't
19 until if somebody requested a report, which was
20 not that often because no one else uses the CDI
21 monitor but us, then I would have to call
22 Navigant.  Well, now it's Navigant, but it was HP3
23 then and say, "Can you tell me how to run this
24 report?"
25     Q    And how about Ann's worksheet, what are

Page 32

1  those?
2      A    Those are her, just her worksheets that
3  she writes down.  They're her findings regarding
4  the patient when she's going through reviewing the
5  patient's medical record.
6      Q    And what becomes of those worksheets?
7      A    Well, we throw them out because once
8  she entered -- you know, the fact that she queried
9  a physician on that and his response that was it.
10 So the worksheets weren't kept because it was not
11 part of the medical record.
12     Q    So the CDI monitor, perhaps, could be
13 cause to prepare a report that would indicate --
14 that would tell us the number of queries that Ann
15 made on a particular kind of medical issue?
16     A    Well, it wasn't that specific.  It
17 would just print out the number of queries that
18 she placed and the number of responses that she
19 got back.  It would also show -- like, you
20 couldn't put in there give me all the queries on a
21 specific diagnosis, you couldn't do that.  So when
22 the report came out it would print everything out,
23 whatever queries she did for chest pain or -- it
24 would print that out.
25     Q    Would it categorize those queries so

Page 33

1  that it would tell you that over a certain period
2  of time there were X number of queries for chest
3  pain, X number of queries for --
4      A    It would give you a subtotal.
5      Q    Okay.
6      A    It would subtotal it for you.
7      Q    Are those reports that you used in your
8  practice as director of HIM?
9      A    No.  No.
10     Q    Okay.  How about the responses, how
11 would Ann know if there was a response from the
12 doctor?
13     A    When she went back to the record it
14 would be documented on the record, or a lot of
15 times the physician would write on the Post-it
16 note that he documented, you know.  He documented
17 in the record.
18     Q    So if the physician didn't write it on
19 the Post-it note, then she'd have to remember how
20 the medical record initially looked and compare
21 that to how it looked --
22     A    Well, if he didn't write anything on
23 the --
24     Q    Sticky note.
25     A    -- on the sticky note, she would go

d432362f-11e7-42eb-a42b-55bc22e6801c

1  right to the progress note.  And if she didn't see
2  any documentation, then that would end it right
3  there.
4      Q    And she would update the CDI monitor to
5  indicate whether there was a response or not?
6      A    Yes.  So if she got a response, she
7  would go in there and document that the physician
8  either agreed or disagreed with her query.
9      Q    Okay.  Was that information that you
10 used in your capacity as director of HIM, the rate
11 of responses from the doctors?
12     A    No.  We never used that information
13 then.  We never used it.  It was just something to
14 be able to track the queries on.
15     Q    Are you a member of the American -- I
16 think it's the --
17     A    -- Health Information Management?
18     Q    Yes.
19     A    I belong to MD HIMA.  I've actually
20 held several offices in MD HIMA.
21     Q    What is MD HIMA?
22     A    Maryland Health Information Management
23 Association, so we're the Maryland chapter of
24 AHIMA.
25     Q    Are there -- okay.  Do you use their

1  publications in the course of your business?
2      A    I mean, I get their publications.  I go
3  to all their meetings.  I just attended one last
4  Friday about the new rules and regs coming out
5  with high-tech.
6      Q    Right.
7      A    So I will go and, you know, listen to
8  the speakers there, and then bring back the
9  information and discuss it with my staff.
10     Q    Do you consider their materials
11 authoritative?
12     A    Yes.  Yes, I do.
13     Q    You rely on them in your business?
14     A    I wouldn't say rely, but I look -- we
15 look to them for guidance, you know, on how to
16 handle some situations.
17     Q    You would consider --
18     A    They're not always right, but --
19     Q    You would consider that they generally
20 set the standard?
21     A    Pretty much.
22     Q    Okay.
23     A    Pretty much.
24     Q    How long have you been a member of MD
25 HIMA?

1      A    Maybe '01.  2001.
2      Q    And you said you had leadership
3  positions in the organization?
4      A    Yes.  I was the -- I sat on the
5  education committee, so I was responsible for
6  getting speakers for our meetings and our annual
7  convention every year.  I worked the annual
8  convention in helping get that together.
9      Q    Okay.  How -- let's see.  How did you
10 evaluate -- well, strike that.
11          For the CDSs for Ann Sewell and the
12 others, what expectations did you have of them in
13 terms of their productivity in reviewing files?
14     A    With Ann we wanted to make sure, and
15 she does and still does review 100 percent of all
16 or our admissions.
17     Q    That Ann should review them personally,
18 or that the CDS staff should review 100 percent?
19     A    Well, Ann personally.  She's the one
20 that has the most experience.
21     Q    Is there a timeframe in which you
22 expect her to accomplish this?
23     A    No.
24     Q    I gather, though, since they're
25 concurrent reviews, you expect to have --

1      A    The rehab -- right.  The surgical
2  patient's length of stay is usually three days.
3  So she'll go up.  She'll do the surgical patients
4  first because she knows they're only going to be
5  staying three days.
6          Our rehab patients length of stay is
7  probably more like 10 to 11 days, and our chronics
8  could be up to 30 days, our chronic patients.
9          So she'll do -- she'll go to the
10 med-surg unit first and review all the new
11 admissions coming in first, and review their
12 records, and if she has any queries she'll place
13 those queries to the physicians.
14     Q    Okay.  What kind of reports do you get
15 about the query process?
16     A    Back then or now?
17     Q    At anytime from 2005 to the present.
18     A    Just the query rate.  And all the query
19 rate says is this is -- not back then but now
20 because the system then we didn't even know about
21 it because nobody showed us how to run reports.
22 So right now she runs the query response report
23 which shows how many queries were placed in that
24 particular month and how many responses out of the
25 queries that were placed how many, you know, how

Page 38

1  many responses to her queries.
2      Q   And if I'm -- correct me if I'm wrong,
3  but I'm assuming that that report began in 2008
4  when the electronic medical record took effect?
5      A   Correct.
6      Q   Do I understand it then from -- strike
7  that.
8          The CDS reviews began in or about 2005;
9  is that correct?
10     A   That's correct.
11     Q   From the time the CDS reviews began in
12 2005 until the electronic medical record took
13 effect 2008, you were getting no reports about the
14 query process?
15     A   Nope.  We didn't know how to run the
16 report.  We weren't shown, unfortunately.
17     Q   Did you ask someone to show you how to
18 do query reports?
19     A   Not really because no one wanted them.
20 No one asked us for them.
21     Q   No one in upper management asked you
22 about the query process?
23     A   Nope.
24     Q   No one in upper management was
25 concerned about the manner in which this new HSCRC

Page 39

1  requirement --
2      A   Well, we --
3      Q   -- was being implemented in this
4  regard?
5      A   Well, the person that was there left.
6  He left shortly after we went on the -- we started
7  the whole process.
8      Q   Who are you referring to?
9      A   George Bayless.
10     Q   Who is George Bayless?
11     A   He was the CFO at the time.  He's the
12 one that when I went to him and I said, "We need
13 to get a clinical documentation improvement
14 program going," he said, "Well, what do you
15 recommend?"
16         I said, "Well, I talked to University
17 of Maryland who they've had their program going
18 for several years."  Plus, I believe, Bon Secours
19 had theirs up and running and a couple other
20 hospitals had theirs up and running.  We didn't
21 know anything about it, so I started researching
22 and getting information about who trained, how do
23 we get training because at one of my MD HIMA
24 meetings this all came about because of the whole
25 state moving to APR-DRGs.

Page 40

1      Q   How does George spell his last name?
2      A   B-a-y-l-e-s-s.
3      Q   Okay.  And where is he now?
4      A   I don't know.
5      Q   Why did he leave?
6      A   Oh, I don't know.
7      Q   Was he fired?
8      A   No.
9      Q   Was he asked to leave?
10     A   No.  Not to my knowledge.
11     Q   As far as you know, it was --
12     A   As far as I know, I believe, when he --
13 if I'm not mistaken, I believe when he left our
14 hospital he was offered another position doing
15 auditing or something like that down at University
16 of Maryland.
17     Q   He was the CFO at Kernan?
18     A   He was the CFO at the time.
19     Q   And when exactly did he leave, what
20 year?
21     A   I can't remember the year.
22     Q   Who took his place?
23     A   Walt Augustin, the CFO now.
24     Q   And did Mr. Augustin ask you for any
25 reports about the query process?

Page 41

1      A   Yeah.  He started asking us about the
2  reports when he came on, and that's when we
3  started getting with Navigant saying, you know,
4  "Are there any reports out there?  Can you run the
5  reports?"
6          I didn't even know really that there
7  was a report until I got the subpoena and then
8  wanted any and all.  And I'm like -- I started --
9  I called Navigant to see if there were any reports
10 out there that I could run.
11     Q   Let me make sure I understand it.
12 Correct me if I'm wrong.  Mr. Bayless was
13 responsible for bring HP3 in at your
14 recommendation?  Yes?
15     A   Uh-huh.
16     Q   I need a yes or a no.
17     A   Oh, yes.
18     Q   Thank you.  That Mr. Bayless left at
19 sometime before the electronic medical record came
20 into effect in 2008, correct?
21     A   Yes.
22     Q   That Mr. Augustin --
23     A   Yes.  Walt Augustin.
24     Q   -- replaced Mr. Bayless at sometime
25 before the electronic medical record took effect

Page 42

1  in 2008?
2       A    Yes.
3       Q    Mr. Augustin asked you for reports
4  about the query process prior to the EMR taking
5  effect in 2008 or after?
6       A    He asked me were there any reports that
7  would show physician response to queries.
8       Q    And he asked that before the EMR in
9  2008?
10      A    Yes.
11      Q    And you told him?
12      A    That I would check into it.
13      Q    Were you able to get him any reports?
14      A    Yes.  We were able to get what's called
15  the CDI Report Card, which is what we currently
16  run.
17           (Deposition Exhibit No. 4 marked for
18           identification and retained by
19           counsel.)
20      Q    Let me show you Exhibit 4.  Is that
21  what you're referring to, the CDI Report Card?
22      A    Yes, this is it, the CDI Report Card.
23      Q    If I understand you correctly, this was
24  not -- this was never run when Mr. Bayless was the
25  CFO; is that accurate?

Page 43

1       A    Uh-huh.  Yes.
2       Q    Would it be accurate for me to say that
3  this report was never run until approximately
4  2007?
5       A    No.  It was 2008.
6       Q    So prior to -- the print date on this
7  Page 1 says June 9, 2008.  Do you see that?
8       A    Yes.  That's when I ran it for the --
9  at the request of the subpoena.
10      Q    Okay.
11      A    When I got the subpoena.
12      Q    And that was the very first time that
13  this report was ever run; is that correct?
14      A    I believe so.
15      Q    The Report Card indicates that there
16  are targets.  Do you see that?
17      A    Yes, I see the target.
18      Q    Where did those targets come from?
19  Where did those percentages come from?
20      A    I don't know.  I don't know.  I really
21  don't.  I don't know enough about the CDI monitor.
22      Q    Who would be able to answer that
23  question?
24      A    Navigant.
25      Q    Navigant or HP3 --

Page 44

1       A    Uh-huh.
2       Q    -- was a consultant for Kernan in
3  installing the system?
4       A    Yes.
5       Q    And their contract with Kernan required
6  them to assist in the transition, correct?
7       A    The training, yes.
8       Q    And then at some point they stopped
9  assisting and let Kernan use the system on its on
10  --
11      A    Yes.
12      Q    -- correct?
13           And I had the impression from things
14  I've read that that occurred about a year after
15  the transition.  Is that an accurate statement as
16  far as you know?
17      A    I really -- I can't remember.  I know
18  that they weren't -- they trained us and then they
19  left, you know, and said, if you have any
20  questions you can contact us.  I really don't
21  remember the date.
22      Q    So as far as where these target
23  percentages came from, you have no information
24  about what --
25      A    I have --

Page 45

1       Q    -- these are from?
2       A    No.  I have no clue.  I really don't.
3  I don't know what these are.
4           One of the things that when they were
5  training us on -- not this because we didn't know
6  anything about this, but they were mostly the
7  acute care setting, not rehab.  There was a lot of
8  stuff they didn't even now about rehab, you know.
9  So I don't know whether these numbers are set
10  based on, you know, the acute care side.  We do
11  have an acute care side but not that many
12  patients, our med-surg unit.  I don't know -- I
13  don't know what these are.  I have no clue.  I
14  don't even know what the target is.  I don't know.
15      Q    The report indicates the top five
16  queries for the period.  Do you see that?
17      A    Yes.
18      Q    For each of the years it shows what the
19  top five queries --
20      A    Yes, I see that.
21      Q    And for the year 2005, do you see in
22  the top five queries there's nothing there for
23  malnutrition, correct?
24      A    2005.  Where is that?
25      Q    On the first page there.

1    A   2005.  That's correct.
2    Q   And then if you go over to 2006,
3  malnutrition makes the top five.  Do you see that?
4    A   Yes.
5    Q   At 13 percent?
6    A   Yes.
7    Q   And then 2007, malnutrition moves up in
8  the rankings from four to two.  Do you see that?
9    A   Yes.
10   Q   As part of your responsibilities as
11  director of Health Information Management, were
12  you monitoring the nature of the queries that Ann
13  or any of the other CDS staff were making?
14   A   I mean, I didn't receive a report or
15  anything from them but not really.  Ann would --
16  if she had an issue with one of the physicians not
17  answering the query then she would come to me, and
18  I would call the physician and ask him what the
19  problem was.
20   Q   So in terms then of the actual clinical
21  conditions that she was querying, that was all
22  left up to Ann?
23   A   No.  It was based on what we were --
24  what Navigant told us and gave us specific lab
25  values to look for to query the physician on.  So

1  I don't even know what the lab value is for
2  malnutrition, but any way if the lab value is
3  this, we were told -- Ann was told to query this.
4  If the lab value was this, query this.  Not, Ann
5  knows what lab, you know, what high lab values and
6  low lab values are, but based on what HP3 what Ann
7  was trained to do that's how she queried.
8    Q   Okay.  So the way she was querying then
9  was whenever there was a lab value in the chart
10  that met these parameters that HP3 or Navigant had
11  provided she would issue a query?
12   A   She would issue a query.  Well, not
13  just that but she would also -- it depended on
14  what was documented in the record, okay.  So if
15  the physician has documented something that she
16  needed clarification on, she would ask the
17  physician, I need clarification on this.  Take a
18  look at this lab value.
19   Q   So if the chart came to her and it had
20  a lab value that HP3 said was indicative of
21  malnutrition, it would have been appropriate for
22  her to query the doctor if that was the only
23  information --
24   A   Correct.
25   Q   -- in the chart?

1    A   If that was the only information in the
2  chart because that's how she was taught.
3    Q   Okay.
4        (Deposition Exhibit No. 5 marked for
5        identification and retained by
6        counsel.)
7    Q   Ms. Green, let me show you what we've
8  marked as Exhibit 5 and ask if you can identify
9  what this document is, please?
10   A   Yes.  This is the document that I ran
11  when I received the subpoena that said send any
12  and all documents associated with malnutrition or
13  respiratory failure.
14   Q   And when you ran this in response to
15  getting -- by the subpoena you're referring to the
16  IG subpoena that was served?
17   A   Yes.  The original.  Right.
18   Q   Had you run a report like this prior to
19  that time?
20   A   No.  I had to call Navigant and ask
21  them.
22   Q   What does this report show?
23   A   This shows -- well, this is -- that
24  must be the documentation clarification.  That is
25  another piece -- that's another query --

1    Q   Above the gray line on the middle --
2    A   Yeah.
3    Q   -- of the first page.  I understand
4  that.  Yes.
5    A   Right.
6    Q   So malnutrition begins half --
7    A   Right.
8    Q   -- way down?
9    A   Malnutrition begins here, so it
10  basically shows nyou the number of encounters, the
11  medical record encounter meaning visit.  Our
12  encounters are our visits, so every time you come
13  back to the hospital you get a new encounter
14  number.
15   Q   Admission?
16   A   Yes.  A new admission.
17   Q   Okay.
18   A   So it shows -- you go all the way down
19  to the bottom.  And I ran it within that period of
20  time which, unfortunately, it's not on here
21  because the way the report ran, it ran everything
22  and so I only submitted what they asked for, which
23  was the malnutrition and the respiratory failure.
24   Q   So when you -- I see.  Correct me if
25  I'm wrong.  When you ran the report, it ran it for

Page 50

1  every medical condition that's captured in the
2  system?
3      A   Correct.
4      Q   And what you've done is you've just
5  given us the pages that pertain to malnutrition
6  and respiratory failure?
7      A   Right.
8      Q   Thank you.  So within the part that
9  relates to malnutrition you said that there's the
10 column under encounter relates to every admission?
11     A   Yes.
12     Q   Each encounter is a separate admission?
13     A   Yes.
14     Q   The medical record number would be the
15 number of the chart, the medical record chart?
16     A   Right.  Which that stays the same.
17     Q   Okay.
18     A   That doesn't change.
19     Q   Does the encounter -- does the
20 alphanumeric for the encounter, does that give the
21 date of the admission?
22     A   This?
23     Q   Yes.
24     A   Not on here, no.
25     Q   It looks like it's got dates, 2008.

Page 51

1      A   No.  That's the account number.
2      Q   Okay.
3      A   All of our account numbers are 2008
4  something.
5      Q   Okay.
6      A   I think we're up to nine now.
7      Q   Okay.  And then it shows there's a -- I
8  can't read it.
9      A   It says queries.
10     Q   Queries.  What does that mean?
11     A   I don't know.  I don't know.
12     Q   And then there's a column for queries
13 with variance.  Do you see that?
14     A   Uh-huh.
15     Q   Do you know what that means?
16     A   No.
17     Q   May I borrow the exhibit for a moment?
18     A   Sure.
19     Q   Are the encounters and medical record
20 numbers listed on this chart for malnutrition, are
21 these instances where a query was asked as far as
22 you know, or are these all the instances where
23 there was malnutrition whether a query was asked
24 or not?
25     A   No.  This would be the instances where

Page 52

1  a query was asked.
2      Q   And the --
3      A   That I do know.
4      Q   Okay.  So there would be presumably
5  other charts where malnutrition was coded as a --
6  strike all that.
7          It's malnutrition as a secondary
8  diagnosis?
9      A   Yes.
10     Q   So there would be other charts out
11 there where malnutrition was coded as a secondary
12 diagnosis where no query was asked but they
13 wouldn't be on this list?
14     A   Correct.  Yes.
15     Q   What's the far column, query variance?
16     A   This far column I didn't know what this
17 was, but I called Navigant when I ran it, and they
18 said, "Oh, well, don't worry about this column
19 because you guys are on APR-DRGs, and this is for
20 states that are getting paid by DRGs."  So this
21 variance would have to do with the DRG and the
22 reimbursement.  And he said, "And then you'd have
23 to have your rate table set up in the CDI
24 monitor," which we don't have any rate table set
25 up in there because we're APR-DRGs, so --

Page 53

1      Q   So in a non-Maryland system, the query
2  variance would be the amount of money --
3      A   That --
4      Q   -- that is attributable to the change
5  in the secondary diagnosis by adding malnutrition?
6      A   I don't know exactly.  He didn't get --
7  I mean, I didn't go into a lot of detail.  I asked
8  him, and he told me don't worry, that doesn't have
9  anything to with us because we're an APR-DRG
10 state.
11     Q   Okay.  The take away I'm getting is
12 that until the subpoena came in you weren't
13 getting any reports at all the query process; is
14 that accurate for me to say?
15     A   Yes.
16     Q   What's your practice presently?
17     A   Presently we run the report card.
18 That's the only report that we run monthly.
19     Q   Exhibit 4?
20     A   Yes.
21         MR. SHEPARD:  Is that it?  Is that your
22 4?
23         MR. LOUCKS:  Yeah.
24     A   Actually, I don't know if this is the
25 one we're running.  This looks different.  You

1  know why it looks different, okay.  It looks
2  different because we're on a new system.  They
3  upgraded the CDI monitor probably a year ago.  It
4  might not even be that long ago.  I really don't
5  remember, but the CDI monitor has been upgraded.
6      Q   So you get a report that's called the
7  CDI report card --
8      A   Yeah.  But it doesn't look --
9      Q   -- but it does look like this?
10     A   I don't think so.
11     Q   Tell me, does it capture the same
12  information that's on Exhibit 4 that's in front of
13  you?
14     A   Well, I know Ann runs it.  I don't run
15  it.  Ann runs it monthly, and I know it breaks it
16  down by service so it shows -- we can't break it
17  down by physician.  We've been asking for that if
18  we could break it down by physician for their
19  query responses, but this looks different.
20     Q   Okay.
21     A   But it is called the CDI --
22     Q   -- report card?
23     A   -- report card.  Query report card or
24  something to that extent.
25     Q   Do you have -- do you maintain --

1  strike all that.
2          Ann runs this report card?
3      A   Yes.
4      Q   Does she give you a copy of it?
5      A   Yes.  She gives me a copy of it.  Well,
6  she emails me a copy of it, just as an FYI, and
7  then she sends it on to Walt, and then she sends
8  on to our physician adviser to follow up with the
9  physicians who have -- well, actually she sends it
10  to Dr. Patel just as an FYI.
11     Q   Is he the physician --
12     A   She.  She's the physician adviser.
13     Q   The physician adviser.
14     A   Uh-huh.
15     Q   What does the physician adviser do?
16     A   The physician adviser, if Ann has
17  queried a physician and she hasn't heard back from
18  him and she needs an answer, you know, just to
19  clarify something in the chart, it could be
20  anything.  It doesn't have to be a diagnosis.  It
21  could be anything for clarification in the record.
22  Then the physician, we get the physician adviser
23  involved, and then the physician adviser will go
24  speak with the physician.
25     Q   Do you keep copies of these reports?

1      A   No.
2      Q   Does Ann keep copies of these reports?
3      A   I don't know.  She may, but I kind of
4  doubt it because it's stored electronically.  So,
5  like, she could go in and run this at anytime for
6  any given period of time since we went on the --
7      Q   Oh.  So she could go back and say for
8  June of 2009 what was the query rate, what was the
9  response rate?
10     A   I think the new system can do that.  I
11  know that's how I did that one report --
12     Q   Exhibit --
13     A   -- when I ran it.
14     Q   Exhibit 5?
15     A   No, not that one.  It was 4 because
16  that's when I ran it.
17     Q   Okay.
18     A   That's the date I ran it, and that's
19  for the period I ran it.
20     Q   Okay.
21     A   Now, the new system I don't know
22  because I don't know what data is stored in there.
23  I believe -- and I was trying to get that answer
24  from our IT people what data since the new system
25  has been implemented.  I think we only have '05

1  data on --
2      Q   What kind of -- do you know what kind
3  of email system you have?
4      A   Our email?
5      Q   Yes.
6      A   Groupwise.
7      Q   What's it called?
8      A   Groupwise.
9      Q   Groupwise?
10     A   Uh-huh.
11     Q   And do you have personal email back to
12  2008 in your system?
13     A   I don't.  I delete everything.  I get
14  it out.  As soon as I answer, I delete it.
15     Q   Who's the head of the IT department at
16  Kernan?
17     A   Now it's Linda Hines.
18     Q   How long has she been there?
19     A   Well, Allen Tracy left maybe a year
20  ago.  Well, he didn't leave, leave.  He took
21  another positon down University of Maryland.  I
22  think it's been about a year.  And then Linda
23  Hines actually oversees our hospital, UHS, the
24  medical center.
25     Q   Okay.

Page 58

1    A   Poor thing.
2    Q   With the new system, the EMR system in
3  2008, are queries done by email?
4    A   No.  We've never used email because the
5  doctors don't answer their email.
6    Q   Okay.
7    A   They don't answer their email.
8    Q   With the new system -- and it was with
9  the new system, the EMR system in 2008 that you
10  moved away from the sticky notes?
11    A   Yes.
12    Q   So how did the query process work in
13  the new system?
14    A   Before we went live, we met with the
15  Epic team or the Portfolio team and we said, well,
16  we have to have a way to query.  Downtown uses
17  Otis, which is the document management system to
18  query.  We don't have -- I mean, we have Otis, but
19  we don't have that capability.  So the Portfolio
20  team came up with -- it's called the sign-out
21  report.
22        So what the sign-out report basically
23  is, is Ann goes into that report into the record
24  and she places the query in there for the
25  physician.  She'll type it in red.  Please check

Page 59

1  the labs on this patient, you know, and present
2  with -- something, like, for a clinical diagnosis.
3  We don't ask directly out.  We just ask them to
4  review this and give us a clinical diagnosis on
5  the patient.
6    Q   This is all done in an electronic
7  database?
8    A   Yes.
9    Q   What's the name of that database again?
10    A   It's called Portfolio.  We call it Epic
11  or Portfolio.  It's our EMR.
12    Q   What does Epic stand for?
13    A   I have no clue.
14    Q   Is that an acronym, E-p-i-c?  Have I
15  got the acronym right?
16    A   Yeah.  It is E-p-i-c --
17    Q   Okay.
18    A   -- but I don't know what it stands for.
19    Q   You think of Epic and Portfolio as --
20    A   The same.
21    Q   -- the same, okay.
22        Otis is something else?
23    A   Right.  Otis is where all of our
24  dictated notes go into.  That's our document
25  management system.

Page 60

1    Q   Okay.  The Portfolio or Epic system,
2  though, is specific to the query process?
3    A   Yes.  We use that to query now since we
4  don't have paper charts anymore.
5    Q   And what kind of reports do you run
6  from Epic or Portfolio?
7    A   Oh, we don't have any reports.
8    Q   You don't track the number of
9  responses?
10    A   Yes.  We do out of the CDI monitor.  So
11  Ann will put the query in the CDI monitor.  So the
12  CDI monitor was set up to track the number of
13  queries.
14    Q   How does the CDI monitor relate to Epic
15  and Portfolio?
16    A   It doesn't.  Ann will place the query,
17  and then she has to go back and enter it in the
18  CDI monitor.
19    Q   That's the same CDI monitor that she
20  had from before?  The CDI monitor has been there
21  ever since 2005, right?
22    A   Right.  Except for the upgrade.  So
23  there's things that we can do now that we were not
24  able to do back then.
25    Q   Like what?

Page 61

1    A   Well, like run reports, you know.
2    Q   Before the upgrade you would have had
3  to have called Navigant --
4    A   To get a report.
5    Q   -- and ask them for a report?
6    A   Uh-huh.  Yeah.
7        (Deposition Exhibit No. 6 marked for
8        identification and retained by
9        counsel.)
10    Q   Let me show you Exhibit 6.
11    A   Uh-huh.
12    Q   What is this?
13    A   I have no clue.  I don't know.  I've
14  never seen it.
15    Q   Okay.  Would you be able to enlighten
16  me about who uses this report?
17    A   No one I know of.
18    Q   Would you be able to --
19    A   We don't use it.
20    Q   Would you be able to tell me about what
21  decisions are made as a result of this report, the
22  information on this report?
23    A   No.  I don't know --
24    Q   Can you tell me --
25    A   -- where it came from.

d432362f-11e7-42eb-a42b-55bc22e6801c

1    Q   -- how often this report is run or what
2  the distribution of this report might be?
3    A   No.  I've never seen it.
4    Q   What is kwashiorkor.
5    A   The only thing I can tell you I know
6  about kwashiorkor, because I'm not a coder, but if
7  you go to the code book and you look it up, it's a
8  malnutrition.  I would say if you're looking it --
9  it would be severe malnutrition.  That's how I
10 would take it, but I'm not a coder, so I really
11 don't know.  If you go to the code book and you
12 look -- to me it's, like, severe malnutrition.
13       (Deposition Exhibit No. 7 marked for
14       identification and retained by
15       counsel.)
16   Q   Let me try you on this one.  Do you
17 recognize this report?
18   A   No.
19   Q   Would you be able to enlighten me about
20 why it's run or how it's used or who reviews it?
21   A   No.  I've never seen it.
22   Q   Okay.
23   A   I'm sorry.
24   Q   That makes it easy.  Let me try one
25 more as long we're working this line.

1    A   Okay.
2        (Deposition Exhibit No. 8 marked for
3        identification and retained by
4        counsel.)
5    Q   Let me show you Exhibit 8.  Same
6  question.  Can you identify that?
7    A   I have seen a similar report because I
8  see the Case Mix Index Reports, but I don't know
9  what this one is showing me.  I have no clue.
10   Q   What are the Case Mix Index Reports?
11   A   Case Mix Index Reports are -- I'm
12 looking at them now on our -- for our PPCs or our
13 POAs, which is our present on admission PPCs,
14 which the Case Mix Index shows what your -- I look
15 at it as what types of patients you're seeing at
16 your facility.
17       So if you're seeing really, really sick
18 patients -- I know enough about case mix that if
19 you're seeing really sick patients, if your
20 patients are, like -- especially with our
21 traumatic brain injury patients, your case mix
22 index is going to be higher than another facility.
23 We're the only traumatic brain injury unit in
24 Maryland.  So to me the Case Mix Index shows how
25 sick our patients are, but I don't know what this

1  is showing me.
2    Q   And who in -- who do you report to?  Do
3  you report to the CFO?
4    A   Yes.
5    Q   The CFO reports to who?
6    A   The CEO.
7    Q   Who is the present CEO?
8    A   Michael Jablonover.  Dr. Jablonover.
9    Q   How long has Dr. Jablonover been the
10 CEO?
11   A   I'm trying to think.  Maybe two years.
12   Q   And who was the CEO before Dr.
13 Jablonover?
14   A   Oh, my God.  What's his name?  I'm
15 trying to think of what his name is.  He's
16 actually down at Chester River now.  I believe
17 it's Chester River.  What is that?  It will come
18 to me.
19   Q   Okay.  When it does.
20       Accurate for me to say that Dr.
21 Jablonover was CEO from -- since about 2009?
22   A   Yes.  That's -- probably since then.
23   Q   And Dr. X who will come to you --
24   A   I'll think of it.  It'll come to me --
25   Q   -- was the --

1    A   That's horrible.  He was there forever.
2    Q   We'll seal this part of the record.
3    A   Good.  Don't let him know that.  I'll
4  be so embarrassed.
5    Q   But this person was the CEO from before
6  2005?  The time I care about is essentially 2005
7  --
8    A   Yes.
9    Q   -- to the present.
10   A   This person who I'll think of later was
11 --
12   Q   -- would have covered that period?
13   A   -- would have covered that period.
14   Q   Okay.
15   A   That's horrible.
16       MR. SHEPARD:  Do you want me to give
17 you the name?
18       THE WITNESS:  What it is?
19       MR. SHEPARD:  It's Jim Ross.
20       THE WITNESS:  Oh, my God.  Don't tell
21 him that.  I just saw him last week.
22       MR. SHEPARD:  That would have been easy
23 for you to find.
24       MR. LOUCKS:  I know.  Thank you.
25       THE WITNESS:  Isn't that horrible?

1   Don't tell him that.
2   BY MR. LOUCKS:
3       Q   Do you know if Dr. Ross reviewed
4   reports like the case management index report that
5   you just spoke of?
6       A   I don't.  I don't know.
7       Q   Okay.  Did you have any knowledge
8   whether Dr. Ross would review reports like Exhibit
9   7 or Exhibit 6?
10      A   I don't know.
11      Q   Did you in your position have regularly
12  scheduled meetings with Dr. Ross?
13      A   No.  I never met with him.
14      Q   Did you have regularly scheduled
15  meetings with the CFO?
16      A   Only on an as-needed basis.
17      Q   So there was no regular --
18      A   I mean, we met but there wasn't
19  anything regularly scheduled.  I probably saw him
20  every week --
21      Q   Okay.
22      A   -- but there are no regularly scheduled
23  meetings.
24      Q   What were the topics of discussion when
25  you would meet with the CFO?

1       A   How is everything going in the
2   department, you know, are you having any issues?
3   Usually we talked about staffing issues.  He would
4   tell me, you know -- well, he reported -- he would
5   report the case mix index to the department head
6   meetings, so when he gave the financials he would
7   report what the CMI is, the case mix index,
8   whether its gone up or its gone down, that sort of
9   thing.
10          Our discussions were, you know, it had
11  dropped, if the case mix dropped.  Say it dropped
12  significantly he'd say, "Do you have any idea
13  why?"  Or we talked about -- mostly we'd talk
14  about documentation from physicians because we
15  always have issues with documentation from the
16  physicians.
17      Q   When you say talking about the case mix
18  index dropping what are you referring to?
19      A   Like our -- how sick our patients are.
20  That we're not getting the patients that we used
21  to get anymore from University or the community
22  hospitals.
23      Q   Was there a desire on his part that
24  there -- that Kernan be attracting those kinds of
25  sicker patients?

1       A   No.  Never.  No.
2       Q   The desire was to attract less sick
3   patients?
4       A   Yeah.
5       Q   And the CFO communicated this to you?
6       A   He would just tell me, like, if we were
7   getting -- like when Maryland General -- they just
8   recently started sending all of our traumatic
9   injury patients -- their traumatic brain injury
10  patients over to us.  So, you know, we knew that
11  our case mix was going to go up because the
12  traumatic brain injury patients, of course, are
13  sicker than any other patients in the hospital,
14  those and our spinal cord injury patients are
15  really sick patients.
16          So she would say -- he would just say
17  to me, "We're going to be getting Maryland General
18  patients."
19          And I'd say, "Oh, my God," you know.
20  Those records are very difficult to code.  And
21  what I mean by difficult, not difficult.  It takes
22  a long time to code one of those records.
23      Q   When did that change occur?
24      A   They've been trickling in.  I don't
25  know that we've gotten all of them right now

1   because they've been trickling in over the last
2   probably three or four months.
3       Q   Okay.
4       A   But I don't know that we've gotten all
5   of those patients in.
6       Q   I got the impression that this was
7   something that was going to mean a radical change
8   in your practice and that it was --
9       A   No.  It'd be more charts for my coders
10  to code.
11      Q   Okay.  But this is something that has
12  happened within calendar 2011?
13      A   Oh, yes.
14      Q   Let me ask it this way.  Separate and
15  apart from that, have there been other changes in
16  the case mix, dramatic changes in the case mix,
17  say from 2005 to the present or 2005 to 2008 that
18  stand out for you?
19      A   There was one month, but that was --
20  that was last year, so nothing between --
21      Q   2005 and 2008?
22      A   No.
23      Q   Would it be accurate for me to say that
24  from your standpoint the case mix at Kernan
25  remained essentially the same from 2005 to 2008?

1      A   I would think so.
2      Q   Okay.
3      A   I would think so.  I don't -- nothing
4  stands out between that period of time.  It's only
5  been recently that we've seen some shift in our
6  patients like we used to get vent patients.  We
7  don't get vent patients anymore from University.
8      Q   Okay.  Let's go back if I can --
9      A   Uh-huh.
10     Q   -- to Exhibit 6, and the exhibit
11  appears to indicate that coding of kwashiorkor at
12  Kernan went from zero cases in 2004 to three in
13  2005 to 104 in 2006 and to 281 in 2007.  Do you
14  see those numbers?
15     A   Yes.
16     Q   Is that consistent with your
17  understanding of the coding at Kernan over that
18  time?
19     A   Yes.  Yes.  Uh-huh.
20     Q   Let me take you, if I can, to Page 2 of
21  the exhibit.  The Bates number is KH22 on the
22  lower right.  Are you at that page?
23     A   Uh-huh.  Yes.
24     Q   And this would be for -- it appears to
25  be for, I guess, it's fiscal year 2005, correct?

1  July '04 to June of '05?  Do you see it up there?
2      A   Yeah.  Fiscal year '05.  I mean --
3      Q   '05.
4      A   '05, yes.
5      Q   Okay.
6      A   Is that right?  I get mixed up --
7      Q   What is it, it's for that period of
8  time.  You see the numbers relating to the -- it
9  was the three cases that we saw before.  Total
10  LOS, is that length of stay?
11     A   Yes, that's length of stay.
12     Q   And then average LOS would be average
13  length of stay?
14     A   Yes.
15     Q   And total charges and average charges,
16  who are those?
17     A   I have no idea because I -- I mean, I
18  don't know where they get -- I don't know where
19  they got these charges from.  I don't know if
20  they're hospital charges.  I have no idea where
21  they got these charges.  I don't know where they
22  came from.
23     Q   Did -- strike that.
24        I mean, do you understand the 68,686
25  number to be the charges from these three

1  kwashiorkor patients?
2      A   I have no -- I don't know.  I really
3  don't.  I don't know whether that pertains to that
4  or -- I don't know.
5      Q   If you go to the last page, Page 24,
6  KH024, we have 281 cases of kwashiorkor with total
7  charges of what appears to be 5,074,152.  Do you
8  see that?
9      A   Yes, I see that.
10     Q   Is that consistent with your
11  understanding of about what the charges would be
12  for 281 kwashiorkor patients?
13     A   I have no clue.  I don't know what it
14  would stand for.  I've never seen the report, so
15  --
16     Q   Did the CFO track information like this
17  about kwashiorkor?
18     A   Not to my knowledge.
19     Q   Did the CFO ask you about kwashiorkor
20  diagnosis at Kernan?
21     A   No.
22     Q   Has anybody ever asked you about
23  kwashiorkor diagnosis at Kernan?
24     A   No.
25     Q   And so you've never had an occasion to

1  go back to Navigant or HB3 and ask them to run a
2  report about kwashiorkor cases, correct?
3      A   Correct.
4      Q   And the same would be true of
5  nutritional marasmus, correct?  You've never had a
6  case -- you've never been asked about that,
7  correct?
8      A   Correct.
9      Q   And you've never -- you never asked HP3
10  to run a report about nutritional marasmus cases,
11  correct?
12     A   No.
13     Q   And same with other severe
14  malnutrition?
15     A   No.
16     Q   Correct?
17     A   Correct.
18     Q   Thank you.
19        Same with malnutrition moderate degree?
20     A   Correct.
21     Q   Same with malnutrition mild degree?
22     A   Correct.
23     Q   Same with protein calorie malnutrition
24  NEC?
25     A   Correct.

Page 74

1    Q    Same with protein calorie malnutrition
2    MOS?
3    A    Correct.
4    Q    I gather -- let me switch gears a
5    little bit.
6    A    Uh-huh.
7    Q    I gather that Ann Sewell is a valued
8    member of your staff?
9    A    Yes.  She's good.  She's a fantastic
10   RN.
11   Q    What's her background?  What's her
12   educational background?
13   A    She's an RN -- is it MBA?  And she's
14   also certified in rehab nursing.
15   Q    Do you know what --
16   A    So she has her CNA, I believe it is.
17   Q    Do you know when it is she got her
18   R.N.?
19   A    No.  I don't know when, but she's been
20   in nursing for -- I forget how old is she.
21   Q    She had her R.N. last century, is that
22   what you're telling us?
23   A    No.
24   Q    Outrageous.  And her MBA, do you know
25   what -- did you say MBA?

Page 75

1    A    Yeah.  Is that -- I think she has her
2    masters in R.N.
3    Q    In something?
4    A    Something like that.  And then she's
5    also certified as a rehab nurse.
6    Q    Okay.  Do you know when she obtained
7    that certification?
8    A    No, I don't.
9    Q    I know you told me that she's been
10   coding CDSs from 2005 to the present, but remind
11   me again when did she initially start at Kernan.
12   A    Oh, gosh.  I really don't know the
13   year.
14   Q    Okay.
15   A    She came over from Montibello.
16   Q    And was she -- did she start --
17   A    I remembered the hospital.  There you
18   go.  I told you it'd come to me sometime.
19   Q    Did she start at the wards as a nurse,
20   or did she come straight the coding?
21   A    No.  She didn't come to coding.  She
22   was in the quality department.
23   Q    Okay.  And when you're evaluating her
24   how do you -- what steps do you take to evaluate
25   her performance?  Let me strike that.

Page 76

1    Do you evaluate her performance on a
2    regular periodic and formal way?
3    A    Well, we have to evaluate yearly.
4    Q    Okay.
5    A    We have to do a performance review
6    yearly.
7    Q    And I assumed that.
8    A    Right.
9    Q    What do you do in context with that?
10   A    Well, make sure that her attendance is
11   good, you know, that sort of thing.  As far as the
12   job that she does with the clinical documentation
13   specialist is making sure that she follows up with
14   the physicians or the documentation -- that we
15   have the documentation in order to code the
16   record.  Because if we don't have the
17   documentation we can't code the record
18   appropriately.
19   Q    So it's important -- it's important to
20   you to know the physician response rate in order
21   to --
22   A    Well, no.  Not --
23   Q    -- evaluate her performance?
24   A    No, not for me.  I just want to make
25   sure that she's reviewing the records to make sure

Page 77

1    that we're capturing the diagnosis that we need to
2    capture.  Ann just doesn't review the record for
3    query.  She reviews the record for quality.
4    Q    I understand.  Okay.
5    A    She came from the quality department,
6    so not only is she just reviewing just for the
7    query, she's reviewing for quality.  So if she
8    sees a quality issue going on, then she'll go to
9    the physician or she'll get the physician adviser.
10   Q    For the quality side, do you evaluate
11   her performance in that regard?
12   A    I don't know how I could, other than I
13   know she reviews the record.
14   Q    Does somebody else do that?
15   A    From the quality side?
16   Q    Yes, ma'am.
17   A    No.
18   Q    For the query and CDS side, that's the
19   side you evaluate her on, correct?
20   A    Yes.
21   Q    Okay.  Tell me -- do you run any
22   reports before evaluating her?  You're shaking
23   your head no.
24   A    No.  I'm sorry.  No.
25   Q    Is there a work plan or something that

1  describes what she's supposed to do that contains,
2  perhaps, performance elements that you would
3  evaluate her against?
4      A   We just -- because this position was so
5  new, we didn't have a job description for a while.
6  We kind of, like -- Ann was the first one to do
7  this job because we hadn't even heard of it.  We
8  finally got a job description.  We looked to
9  University and said, "Can you send me your job
10 description?"  Well, theirs is a little bit
11 different because they have managers.
12          We went the R.N. route, not that their
13 case managers aren't R.N.s but we didn't hire a
14 case manager.  We went directly and hired an R.N.
15     Q   What's the difference?
16     A   I don't know.
17     Q   I mean, what's the systemic difference?
18 How does what Ann does differ from what a case
19 manager would do?
20     A   Well, case managers are -- at Kernan
21 they do, like, utilization reviews.  They make
22 sure -- they do discharge disposition, you know.
23 They handle where the patients are being
24 discharged to, making sure that patients have what
25 they need to have before they go home.  So case

1  managers do mostly discharge dispositions,
2  utilization review.  They work with the insurance
3  companies regarding the length of stay, that sort
4  of thing.  Ann is -- R.N.s are R.N.s.
5      Q   Okay.  So when you review her you have
6  her -- is there a performance plan now?  Is there
7  a job description now?
8      A   Yes, there's a job description.
9      Q   Okay.  So you have her job description.
10 You have your memory of what she did during the
11 year, and you do your evaluation based on your
12 memory, your interactions with her?
13     A   My interactions with her, the
14 interactions with the coders.  We all interact.
15     Q   On a daily basis?
16     A   On a daily basis.  We sit in the same
17 room.
18     Q   Okay.
19     A   I don't even have an office.
20     Q   Okay.  Now, how do you audit her?  How
21 do you audit what she does, if you do?
22     A   I don't audit.
23     Q   You do audits of the coders I think you
24 said.
25     A   Yes.  It's required.

1      Q   Okay.  Tell me what those audits
2  consist of.
3      A   Navigant comes in quarterly, and they
4  get what we call the pull list or the charts from
5  Saint Paul computer center.  That's where all of
6  our data goes, to Saint Paul, so they'll randomly
7  just select cases to audit.
8      Q   Saint Paul, is that part of the --
9      A   They send --
10     Q   -- University of Maryland System?
11     A   No.  That's for the whole State of
12 Maryland.  Everyone's data goes through Saint
13 Paul, and then from Saint Paul it goes to HSCRC.
14     Q   Okay.  And you're saying that Navigant
15 develops a pull list from that data?
16     A   They ask Saint Paul, give me Kernan's
17 data between this period and this period, and
18 randomly select, you know.  I don't know how they
19 do their selection.  I really don't know how they
20 select the records.
21     Q   But Navigant does that?
22     A   Yes.
23     Q   Okay.
24     A   Navigant does that.
25     Q   So then you pull those records that

1  Navigant says to pull?
2      A   Uh-huh.
3      Q   Yes?
4      A   Yes.
5      Q   Thank you.
6      A   I'm sorry.
7      Q   No problem.  And then Navigant comes in
8  and audits those?
9      A   Correct.
10     Q   Okay.
11     A   They don't come in any more because
12 it's electronic but, yes, they audit those
13 records, and they give us feedback.
14     Q   And the nature of that feedback is as
15 to the -- whether the coding is accurate or is it
16 something else?
17     A   Whether the coding is accurate to them.
18 They are not the -- the coders may disagree.
19 Okay.  So their word is not the final word.  Okay.
20 If they come in and they say to the coder, I think
21 you need to add this diagnosis, the coder will go
22 back to the record.  And if they find the
23 diagnosis where Navigant says this physician
24 documented this here then they'll agree that yes,
25 okay, I agree.  There's some codes that -- it's

Page 82

1   really documentation that our coders may disagree
2   with Navigant.
3       Q    How often does Navigant do this?
4       A    Quarterly.
5       Q    How many files do they review when they
6   do this?
7       A    Let's see.  Last quarter they reviewed,
8   I believe, 150 records last quarter.  Somewhere
9   around 150 records.
10      Q    And last quarter is fairly
11  representative --
12      A    April, May, June.
13      Q    In terms of the number of files they
14  reviewed last quarter, that's fairly
15  representative for all the other quarters?
16      A    Oh, yeah.  Yes.  They -- yeah.
17      Q    And if I understand you correctly,
18  Navigant when it does these reviews does not look
19  at the query process?
20      A    No.  They don't see it at all.
21      Q    Okay.  When did Navigant begin this
22  practice of auditing files?
23      A    Since I've been there at Kernan.  I've
24  been there 32 years, but since I've been in
25  medical records they've always -- it used to be

Page 83

1   HP3 --
2       Q    Right.
3       A    -- and then it was Navigant.
4       Q    Right.
5       A    My predecessor said, you need to get
6   the records, which I know because when I went back
7   to school I understood why charts have to be
8   audited because you don't want internal audits
9   being done.  First of all, we don't have anybody
10  to internally audit our records.  You usually have
11  to have an external auditor audit your charts.
12      Q    Does the audit -- is it a random sample
13  of files that they select?
14      A    Uh-huh.
15      Q    Yes?
16      A    Yes.
17      Q    Is it a random sample per coder, or is
18  it a random sample --
19      A    No.  It's a random sample of our
20  discharges, based on what our discharges were for
21  that quarter.
22      Q    Is there any other audit process that
23  occurs besides what you've described that Navigant
24  does every quarter?  You're shaking your head no.
25      A    No.

Page 84

1       Q    Thank you.
2       A    No.  Sorry.
3       Q    You're doing great.
4            (Deposition Exhibit No. 9 marked for
5            identification and retained by
6            counsel.)
7       Q    Let me show what you we've marked as
8   Exhibit 9.  This is the sticky note that was used
9   before the MR conversion, right, for malnutrition?
10      A    As far as I know it is.  I never saw --
11  I just knew that they were using sticky notes, you
12  know.  I saw a couple of them.  I don't know if
13  this is what it looked like then.  I have no idea,
14  but they did use sticky notes.
15      Q    Are you telling me that you did not
16  review what the sticky notes were that the coders
17  were -- that Ann was using?
18      A    No.  They get -- we ordered them in
19  packs from Navigant, and they came in and Ann used
20  them.
21      Q    My point being that you did not review
22  them?
23      A    No, I did not review the sticky notes.
24      Q    Okay.
25      A    I would see them on the charts, but I

Page 85

1   didn't specifically read them.  I would just order
2   them and give them to Ann.
3       Q    I want to make sure because I think I
4   might have gotten this confused.  This exhibit,
5   Exhibit 8 -- 9, excuse me.  This is, in fact, the
6   form of the sticky note that was used -- that Ann
7   was using to make a query about malnutrition,
8   correct?
9       A    It's a -- I can't state positively that
10  this is what it said.  I can tell you that a
11  sticky note was used, but I never saw the sticky
12  note.  Do you know what I mean?
13      Q    I think I do.  My second question would
14  have been -- and just to make sure that I
15  understand in terms of the actual format of the
16  query for malnutrition that was -- whatever it was
17  that was on the sticky note, it was not a format
18  that you reviewed for correctness or adequacy or
19  compliance with AHIMA or anything else?
20      A    Correct.  I guess I'm too trusting,
21  right?
22      Q    Can you explain to me why the form
23  states:  Nutrition notes support clinical criteria
24  of malnutrition?  And by that I mean why does the
25  form specifically direct the doctor to nutrition

1  notes?
2      A   I have no idea.
3      Q   Would you agree --
4      A   I don't know.
5      Q   Would you agree with me that the manner
6  in which this question is asked suggests the
7  answer, that it's leading?
8      A   I really can't say.  I don't know how
9  they're supposed to be documented.
10     Q   Would you agree with me that this is a
11 note from Ann telling the doctor that there's a --
12         MR. SHEPARD:  I'm just going to
13 interrupt.  I'm sorry to interrupt you.  I don't
14 know that this form was used.
15         THE WITNESS:  That's what I said.  I
16 don't either.
17         MR. LOUCKS:  She testified to that.
18         MR. SHEPARD:  In the white paper that I
19 provided to you, the ones that we believe were
20 used were different to the extent --
21         It's only to the extent you have
22 personal knowledge as to these.  Don't guess what
23 Ann did.
24     A   No, I don't know.  I mean, I can tell
25 you that this looks like a sticky note, that's it.

1      Q   Okay.
2      A   Did she use this?  I don't know.
3      Q   All right.  My question is different.
4  My question:  Do you agree with me that the first
5  line, nutrition notes support clinical criteria of
6  malnutrition is a leading question that directs
7  the doctor to an answer?
8      A   Yeah, I guess.  If you look at the
9  malnutrition notes -- the malnutrition notes
10 support clinical criteria for malnutrition for
11 this patient.  The patient has malnutrition,
12 please document it.  It's asking the doctor to
13 document it if he agrees that the nutrition notes
14 support that diagnosis.
15     Q   Are you familiar with AHIMA rules that
16 say leading questions are inappropriate in
17 queries?
18     A   I'm not familiar, no.  Not personally.
19     Q   Is there anybody else to supervise Ann?
20     A   No, just me.  Just myself.
21     Q   Are you familiar with AHIMA rules that
22 indicate that a question such as this should
23 include choices for the doctor that say other and
24 unable to determine?
25     A   No.  I can go by hearsay.  I've heard

1  it.
2      Q   You've heard that those are what the
3  rules are?
4      A   I've heard it at -- people talking --
5      Q   And --
6      A   -- but not at my institution, at some
7  of the meetings that I've been at.
8      Q   So you've been to meetings where people
9  have -- have they made presentations where they
10 talked about these things, or is this just talk in
11 the hallways?
12     A   No.  This is just people talking, you
13 know.
14     Q   Okay.
15     A   I was at one meeting where some people
16 were talking about what are your coders doing?
17 What are your coders doing?  Not coders, what are
18 your CDS people doing?  Are they using sticky
19 notes?  Are they saving them?  You know, are you
20 typing your own queries up?  You know, how are you
21 handling the whole query process?
22     Q   And in connection with that meeting,
23 those interactions you learned that people were
24 using the words other and unable to determine?
25     A   No.  I didn't hear anything about that.

1  The whole discussion was what are you all doing at
2  your facility.
3      Q   Did you hear people criticize the use
4  of sticky notes during those meetings?
5      A   No.  The only thing they said -- that I
6  heard them say was are you saving yours?  Are you
7  throwing them out?  What are you doing with your
8  sticky notes?  That was the gist of the
9  conversation because a lot of the hospitals
10 weren't sure whether they should be saving the
11 sticky notes or throwing them out.  I had heard at
12 one point that AHIMA was going to come out with
13 guidelines.  I don't know if they have yet or not.
14     Q   Did you look for them?
15     A   No.
16     Q   Why not?
17     A   Well, because I get their journal,
18 so -- I do get their journal, so usually on the
19 front page they'll say something if it's coming
20 out or they're discussing the practice briefs or
21 whatever.  I didn't see anything about this.
22     Q   What is a practice brief?
23     A   It's kind of like AHIMA will put out
24 these practice briefs inside the journals kind of,
25 like, to give you guidance on certain things.

1    Q    So the practice briefs are published
2 inside the journals?
3    A    Inside the journals.
4    Q    Inside the journal that you subscribe
5 to?
6    A    Yes.
7    Q    And when did you begin subscribing to
8 the journals?
9    A    Since I've been a member.
10    Q    When --
11    A    Now, do I read them all?  No.
12    Q    When did you begin subscribing?
13    A    When was it when I became a member?
14 2001 or somewhere around there.  Whenever I became
15 a member they start sending you journals out, but
16 I'll be honest with you.  Do I read them all?  No.
17 I don't have time to read them.  I'll glance at
18 the first page, and if it catches my interest I'll
19 go inside the journal, but do you know to this day
20 -- I don't know whether anything has been solved
21 about this because I know people were still
22 talking about querying.  I don't know whether
23 AHIMA has come out with any guidelines.
24    Q    Do you have an impression based on
25 either your conversations, your interactions with

1 other professionals in the industry or any other
2 source as to what other hospitals are doing with
3 respect to preserving sticky notes or throwing
4 them away?
5    A    My take is they don't know what to do
6 at this point, they don't.  They don't know what
7 to do.
8    Q    So how did you make the -- is there a
9 written policy at Kernan about whether to save the
10 sticky note or whether to throw it away?
11    A    No.  We had a policy about the
12 worksheets that Ann uses that they would only, you
13 know.  They were just worksheets.  They weren't
14 part of the medical record, but we never really
15 had a policy on sticky notes.
16         We were just told by Navigant once the
17 physician documents in the record you don't need
18 to -- there's no need to keep the sticky note any
19 longer, so we threw it out.  We never saved them.
20    Q    Where would the policy about Ann's
21 worksheets be kept?
22    A    In the document, the CDS.  In her job
23 description.  I believe that's where it is.  I
24 have to go back and look.
25    Q    You think it's actually in her job

1 description?
2    A    I think in her -- our policies -- not
3 policies.  Our policy on clinical documentation
4 specialist.  I think it's in there.  I'd have to
5 go back and look.
6    Q    Are you referring a memo, a
7 publication, a booklet?  What are you referring
8 to?
9    A    It's kind of like a process.  We call
10 them policies and procedures, but it's more of a
11 process that we do internally.
12    Q    Where does it reside?  Is it on the
13 computer?
14    A    I don't know if Ann has it on the
15 computer or whether she's just got it -- I think
16 it's in the computer.
17    Q    Is that something that you could give
18 to Mr. Shepard?
19    A    Uh-huh.
20    Q    Okay.
21    A    Now, we didn't have a policy back then.
22    Q    That's fine.
23    A    This is just recent.
24    Q    That's fine.  I gather the policy will
25 say that Ann's worksheets are not to be

1 maintained?
2    A    Yes.
3    Q    Because they're not part of the medical
4 record?
5    A    Correct.  And we didn't consider that
6 part of the medical record either.
7    Q    Referring the sticky notes?
8    A    The sticky notes, yeah.
9         (Deposition Exhibit No. 10 marked for
10         identification and retained by
11         counsel.)
12    Q    Let me ask about this one.  And I'm
13 just going to ask you straight out what is this?
14    A    This is an agenda that -- for the rehab
15 docs where we got put on their agenda to talk to
16 them about malnutrition.
17    Q    When you say the rehab docs, what do
18 you mean?
19    A    The units.  The TBI unit, the CBA unit,
20 spinal cord and CMI units.
21    Q    That's the most of the hospital, right?
22    A    Right.  It's not on the med-surg.  We
23 couldn't get all the docs together in the same
24 room, so we went to one of their meetings to talk
25 to them.

Page 94

1     Q    What was the reason for getting
2  malnutrition on the agenda?
3     A    Because we knew that that documentation
4  wasn't clear enough, and we needed to let them
5  know.  We needed to know from a coder's
6  perspective on how -- what diagnosis code to use
7  because we weren't sure based on their
8  documentation.  Their documentation needed
9  clarification.
10    Q    What was the problem with the
11 documentation?
12    A    Well, this was in '08, and I believe --
13 let me think what happened in '08 why we put on
14 malnutrition.  We talked about it.  The
15 document -- we needed clarification for the
16 because Navigant during their audit told us to
17 get -- we needed our documentation clarified
18 because there was mild, moderate and severe
19 malnutrition not just malnutrition.
20    Q    So Navigant at some point prior to
21 June 16 of 2008 advised Kernan that coding for
22 malnutrition was not specific enough; is that --
23    A    Yes.
24    Q    -- for me to say?
25    A    Yes.  They told us it was not specific

Page 95

1  enough and we needed to look at -- I guess it was
2  based on their audits, you know.  They came back
3  and they said you need to get with your
4  physicians, and you need to get your documentation
5  clarified because there's mild, moderate and
6  severe malnutrition.
7     Q    So you believe this was based on the
8  quarterly audits that Navigant was doing?
9     A    Yes.  I think it was.
10    Q    When they do a -- when Navigant does
11 one of the quarterly audits do they prepare a
12 report?
13    A    Yes, they do.
14    Q    Where are those reports maintained?
15    A    They're maintained -- I send a copy
16 down to University to -- I don't know who gets it
17 now.  Now Theresa Kreps gets it.
18    Q    Do you keep a copy?
19    A    Yes, I have a copy.  I don't have it
20 electronically.
21    Q    You've got copies that you can give to
22 Mr. Shepard?
23    A    From back then, no, I don't have copies
24 from back then.
25    Q    Who would have copies from back then?

Page 96

1     A    Navigant.
2     Q    Okay.
3     A    They have them electronically.
4     Q    You have copies from when?
5     A    I have copies right now from last year,
6  this past fiscal year that we're getting ready to
7  end.
8     Q    Would you give whatever it is you have
9  to Mr. Shepard, please?
10    A    Uh-huh.
11    Q    Did you understand the Navigant audit
12 prior to June 16, 2008 to have shown that cases
13 were being coded at a higher level of severity for
14 malnutrition than was warranted?
15    A    No.  Uh-uh.
16    Q    Do you have the audit that lead to
17 putting malnutrition on this agenda?
18    A    I don't.
19    Q    Who does?
20    A    Navigant.
21    Q    Did you attend this session?
22    A    No, I did not attend that session.  Ann
23 attended this with Dr. Gorman.  I believe it was
24 Dr. Gorman and rehab docs.
25    Q    Who's Dr. Gorman?

Page 97

1     A    He's the chief of the rehab docs, Peter
2  Gorman.
3     Q    Okay.  Did Ann prepare any materials
4  for this session?
5     A    I don't know.  She could have.  I
6  really don't know.
7     Q    Is that something you can check for me?
8     A    Uh-huh.
9     Q    Do you see the reference to Epic
10 electronic medical record?
11    A    Yes.
12    Q    That's the electronic medical record
13 you were referring to before?
14    A    Yes.
15    Q    This suggests that the electronic.
16 Medical record would be in place 12 months after
17 June of 2008.
18    A    Yes.  I mean, that's what this would
19 suggest.  I know we went live in May.
20    Q    I gather that's --
21    A    We went live May 31st, I know that.
22    Q    Some year?  Got it.  You and I have
23 been using the year 2008 during our deposition
24 here today?
25    A    Yeah.  It must have been -- unless they

1   were running -- I know they were running behind.
2   I just know we went live May 31st.
3       Q   Okay.
4       A   That sticks in my brain.  The year I'm
5   really not -- I thought we were coming up -- I
6   thought we already finished three years.
7       Q   Okay.
8           (Deposition Exhibit No. 11 marked for
9           identification and retained by
10          counsel.)
11      Q   What is this and what's going on here?
12      A   This was -- Kathleen Dunleavy was our
13  contact person at HP3, and this was an email
14  congratulating me that we finally found a CDS
15  person and that Benito would be starting training
16  on the 31st -- on the 21st of April.
17      Q   That's a new name.  I thought Ann was
18  the --
19      A   No.  Benito works for -- Benito works
20  for HP3.  He's the one that came in to train us.
21      Q   Okay.
22      A   Benito Feliciano.
23      Q   Kernan hired him?
24      A   No.  He works for HP3.
25      Q   Okay.

1       A   We contracted with HP3.
2       Q   And so Benito was the HP3 person
3   on-site --
4       A   Yes.
5       Q   -- to do training?
6       A   Yes.
7           (Deposition Exhibit No. 12 marked for
8           identification and retained by
9           counsel.)
10      Q   Exhibit 12.  See if you can help me
11  with that.
12          MR. SHEPARD:  Let me see the number.
13          THE WITNESS:  Uh-huh.
14      Q   I've got you here and I want to ask you
15  about this.  If you can enlighten me about what
16  this document is I'd be grateful, and if you don't
17  know what it is that's fine too.
18      A   I have no idea what this is.
19      Q   Great.
20          (Deposition Exhibit No. 13 marked for
21          identification and retained by
22          counsel.)
23      Q   Exhibit 13.  Again, take a look.  If
24  you can help me understand what these are I'd
25  greatly appreciate it.

1       A   Now, this I do know.
2       Q   Okay.
3       A   Okay.  What this is you heard me talk
4   in the beginning about our encoder --
5       Q   Yes.
6       A   -- QuadraMed.  When the coders get the
7   documentation where the physician documents
8   protein malnutrition and you type in protein
9   malnutrition you can type in the code.  I mean,
10  you can type in the phrase protein malnutrition,
11  and that's what that is there, and then you hit
12  enter, and it takes you to malnutrition 260.  And
13  then it comes up again.  The search term tells you
14  what you searched out, 260.  And then it tells you
15  what 260 code is, Kwashiorkor includes nutritional
16  edema, blah, blah, blah, blah, blah, blah.  So
17  that was in QuadraMed.  That's our encoder, was
18  our encoder.
19      Q   So if I understand you correctly, you
20  access the program and it gives you this web page
21  dialogue on page 1708, right?
22      A   Yes.  You're in the patient.  You're
23  inside the patient's record.  You're at the coding
24  screen.
25      Q   Then there's a button you click.  You

1   click the coding button, right?
2       A   Yes.  See coding and abstraction right
3   there?
4       Q   Yes.
5       A   That's the tab we're in.
6       Q   Right.
7       A   And if you --
8       Q   And then you go to this one here,
9   coding?
10      A   No.  If you click down in the little
11  box down here -- you can't see it.  Say one of
12  these boxes here where you have to put the code in
13  and you start typing protein malnutrition it pops
14  up.
15      Q   As that web page dialogue?
16      A   Correct.
17      Q   Okay.
18      A   And then when you hit enter, it takes
19  you to what the code is for protein malnutrition,
20  260.  And then on the third page it tells you what
21  260 is on that last document.
22      Q   Well, it gives you it gives you -- it
23  gives you 260, but it also gives you 261, and 62
24  and the others down to 269, right?
25      A   That's correct.  But that's based on

d432362f-11e7-42eb-a42b-55bc22e6801c

Page 102

1    the documentation, whatever the documentation is
2    in the record.
3         Q    So if you were -- once you got to the
4    screen that's reflected on page KH710, if you
5    pushed the down arrow button you would go from
6    Kwashiorkor to 261, nutritional marasmus, correct?
7         A    No.  Well I don't know if you push the
8    down button.  It just gives you other diagnosis
9    that it could be based on the documentation.
10        Q    Right.
11        A    Uh-huh.
12        Q    You've got a number of choices here?
13        A    Right.  It will give you -- it will
14   give you a choice.
15        Q    And you could move it from -- I
16   apologize for interrupting.
17        A    No.
18        Q    You could move it from 260.  You could
19   move the selection to 261 or 262 or any of the
20   other numbers here, correct?  The program is
21   capable of being moved, okay.
22        A    I would imagine it's a down arrow.  I
23   don't know exactly what --
24        Q    Maybe it's the cursor.
25        A    Right.

Page 103

1         Q    Maybe it's the mouse or something --
2         A    Right.  It would give you the
3    selections.
4         Q    The point is -- the point being you
5    could move it from 260 to any one of these other
6    choices, correct?
7         A    Yes.
8         Q    So when one types in protein
9    malnutrition, it goes to 260.  What it gives you
10   is a list of choices that you could make?
11        A    Correct.
12        Q    And what the coders should do is
13   determine which of those choices on page 1710 is
14   most accurate, is the most accurate reflection of
15   the chart, correct?
16        A    Correct.  Based on the physician
17   documentation.
18        Q    Right.
19        A    So if the physician had documented
20   nutritional marasmus or whatever, then she would
21   select 261.
22        Q    Right.
23        A    Right.
24        Q    So if the physician documented protein
25   malnutrition, the coder should look in the chart

Page 104

1    and see which of these codes on page 1710 applies,
2    correct?
3         A    Yes.
4         Q    It would be inappropriate for the coder
5    automatically to select 260, Kwashiorkor, correct?
6         A    If that's all the documentation she has
7    then it would be that, but if there was further
8    documentation in the record, if the physician had
9    documented for other things going on with the
10   patient like what's listed here, then she would
11   select one of those codes.
12        Q    Are you telling me that if the doctor
13   puts protein malnutrition in the chart she goes
14   automatically to Kwashiorkor; is that your
15   testimony?
16        A    Yes.  Because that's the code it's
17   telling her to use.
18        Q    You're telling me that the coder is not
19   to use his or her discretion to determine whether
20   protein malnutrition could fit any of these other
21   categories?
22        A    No.  She's not a doctor.  All she's
23   doing is -- coders have guidelines that they go
24   by, the coding guidelines.  They have -- they
25   cannot code -- they have to code what the doctor

Page 105

1    documents.
2         Q    Do you believe that Kwashiorkor is the
3    same thing as protein malnutrition?
4         A    I don't know.
5         Q    Do you have coding tools, coding
6    protocols that establish that Kwashiorkor is the
7    same is protein malnutrition?
8         A    No.
9         Q    Have you ever looked up what the
10   diagnosis of Kwashiorkor is?
11        A    I have now, but --
12        Q    Were you surprised?
13        A    Yeah.
14        Q    Why were you surprised?
15        A    Because it's severe malnutrition, which
16   is what I thought it would be.  Severe
17   malnutrition.
18        Q    Usually found in Sub-Saharan Africa,
19   correct?
20        A    Yes.
21        Q    Not especially prevalent in Baltimore
22   City, is it?
23        A    I don't know about Baltimore City.  I
24   don't know.  I don't know.  I just know that when
25   I look it up I felt it was, like, severe

27 (Pages 102 to 105)

Page 106

1  malnutrition, you know.
2      Q   Protein malnutrition is not severe
3  malnutrition, is it?
4      A   I don't know.  I really don't.
5      Q   It's not necessarily severe
6  malnutrition, is it?
7      A   I don't know.
8      Q   For protein malnutrition to get to
9  Kwashiorkor, a severe malnutrition, you need some
10 other evidence in the chart, wouldn't you?
11     A   I don't know.
12     Q   Okay.
13     A   I really don't.
14     Q   You're the director of Health
15 Information Management?
16     A   Right.  But I'm not a coder.  I mean,
17 if I was coding the record and the doctor said
18 protein malnutrition and I typed in protein
19 malnutrition and that came up with that code I
20 would select that code.  I'm not a doctor, and I'm
21 not supposed to question the physician.
22     Q   I got the impression from something you
23 said before, and I may have gotten this wrong but
24 you can correct me that the coders did have the
25 responsibility for looking through the chart and

Page 107

1  exercising a certain amount of judgment about
2  whether coding was accurate?
3      A   Whether the documentation was there to
4  support their code.
5      Q   Okay.  That requires a certain amount
6  of judgment; would you agree?
7      A   Explain judgment.  Like, are you
8  talking about --
9      Q   Let me ask it this way.
10     A   -- like coding judgment?
11     Q   If there's a question in the chart and
12 the coder isn't sure, would the coder interact
13 with Ann to have a query issued?
14     A   Yes.  If they're not clear on the
15 documentation but it would be on the
16 documentation, not on a clinical basis.
17     Q   So if a coder had a question about
18 whether a certain code was appropriate, the coder
19 had the authority to ask Ann to issue a query?
20     A   But it wouldn't -- it's not on the
21 code.  It would be on the documentation to support
22 the -- if she didn't think that the documentation
23 was there.
24     Q   Right.
25     A   You know, say the doctor didn't say

Page 108

1  protein malnutrition.  Say he just said
2  malnutrition or whatever and we needed
3  clarification on that, then the coder would ask
4  Ann to do a query.
5      Q   Okay.  But in this instance it
6  appears -- if I understand your testimony
7  correctly, the way in which the system is set up
8  it takes away the coders ability to make that
9  querying judgment.  Am I understanding your
10 testimony correctly?
11     A   No.  It doesn't take her -- because
12 she's got the documentation.  Okay.  So it doesn't
13 take away -- the coder isn't going to know --
14 doesn't know what Kwashiorkor is.  I didn't know
15 what Kwashiorkor was.  All the coder is looking
16 for is do I have the documentation to support that
17 diagnosis code of 260.  They're not going to look
18 up Kwashiorkor.  They're going to code it, and
19 they're going to go on with the next chart.  The
20 only time that they would question is if the
21 physician wasn't specific enough in his
22 documentation.
23     Q   In your practice as the director of HIM
24 at Kernan did you do any kind of review about
25 the -- about how the coding was changing after

Page 109

1  this new system wasn't into place?
2      A   No.  I didn't see any.  I mean, I get
3  any reports or anything from the commission.
4      Q   Okay.  And very specifically with
5  respect to Kwashiorkor I showed you the exhibit
6  before that appeared to reflect the numbers
7  increasing.  Do you recall that?
8      A   Yes, I saw that.
9      Q   That was not information that you
10 sought to obtain prior to receiving the subpoena?
11     A   No.
12     Q   And that would be the same with any
13 other ICD-9 diagnosis?
14     A   Correct.
15     Q   The coders were doing whatever it was
16 they were doing, and nobody was checking to see --
17     A   No.  The auditors were checking.
18 That's why we had the charts audited.  I'm not a
19 coder so I didn't audit the records.  That's why
20 we had outside Navigant audit the records to make
21 sure that we were coding appropriately based on
22 our documentation.  We still do to this day.
23     Q   They check particular charts, right?
24     A   No.
25     Q   So they would review 100 to 150 charts

Page 110

1  I think you said.
2      A   Uh-huh.
3      Q   They're not reviewing to see, well,
4  we've got a spike in Kwashiorkor diagnosis?
5      A   Oh, no.  They're not looking --
6      Q   What's the reason for that?
7      A   They're not looking for that.
8          MR. SHEPARD:  If you know.  Do you know
9  what the audits are doing?
10     A   They're --
11     Q   You get the reports, ma'am, don't you?
12     A   Right.
13     Q   Right.
14     A   They're looking at --
15     Q   And you know from those reports that --
16 the reports will speak for themselves, but as far
17 as your understanding is, those reports looked at
18 the 100 to 150 charts, correct?
19     A   Correct.
20     Q   And my question is:  When you've got a
21 spike in Kwashiorkor of the kind that we saw
22 nobody at Kernan was looking at that, why there
23 was a spike, is that -- as far as you know, right?
24     A   As far as I know.  I don't know if
25 anybody was looking at that or not.  I can tell

Page 111

1  you the audits that I get from Navigant they're
2  based on this is how many charts we looked at
3  that.  This is how many DRG changes there were,
4  and that's it.  It doesn't drill down to the
5  diagnosis.
6      Q   What do you mean by the DRG changes?
7      A   Well, if the -- for instance, if the
8  patient is a rehab patient and they have a
9  surgical procedure, the DRG would go from 860 to
10 850, so they're looking --
11     Q   I'm not following you.  What do you
12 mean?  What is Navigant looking at when they do
13 that?
14     A   They're looking to make sure that we're
15 coding, that our coders are assigning the correct
16 codes based on the documentation in then record.
17     Q   Okay.
18     A   So they're looking at this
19 documentation.  Did the coder code -- use the
20 right code for this documentation in the record.
21 And then if they're not sure, they'll even come
22 back to us and say, "It's unclear.  You need to do
23 a retrospective query.  We're not sure.  We
24 suggest that you query the physician to get more
25 specific."  So that's what they're looking at.

Page 112

1      Q   Okay.
2          MR. LOUCKS:  This would be a really
3  good time to take a break.
4              L U N C H E O N   R E C E S S
5
6
7
8
9
10
11
12
13
14
15
16
17
18         A F T E R N O O N   S E S S I O N
19             (Deposition Exhibit No 14 marked for
20             identification and retained by
21             counsel.)
22 BY MR. LOUCKS:
23     Q   Let me show you what we've marked as
24 Exhibit 14.
25     A   Uh-huh.

Page 113

1      Q   You recognize that, don't you?
2      A   The ICD-9 code book.
3      Q   The 2001 version.
4          MR. SHEPARD:  Do you know if this is
5  the official version?
6          THE WITNESS:  No, I don't.  I don't
7  know.  I just --
8      Q   It's a version.  I don't know if it's
9  an official version.
10         What we've copied is the part that
11 relates just to malnutrition, I gather.  I grant
12 you.
13         Here's my question:  Your coders would
14 have access to either this book or a book like it?
15     A   The most recent version, yes.
16     Q   And that would have been true
17 throughout the time that they were coding, right?
18     A   Yes.
19     Q   When they're coding -- we looked at the
20 computer screens right before the break.  Would
21 you expect the coders to refer to these materials,
22 to the printed ICD-9 materials while they're using
23 the computer screens?
24     A   No.  They would use whatever is in the
25 computer or -- well, they use both.  Let's put it

Page 114

1 this way.  They use both.
2     Q    How?
3     A    The book and what's in the computer
4 screen.
5     Q    Explain to me how they would do that.
6     A    Well, they have a book.  Okay.  They
7 have a copy of the book, and then they have what's
8 in the computer.  The book -- there's an ICD-9,
9 and then there's -- in the computer, and then
10 there's the book.
11    Q    So what they should be doing then is
12 they type in protein malnutrition.  It pops up in
13 the web dialogue.  It takes us to ICD-9 260,
14 right?  And they should be then using the book to
15 check?
16    A    No.  They don't use the book to check.
17    Q    Okay.
18    A    They would only us the book if the
19 system, the computer system was down.
20    Q    Okay.
21    A    That why they have the --
22    Q    How would they code if the computer
23 system is down?
24    A    Paper.
25    Q    What other reference tools do the

Page 115

1 coders -- did the coders, did the coders have
2 from, say, 2005 to the 2008 timeframe, other than
3 something that contained the ICD-9 codes like
4 Exhibit 14?
5     A    Well, they have Coding Clinic, the CPT.
6 Coding Clinic, CPT, ICD-9.  Let's see.  Is there
7 another one?  No, I think that's it.  Coding
8 Clinic, ICD-9 and CPT.
9     Q    And they would use CPT and the Coding
10 Clinic in the same way in that if the system was
11 down and the system didn't direct them to an ICD-9
12 number, then in that circumstance they'd have
13 reference to the ICD-9 book, the CPT or the Coding
14 Clinic?
15    A    Well, they would have access to it, but
16 they wouldn't use the CPT.  The CPT is only for
17 procedural coding.
18    Q    I know.
19    A    Then --
20    Q    But you wouldn't use any of that stuff
21 as long as the computer is up, correct?
22    A    Correct.
23    Q    You follow what the computer says?
24    A    Correct.
25    Q    What kind of training does Kernan

Page 116

1 provide for the coders, say in the 2005 to 2008
2 timeframe?
3     A    Well, all of our coders are certified
4 coding specialists, so they're CCS.
5     Q    And what --
6     A    Certified coding specialist.
7     Q    Certified coding specialists.  Okay.
8     A    Uh-huh.
9     Q    And they would have that before they
10 come onboard, before they're hired?
11    A    Correct.
12    Q    Then in terms of additional training
13 that Kernan provides or makes available by sending
14 them off to conferences or something --
15    A    Yes.
16    Q    -- what happens?  What kind of training
17 is there for coders?
18    A    Whatever is out there, whatever they
19 want to go to.  They'll get things in the mail or
20 notifications, and they'll say to me can I go to
21 this.  I put a lot of money in the budget for
22 education.
23    Q    Do you have records of what training
24 your coders have taken over the years?
25    A    They get the certificates.

Page 117

1     Q    Do you maintain a list of the kinds of
2 training that the coders have received over the
3 years?
4     A    I send a copy of the certificate to HR
5 --
6     Q    Okay.
7     A    -- for their employee file.
8     Q    There's no list that you maintain
9 about -- chose your name, has gone to X number of
10 seminars or conferences or something?
11    A    No.
12    Q    Okay.
13    A    No.
14    Q    How about -- is there any in-house
15 training that's done?
16    A    No.
17    Q    How about Ann, what kind of -- is there
18 a record of training that she has been to?
19    A    No.  Only Navigant.  Only the Navigant
20 training.
21    Q    And what do you mean by the Navigant
22 training?
23    A    When we first went up on the CDI
24 program they trained her.
25    Q    Okay.  When did that occur?

d432362f-11e7-42eb-a42b-55bc22e6801c

Page 118

1     A   2005.
2     Q   All right.
3     A   Yes.
4     Q   What was involved in that training?
5     A   Well, that gentleman, Benito, he came
6  out to the hospital.  There was in-class training,
7  and then there was on the unit training.
8     Q   How was the coding done -- we've been
9  talking about coding queries and such like,
10 essentially from 2005 timeframe and later.  How
11 was it done prior to 2005?
12    A   The same.
13    Q   Was there a query process?
14    A   No.
15    Q   Why not?
16    A   I don't know.  Just never had it.
17    Q   Okay.  The coders didn't have any
18 recourse to the doctors if there was conflicting
19 information in the chart or ambiguous information
20 in the chart or incomplete information?
21    A   Not that I'm aware, no.
22    Q   Okay.  So the whole query process
23 really evolved from the HSCRC mandate about using
24 ARP-DRGs?
25    A   Yes.  Yes.

Page 119

1        (Deposition Exhibit No. 15 marked for
2        identification and retained by
3        counsel.)
4     Q   Take a look through.  Tell me first if
5  you're familiar with this.  I gather it comes as
6  a -- in some form that the doctors can carry
7  around with that but I could be wrong on that.
8  You tell me.
9     A   I don't know.  I really don't.  I don't
10 know.
11    Q   Have you seen this or something like it
12 before?
13    A   No.
14    Q   If you look at Page 2 of the document,
15 Bates KH10, it appears to -- and maybe you can
16 interpret this better that I can.  Do you see
17 where it says severity level and relative weight
18 ranking?
19    A   Severity level.  I'm sorry.  Where?
20    Q   Sort of at the top.
21    A   Yes, I see.
22    Q   And it's referring to those columns and
23 figures, correct?
24    A   I have no idea.
25    Q   Can you interpret those figures for me

Page 120

1  in the columns --
2     A   No.
3     Q   -- labeled one, two, three and four?
4     A   No.
5     Q   Can you think of a reason why Kernan
6  would be handing out a document that would tell
7  the doctors the effect on the severity rating of
8  one diagnosis or another?
9     A   No.
10       (Deposition Exhibit No. 16 marked for
11       identification and retained by
12       counsel.)
13    Q   Can you identify this document, Exhibit
14 16?
15    A   It's a lab report.
16    Q   At the top it says sample of
17 pre-albumin levels.  Do you see that?
18    A   Yes.
19    Q   Do you know what -- what is the
20 significance of that?
21    A   I have no clue.
22    Q   Were you -- you participated in the
23 effort to produce documents in response to the
24 subpoena?
25    A   Yes.

Page 121

1     Q   Was this one of the documents that is
2  you collected?
3     A   Not me.  Not myself, no.
4     Q   Did you review this document in the
5  course of collecting documents or preparing the
6  responses to the subpoena?
7     A   No.
8     Q   Is this document a part of a larger
9  book?
10    A   I don't know.
11    Q   Is this document a resource that the
12 coders or that Ann Sewell would have access to?
13    A   I don't know.
14    Q   We were talking before about when to
15 issue a query, and I don't want to go over what
16 you said before, but I wanted to make sure was
17 that I had captured information that you had about
18 Kernan policies about when was appropriate to
19 issue a query, and let me ask it this way if I
20 can.  Is there anything in writing in Kernan that
21 would tell a coder when it is appropriate to issue
22 a query in a particular case?
23    A   No.
24    Q   And I don't want to -- you know, I
25 asked a question is there anything.  Let me make

Page 122

1  sure I ask the question completely appropriate.
2  From the time of 2005 to the present, has Kernan
3  had written policies in effect that would
4  articulate the conditions under which it would be
5  appropriate for a coder to issue a query to a
6  doctor?
7      A   It wouldn't be a coder.
8      Q   Well, whoever.
9      A   CDS.
10     Q   Okay.
11     A   No.
12     Q   Okay.
13     A   No.
14     Q   When the -- when HSCRC made the
15  decision the implement APR-DRG you were in the
16  position of being director of HIM at that time?
17     A   Yes.
18     Q   And were you -- what involvement did
19  you have in the process of doing whatever needed
20  to be done at Kernan to accommodate that change by
21  HSCRC?
22     A   He only thing I did was call university
23  and ask them who did their training for the CDS
24  program.
25     Q   And they gave you HP3's name?

Page 123

1      A   Correct.
2      Q   And if I understand it correctly from
3  the materials I've been given, the CFO negotiated
4  the arrangement with HP3?
5      A   Correct.
6      Q   That was Mr. --
7      A   Bayless.
8      Q   -- Bayless.
9      A   Uh-huh.
10     Q   Thank you.
11         Were you involved in that process of
12  negotiating with HP3?
13     A   No.
14     Q   Was anybody else involved in that
15  process as far as you know?
16     A   As far as I know.  I don't know.
17     Q   When did that process begin?
18     A   I really don't know.  I have no idea
19  when Mr. Bayless started that had whole process.
20     Q   Did you attend any meetings in regard
21  to that process?
22     A   No.
23     Q   They didn't get you involved in terms
24  of the specifications as to what the systems were
25  and what things would need to be changed in order

Page 124

1  to this?
2      A   No.
3      Q   When did you first learn of HP3 and the
4  fact that they would be involved?
5      A   When George called me to his office and
6  they said that they had signed a contract with
7  HP3.
8      Q   What was your understanding of the
9  terms of that contract?
10     A   I had no idea.  He did not let me know
11  what that was.
12     Q   Okay.  Did you -- what was your
13  understanding about what it was that HP3 was to
14  do?
15     A   I don't know.  I didn't see the
16  contract.
17     Q   No.  No.  I'm asking what your
18  understanding was.  What was your understanding at
19  that time of what it was HP3 was to do?
20     A   I had -- I didn't have any.  I didn't
21  know.  I had no idea what they were going to do
22  until they came on-site.
23     Q   Okay.  Well, when they came on-site,
24  what was your understanding at that time as to
25  what HP3 was go do?

Page 125

1      A   That they were to train Ann on whole
2  CDS or CDI program, what it was because we had
3  never heard of it before.  So what it was.  They
4  were to train her.  They were to train the coders,
5  and they were to meet with the physicians and let
6  them know what the whole program was.
7      Q   Did you -- and those trainings, in
8  fact, occurred with Ann and the coders?
9      A   Correct.
10     Q   Did you attend those trainings?
11     A   No.
12     Q   Why not?
13     A   I don't know.
14     Q   Okay.
15     A   I didn't attend.
16     Q   And the meetings with the physicians
17  occurred?
18     A   Yes.  I do -- yes.  The meetings with
19  the physicians occurred.
20     Q   Did you attend those meetings?
21     A   No.
22     Q   When was it that HP3 arrived on the
23  scene in that way?
24     A   I think it was around 2006 because I
25  remember from the time George told me that they

Page 126

1  were coming it was quite a while before they got
2  there.  It might have been the beginning of 2006.
3      Q    Okay.
4      A    I don't remember.
5      Q    Let me show you this.  May you've seen
6  it and maybe you haven't.  Tell me if you
7  recognize that document.
8          (Deposition Exhibit No. 17 marked for
9          identification and retained by
10         counsel.)
11     A    No.
12     Q    Take a look at the third page, which is
13 Bates No. KH17 --
14     A    Uh-huh.
15     Q    -- which I think starts talking about
16 things that might actually relate to your area.
17 It talks about documentation specialist training,
18 case manager training, HIM coder training.  Do you
19 see those things?
20     A    Yes, I see them.  Uh-huh.
21     Q    Does this jog any memories about
22 timing?  There's a date of April 13th in the upper
23 right corner.  CDI classroom training seem to be
24 April 21st to 27th, at least on this piece of
25 paper.  I'm just wondering if this jogs any

Page 127

1  memories about the timing.
2      A    No.
3      Q    How much time did the training take
4  with the coders?
5      A    I don't know.
6      Q    Are there materials that Navigant or
7  HP3 gave to the coders in connection with that
8  training?
9      A    I don't know.
10     Q    Would it be possible for you to check
11 with the coders to see if they retained any
12 materials that they might have been given?
13     A    Yes.  I can check with them.
14     Q    And then if you find something give it
15 to Mr. Shepard?
16     A    Uh-huh.
17     Q    Same question as regards to Ms. Sewell,
18 Ann.  If she retained any training materials would
19 you check with her?
20     A    Sure.
21         (Deposition Exhibit No. 18 marked for
22         identification and retained by
23         counsel.)
24     Q    I'm showing you a document marked as
25 Exhibit 18.  Let me ask you if you've seen this

Page 128

1  document before.
2      A    No, I haven't.
3      Q    It says is a proposal for severity
4  ratings assessment.  Do you see that?
5      A    Yes.
6      Q    Did you have any exposure to any
7  proposals that HP3 made --
8      A    No.
9      Q    -- to Kernan?
10         Did you have any understanding about
11 the -- any goals that Kernan had as a result of
12 that change over?
13     A    No.
14     Q    Were there any monetary goals that
15 Kernan was trying to achieve with this change
16 over?
17     A    No.
18     Q    Were there any other kinds of
19 efficiency goals that you're aware of that Kernan
20 might have been trying to achieve?
21     A    No.
22     Q    On page three of the document at Bates
23 KH54, it says that one of the objectives is to
24 conduct a baseline analysis, and then it has a
25 reference to desired improvement.  Do you know

Page 129

1  what kind of desired improvement might be intended
2  there?
3      A    No, I don't.
4      Q    Did the CFO mention to you at anytime
5  that there was a desire to improve collections
6  through the use of APR-DRG process?
7      A    No.
8      Q    Were there any targets for improvement
9  in terms of reimbursement through the use of the
10 APR-DRG process?
11     A    No.
12     Q    On the next page on page KH55, there's
13 a reference at the top to coding.  Do you see
14 that?
15     A    Yes.
16     Q    It says HP3 will conduct a baseline
17 audit of a sample of 300 inpatient records.  Do
18 you see that?
19     A    Yes, I see it.
20     Q    Was such a random sample audit
21 performed?
22     A    I don't know.
23     Q    If such a random sample had been
24 performed in 2004, would it have been your office
25 that would have gathered the files for HP3 to

d432362f-11e7-42eb-a42b-55bc22e6801c

Page 130

1  review?
2      A   I don't know.
3      Q   Would there have been some other office
4  that would have done that at Kernan?
5      A   I don't -- I really don't know.
6          (Deposition Exhibit No. 19 marked for
7          identification and retained by
8          counsel.)
9      Q   Do you recognize this, Exhibit 19?
10     A   No, I don't.
11     Q   Take your time and flip through it if
12 you'd like.
13     A   No, I've never seen this.
14     Q   Is this the kind of document that would
15 have been used to train the coders?
16     A   I don't know what HP3 would have used.
17     Q   Okay.  Is this the kind of document
18 that would have been used to train Ann?
19     A   I don't know.
20     Q   Is this a document that would have been
21 used to train the physicians?
22     A   I definitely don't know about that.
23     Q   Okay.
24     A   I have no idea what they used.
25     Q   Did Benito Feliciono get involved with

Page 131

1  training the physician personally?
2      A   I don't know whether he did or he did
3  not.
4      Q   He did get involved personally with
5  training the coders?
6      A   Yes.
7      Q   And he did get involved personally with
8  training Ann?
9      A   Yes.
10     Q   The CFO is not a physician, correct?
11     A   Correct.
12     Q   Was there any physician that was
13 involved in the process of retaining HP3 as far as
14 you know?
15     A   No.  Not that I'm aware of.
16     Q   Okay.  Was there any committee formed
17 at Kernan to advise the CFO with respect to the
18 retention of HP3 for this purpose?
19     A   I wouldn't know that.
20     Q   Did any physician review the materials
21 that are set forth in Exhibit 19 to your
22 knowledge?
23     A   I don't know.
24         (Deposition Exhibit No. 20 marked for
25         identification and retained by

Page 132

1          counsel.)
2      Q   Let me show you Exhibit 20.
3      A   All right.
4      Q   Have you seen this one before?
5      A   No, I haven't seen this one.
6      Q   So Exhibit 20 you have not seen this
7  before?
8      A   No.
9      Q   Have you seen anything like this
10 before?
11     A   No.
12     Q   Were you advised as a result of the HP3
13 process of the volume of retrospective queries
14 should increase?
15     A   No.  Uh-uh.
16     Q   In fact, there was not very much
17 emphasis on retrospective queries if I understand
18 your testimony.
19     A   I have no idea.
20     Q   At Kernan?
21     A   Right at Kernan.
22     Q   Presently there's relatively -- your
23 query process is principally a concurrent query
24 process, right?
25     A   That's correct.

Page 133

1      Q   And you told me that the retrospective
2  query process was only done as a result of the
3  quarterly audits by Navigant?
4      A   Yeah.  That they recommended we query.
5      Q   So if they were looking at a chart and
6  they had some question about it in that
7  circumstance they would recommend a query to the
8  doctor?
9      A   They would recommend a query, yes, to
10 the doctor.  Yes.
11     Q   But other than that, there's no
12 retrospective query process at Kernan Hospital?
13     A   No.
14     Q   Did anybody at anytime in this process
15 of retaining HP3 give you any sense about monetary
16 expectations that would flow from this coding
17 process?
18     A   No.
19     Q   Did anybody suggest that by virtue of
20 capturing -- more accurately capturing the
21 secondary diagnosis that in all likelihood
22 reimbursement rates would rise?
23     A   No.
24     Q   Or fall?
25     A   No.

Page 134

1    Q   Or stay the same?
2    A   No.
3    Q   Nobody said anything to you one way or
4  the other?
5    A   Nope.  Nothing.
6    Q   Take a look if you would, please, at
7  page KH212.  I think it's Page 2 of the exhibit.
8  No.  I lied.  Page 4.
9    A   Uh-huh.
10   Q   Do you see at the top -- I think you're
11 one page further.
12   A   Oh.
13   Q   Come back one page if you would,
14 please.
15   A   Okay.
16   Q   Do you see at the top coding and record
17 completeness findings?
18   A   Uh-huh.  Yes.
19   Q   Then it says for Kernan down in the
20 chart below:  Findings are driven by one, the
21 small number of CMS-DRGs in the patient
22 population.  Do you see that verbiage?
23   A   Yes.
24   Q   I take that to mean that Kernan has a
25 limited number of DRGs that it's working with, a

Page 135

1  limited number of ICD-9s to code; is that right or
2  wrong?
3    A   I really couldn't tell you.
4    Q   What does that mean?
5    A   I don't know.
6    Q   Well, you know what a DRG is, right?
7    A   Yes.  I don't know what our DRGs are.
8    Q   Tell me if I'm -- maybe you don't know.
9  Tell me if I'm right or wrong.
10   A   Uh-huh.
11   Q   I understood this to mean that because
12 Kernan was a rehabilitation hospital, there were a
13 relatively small number of applicable DRGs to what
14 Kernan did.  Is that consistent with your
15 understanding?
16   A   I have no idea.
17   Q   Above there it appears to suggest that
18 there was an analysis of Kernan's coding.  Coding
19 quality 99 percent, coding completeness 80
20 percent, coding productivity 1.6 per hour.  Do you
21 see that?
22   A   Yes, I see it.
23   Q   Are those numbers that were familiar to
24 you at anytime during your experience?
25   A   No.

Page 136

1    Q   No?
2    A   No.
3    Q   Did you -- have you ever received data
4  that references the coding completeness?
5    A   No.
6    Q   Have you ever received data that
7  reflects the coding productivity in hours?
8    A   No.
9    Q   And have you ever received data that
10 analyzes the quality of the coding of your coders?
11   A   No.
12   Q   The chart right below that on the same
13 page speaks about coding turnaround time, coding
14 queries and coder fitness testing.  Do you see
15 that?
16   A   Yes.
17   Q   Do you see where it says, coder fitness
18 testing 72 percent?
19   A   Yes, I see it.
20   Q   What does that mean to you?
21   A   I have no idea.
22   Q   In your time as director of HIM, no one
23 has given you data or information on coder fitness
24 testing for your coders?
25   A   No.

Page 137

1    Q   Is there any -- I mean, take a look
2  through the balance of the chart.  What I don't
3  want to do is go through and have you have to say
4  no to everything.
5    A   Right.
6    Q   I mean, if there's something on here
7  that's actually familiar to you I'll ask you
8  questions about it.
9    A   No.
10   Q   I don't want to waste your time or
11 mine.
12   A   I've never seen this report, so I
13 couldn't answer to it.  I've never seen this.
14   Q   It's the substance of the information
15 also that I'm interested in, Ms. Green, so if
16 there's something there like you received a report
17 about or that you received information about or if
18 you asked for information about or you were told
19 about, again, I don't want to drag this out
20 forever --
21   A   Right.
22   Q   -- but if there's something there that
23 strikes you as part of your business, I'd like to
24 ask you about it.
25   A   No.

d432362f-11e7-42eb-a42b-55bc22e6801c

Page 138

1    Q   Okay.
2    A   Not that I see on this document.
3    Q   Okay.
4        (Deposition Exhibit No. 21 marked for
5        identification and retained by
6        counsel.)
7    Q   Let's try this one.
8        MR. LOUCKS:  I've marked on this one.
9    I just highlighted a couple things.  What's weird
10   about it is that the copy didn't copy this
11   apparently.
12       MR. SHEPARD:  Huh.
13   Q   Maybe because I did the highlighting
14   over it.  My goal had been to have a clean copy
15   for you, Ms. Green.  I apologize for that.
16   A   That's okay.
17   Q   Now, you would be Martha, right?
18   A   Right.
19   Q   And Paul would be who?
20   A   The CFO.
21   Q   Okay.  Now let me switch and give you
22   21.  Now, how did it come to pass that Paul wrote
23   this here for you?
24   A   I have no idea why he wrote -- Martha,
25   FYI.  Paul.  I don't know.

Page 139

1        MR. SHEPARD:  May I ask to see one?
2    Are they the same Bates No.?
3        MR. LOUCKS:  I think they are.  They're
4    supposed to be.  Maybe we can make that 21-A that
5    she's looking at.
6        MR. SHEPARD:  I'm just wondering if
7    that's the same Bates No. whether that was on
8    there when we produced it.
9        MR. LOUCKS:  It was.
10       MR. SHEPARD:  Then why isn't it on both
11   copies?
12       MR. LOUCKS:  I don't know.  It's
13   bizarre.  Let's mark that 21-A.
14       (Deposition Exhibit No. 21-A marked for
15       identification and retained by
16       counsel.)
17       MR. SHEPARD:  I put an A.
18       MR. LOUCKS:  Exhibit 21 is the hard
19   copy.  Exhibit 21-A I printed out from the
20   computer because I took the disc.
21       MR. SHEPARD:  Okay.
22       MR. LOUCKS:  You gave me the disc with
23   it all on PDF.  I loaded it on my computer, and so
24   the other day I printed this out.  I didn't notice
25   that that wasn't there.  That's peculiar.

Page 140

1        MR. SHEPARD:  I have no idea.  They
2    should be exactly the same --
3        MR. LOUCKS:  I agree.
4        MR. SHEPARD:  -- if it's the same
5    number.
6    BY MR. LOUCKS:
7    Q   In any event, do you recall -- so we're
8    talking about Paul.  Which one is Paul again?
9    A   He was the CFO.  Mr. Bayless.
10   Q   I thought you said George Bayless.
11   A   I did.  Sorry.  George.  Where did I
12   get Paul from?  Sorry.
13   Q   So who's Paul?
14   A   Paul -- we had a Paul Nicholson who was
15   also a CFO, but that was way back when I was doing
16   transcription.  Sorry.
17   Q   Do you know who this Paul here is on
18   Exhibit 21?
19   A   No.  I have no idea who that is.
20   Q   It's somewhere presumably around --
21   after June 22.  Maybe not.  I don't know.
22   Somewhere around that timeframe.  Does that jog a
23   memory?
24   A   God.  I'm trying to think who Paul
25   could be.

Page 141

1    Q   Did you give this document to counsel
2    in response to the subpoena?  Did this come from
3    your files?
4    A   Not that I remember, no.  I don't know.
5    Q   Did you go through your files in
6    response to the subpoena?
7    A   No, I didn't go through them.  No.
8    Q   Do you have paper files that relate to
9    the querying process?
10   A   No.
11   Q   Do you have electronic files that
12   relate to the querying process?
13   A   No.
14   Q   Do you have files electronic or in
15   paper that relate to coding or that relate to
16   training?
17   A   No.  I don't have -- I didn't get these
18   materials.  The coders got the materials and the
19   CDS got the materials.  I did not get the
20   materials.
21   Q   All right.  To your knowledge, were
22   there target -- at anytime were there target rates
23   for queries, responses and query agreement?
24   A   No.
25   Q   Please turn to page KH146 of Exhibit

d432362f-11e7-42eb-a42b-55bc22e6801c

Page 142

1    21-A, and look at the top chart.  Do you see there
2    a target rate for physician response of
3    75 percent?
4        A    Yes, I see it.
5        Q    And right above there there's a query
6    rate of 40 percent?
7        A    Yes.
8        Q    And then down from that there's a query
9    agreement rate of 80 percent.  Do you see that?
10       A    Yes.
11       Q    And it appears that somebody was
12   tracking whether the actual result met the
13   targets.  Do you see those numbers for quarter
14   one, whatever quarter one was?
15       A    Where's that?
16       Q    It's in the column right to the left of
17   target.
18       A    Okay.  Sorry.
19       Q    So the query rate was 40 percent.  The
20   target was 40 percent.  The percent achievement
21   was 100.  You see all that, right?
22       A    Yes.
23       Q    The response rate was 50 percent
24   whereas the target was 75 percent, so you've to a
25   67 percent achievement rate.  Do you see that?

Page 143

1        A    Uh-huh.
2        Q    Are these familiar numbers to you?
3        A    No.
4        Q    Did anybody tell you that there were
5    response rates and query agreement rates?
6        A    No.
7        Q    You had no role in formulating these
8    rates?
9        A    No.
10       Q    As far as you know, there's no rate
11   whatsoever that applies to these matters?
12       A    I couldn't answer that.  I have no
13   idea.
14       Q    If there was a zero physician response
15   rate, would then engender a problem in terms of
16   the query process?
17       A    I have no idea.
18       MR. SHEPARD:  Can I just make one
19   clarification for the record?
20       MR. LOUCKS:  Yeah.  Sure.
21       MR. SHEPARD:  The document we were just
22   looking at, KH000146 the top has in parentheses
23   samples.
24       MR. LOUCKS:  Well, the document speaks
25   for itself.

Page 144

1        MR. SHEPARD:  Right.
2        Q    To this day, Ms. Green, have you seen
3    any documents that establish rates for physician
4    agreements with queries at Kernan Hospital?
5        A    For data today?
6        Q    At anytime when there was a query
7    process at Kernan Hospital you have seen any
8    document that relates to or in any way references
9    the notion of physician agreement with the query
10   and what the rate of that agreement might be?
11       A    No.  No.
12       Q    I'm looking for information about
13   targets, information about quotas.
14       A    No.  No.
15       Q    My question was about things in
16   writing.  Let me ask the same question about oral
17   information.  Have you heard anything or been told
18   anything that there was, in fact, rates for
19   physician agreement with the queries?
20       A    No.
21       Q    To your knowledge has anybody done an
22   audit of the queries to determine whether the
23   agreement rate was high or low?
24       A    I wouldn't -- not to my knowledge.
25       Q    What does AHIMA say about -- to your

Page 145

1    knowledge what does AHIMA say about auditing
2    physician agreement rates?  Does AHIMA say --
3        A    I don't have any information --
4        Q    You don't know?
5        A    I don't.
6        Q    You don't know if AHIMA thinks that's a
7    good thing to audit or a bad thing to audit?
8        A    No.  I don't know.
9        MR. LOUCKS:  Short break.
10       (Pause in the proceedings.)
11   BY MR. LOUCKS:
12       Q    I'm going to show you just these last
13   few just to sort of fill out as long as I'm here.
14       (Deposition Exhibit No. 22 marked for
15       identification and retained by
16       counsel.)
17       Q    This is 22.  You tell me is this
18   something you're familiar with?  It's a draft.
19       A    No.
20       Q    Here's the thing, these are -- what I'm
21   showing you are what the hospital produced, and I
22   had sort of assumed that at some point these were
23   materials that were used in training either your
24   staff or training hospital staff during the
25   rollout, and what I hear you saying is that you

37 (Pages 142 to 145)

d432362f-11e7-42eb-a42b-55bc22e6801c

Page 146

1  don't recognize any of these things.
2      A   No. I didn't go through training, so I
3  wouldn't know what materials.
4      Q   Why didn't you go through training?
5      A   Because I'm not a coder or a CDS.  I
6  just stay back and run the rest of the department.
7  I didn't have time really.
8          (Deposition Exhibit No. 23 marked for
9          identification and retained by
10         counsel.)
11     Q   Here's 23.  I suspect these two relate
12 to each other but I don't know.
13     A   I don't know.
14     Q   It's not something you've seen?
15     A   No.
16         (Deposition Exhibit No. 24 marked for
17         identification and retained by
18         counsel.)
19     Q   Twenty-four.  Try on this one.  Does
20 that look familiar?
21     A   No.  I haven't seen this document
22 either.
23     Q   Go if you would to Page 4 of the
24 document, KH118.  Do you see the chart up at that
25 time, Preparedness for Severity in Maryland?

Page 147

1      A   Uh-huh.
2      Q   You've seen that chart before, right?
3      A   No, not this one.
4      Q   You've seen other charts that reflect
5  the process, right?
6      A   I don't know.  I don't know what their
7  process is here.
8      Q   Okay.  Well, go over to Page 119.
9      A   Uh-huh.
10     Q   Implementation of CDI program at
11 Kernan.  Do you see that language?
12     A   Uh-huh.
13     Q   One CDS FTE to begin CDI program.  Do
14 you see that?
15     A   Uh-huh.
16     Q   Say yes, please.
17     A   Yes.
18     Q   Thank you very much.
19         Do you see where it says right below
20 that for APR logic, Kernan should aim to achieve a
21 40 percent concurrent query rate?
22     A   Yes, I see it.
23     Q   Does that -- is that true?
24     A   I have no idea.
25     Q   Do you agree with me that the

Page 148

1  40 percent rate is a different rate than we saw in
2  some of the other charts that I showed you?
3      A   I don't know.
4      Q   I'd have to show you charts is what
5  you're saying?
6      A   Yes.  I don't remember.
7      Q   For example, here it says targeted
8  physician response rate of 65 percent.  You don't
9  recall anybody mentioning anything about a
10 targeted physician response rate of 65 percent?
11     A   No.
12     Q   Nobody spoke to you about what an
13 optimal physician response rate would be?
14     A   Nope.
15     Q   Or what factors should go into
16 consideration about what an optimal physician
17 response rate should be?
18     A   No.
19     Q   As far as you know, nobody who inquired
20 or planned for response rates spoke to any of your
21 staff to collect information about these matters?
22     A   I wouldn't know.  I wouldn't know.
23     Q   Okay.
24         MR. LOUCKS:  Ray, I think I'm almost
25 done.  I'm going to try to find my notes.  I think

Page 149

1  I had something else there, but I'm close.
2      Q   There were references, Ms. Green, in
3  some of these materials to deliverable on HP3
4  contract.  I gather you're not familiar with
5  anything like that?
6      A   No.  Nope.
7      Q   So are their coder report cards?
8      A   No.  We don't have coder report cards,
9  no.
10     Q   Okay.  How about physician report
11 cards?
12     A   No.  Uh-uh.
13     Q   That term doesn't ring a bell to you?
14     A   No.
15     Q   Okay.  I saw a reference to CDI monitor
16 reports.
17     A   Yes.  The CDI monitor reports.
18     Q   Okay.
19     A   We never had any.
20     Q   Those the ones that you never had until
21 the subpoena came out?
22     A   Correct.
23     Q   There were a reference in one of these
24 materials to support visits that would include
25 data analysis from HP3, and my question is: Did

Page 150

1  you have any data analysis done by HP3 prior to
2  the subpoena coming in?
3      A   Not that I was aware of.
4      Q   Is there such a thing as a coder
5  fitness test?
6      A   I've never heard of it.  Nope.
7      Q   And the impression I have is that HP3
8  did some kind of a baseline analysis prior to
9  implementation of the system.
10     A   I have no idea if they did or they
11 didn't.
12     Q   And if there were one, what it says you
13 wouldn't be able to tell me?
14     A   I have no idea.  Nope.
15     Q   How did the doctors respond to the
16 query system?
17     A   I really don't know because I wasn't
18 querying them.
19     Q   Did any of the doctors contact you and
20 complain?
21     A   No.  No.
22     Q   And I think I asked you this before.  I
23 apologize if I did.  This happens sometimes.  Do
24 you audit the coders?  You said that if a code had
25 a question about a chart they could ask Ms. Sewell

Page 151

1  to implement a query?
2      A   Correct.
3      Q   Do you track whether certain coders do
4  that more frequently than others?
5      A   No.  That's not something we track or
6  we can track.
7      Q   Okay.  Do you have a sense sitting here
8  of whether certain coders ask queries or cause Ms.
9  Sewell to ask queries more often than others?
10     A   I wouldn't know.
11     Q   We looked at the sticky note for the
12 malnutrition query.  Do you, in fact, know that
13 Ms. Sewell is using that form --
14     A   I have --
15     Q   -- or that she was during the time?
16     A   I have no idea.
17     Q   As far as you know, she could have been
18 making up her own form?
19     A   I have no idea what she used.
20     Q   Would you agree with me that it's
21 possible to ask a query that's completely
22 inappropriate?
23     A   I have -- I don't know anything about
24 queries.  I have no idea.
25     Q   Well, would you agree with me that it

Page 152

1  would be inappropriate to ask a query that says,
2  Doctor, if you don't code this as malnutrition
3  we'll get you terminated?  Would you agree with me
4  that would be an inappropriate query?
5      A   I wouldn't one way or the other.  I
6  don't know.
7      Q   You can't --
8      A   No.
9      Q   You think that would be an okay query
10 to ask?
11     A   I have no idea.  I'm not a CDS.
12     Q   Okay.
13     A   I have no idea.
14     Q   Do you -- and I gather from that that
15 you don't have anybody come in to actually take a
16 look at the kinds of queries that are being asked
17 to make sure that they're appropriate?
18     A   No.
19     Q   Nobody is auditing Ms. Sewell in that
20 regard?
21     A   No one is auditing -- I'm sorry?
22     Q   Ms. Sewell to see that her queries are
23 appropriate.
24     A   We just have the medical record audits.
25         MR. SHEPARD:  Let me just look through

Page 153

1  real quick.  I'm not going to ask any questions.
2  I do want to clarify one thing that you guys
3  talked about, and that has to do with the
4  availability of Ann's worksheets.
5         MR. LOUCKS:  Yes.
6         MR. SHEPARD:  You didn't ask this
7  question about when the subpoena was received in
8  2008, we immediately issued a do not destroy type
9  thing.
10        THE WITNESS:  Uh-huh.
11        MR. SHEPARD:  We have discovered
12 worksheets from that period, and there may be a
13 few that for whatever reason were left --
14        MR. LOUCKS:  -- hanging around.  Okay.
15        MR. SHEPARD:  We found them in off-site
16 storage.  They're on the disc we're going to
17 provide you.
18        MR. LOUCKS:  Thank you.
19        MR. SHEPARD:  I'm not sure how far back
20 they go, but if they don't go back before that
21 that's because they were discarded.
22        MR. LOUCKS:  That's the reason.  That's
23 cool.
24        MR. SHEPARD:  So you'll actually get to
25 see some of those.  That's the only thing I wanted

d432362f-11e7-42eb-a42b-55bc22e6801c

Page 154

1  to sort of clarify.
2       MR. LOUCKS:  I appreciate that.  Thank
3  you.
4       I assume that the witness has the right
5  to read and sign.
6       MR. SHEPARD:  I think that's right.
7       MR. LOUCKS:  What I think that means is
8  that -- well --
9       MR. SHEPARD:  You have the right to
10 review the transcript to make sure that the
11 transcriptionist wrote down everything correctly.
12 You also have the opportunity to correct anything
13 that you read that you find is maybe not exactly
14 intended or what you intended to say --
15      THE WITNESS:  Uh-huh.
16      MR. SHEPARD:  -- or maybe she didn't
17 quire understand what you were saying it and
18 recorded it differently than what you thought you
19 said, so you have an opportunity to clarify those
20 things.  Basically the way that works is she'll
21 mail it to you with the certificate.  You have
22 about 30 days to review the transcript and get it
23 back to her with the certificate wherein you
24 identify changes and/or state there are no
25 changes.  You have a right to waive that.  I

Page 155

1  recommend you not do that in this case that you
2  actually read it.
3       THE WITNESS:  Medical records reads
4  everything.
5       MR. LOUCKS:  I would encourage you to
6  do that too.
7       THE WITNESS:  Yeah.
8       (Signature having not been waived, the
9       Deposition of MARTHA GREEN, was
10      concluded at 2:13 p.m.)
11          *  *  *  *  *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 156

1          CERTIFICATE OF NOTARY PUBLIC
2       I, SYLVIA L. JACOBS, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing deposition was duly sworn by me;
6  that the testimony of said witness was taken by me
7  in stenotype and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness;
10 that I am neither counsel for, related to, nor
11 employed by any of the parties to the action in
12 which this deposition was taken; and, further,
13 that I am not a relative or employee of any
14 counsel or attorney employed by the parties
15 hereto, nor financially or otherwise interested in
16 the outcome of this action.
17          SYLVIA L. JACOBS
18          Notary Public in and for
19          the State of Maryland
20 My commission expires:
21 June 26, 2012
22
23
24
25