

# Practice Brief: Developing a Physician Query Process

## Principles of Medical Record Documentation

Medical record documentation is used for a multitude of purposes, including:

- serving as a means of communication between the physician and the other members of the healthcare team providing care to the patient
- serving as a basis for evaluating the adequacy and appropriateness of patient care
- providing data to support insurance claims
- assisting in protecting the legal interests of patients, healthcare professionals, and healthcare facilities
- providing clinical data for research and education

To support these various uses, it is imperative that medical record documentation be complete, accurate, and timely. Facilities are expected to comply with a number of standards regarding medical record completion and content promulgated by multiple regulatory agencies.

### Joint Commission on Accreditation of Healthcare Organizations

The Joint Commission's *2000 Hospital Accreditation Standards* state, "the medical record contains sufficient information to identify the patient, support the diagnosis, justify the treatment, document the course and results, and promote continuity among health care providers" (IM.7.2).1 The Joint Commission Standards also state, "medical record data and information are managed in a timely manner" (IM.7.6).

Timely entries are essential if a medical record is to be useful in a patient's care. A complete medical record is also important when a patient is discharged, because information in the record may be needed for clinical, legal, or performance improvement purposes. The Joint Commission requires hospitals to have policy and procedures on the timely entry of all significant clinical information into the patient's medical record, and they do not consider a medical record complete until all final diagnoses and complications are recorded without the use of symbols or abbreviations.

Joint Commission standards also require medical records to be reviewed on an ongoing basis for completeness of timeliness of information, and action is taken to improve the quality and timeliness of documentation that affects patient care (IM.7.10). This review must address the

PROPRIETARY AND CONFIDENTIAL/FOIA EXEMPT                    2GS00025002

presence, timeliness, legibility, and authentication of the final diagnoses and conclusions at termination of hospitalization.

## Medicare

The Medicare Conditions of Participation require medical records to be accurately written, promptly completed, properly filed and retained, and accessible.2 Records must document, as appropriate, complications, hospital-acquired infections, and unfavorable reactions to drugs and anesthesia. The conditions also stipulate that all records must document the final diagnosis with completion of medical records within 30 days following discharge.

## Relationship Between Coding and Documentation

Complete and accurate diagnostic and procedural coded data must be available, in a timely manner, in order to:

- improve the quality and effectiveness of patient care
- ensure equitable healthcare reimbursement
- expand the body of medical knowledge
- make appropriate decisions regarding healthcare policies, delivery systems, funding, expansion, and education
- monitor resource utilization
- permit identification and resolution of medical errors
- improve clinical decision making
- facilitate tracking of fraud and abuse
- permit valid clinical research, epidemiological studies, outcomes and statistical analyses, and provider profiling
- provide comparative data to consumers regarding costs and outcomes, average charges, and outcomes by procedure

Physician documentation is the cornerstone of accurate coding. Therefore, assuring the accuracy of coded data is a shared responsibility between coding professionals and physicians. Accurate diagnostic and procedural coded data originate from collaboration between physicians, who have a clinical background, and coding professionals, who have an understanding of classification systems.

## Expectations of Physicians

Physicians are expected to provide complete, accurate, timely, and legible documentation of pertinent facts and observations about an individual's health history, including past and

PROPRIETARY AND CONFIDENTIAL/FOIA EXEMPT                                      2GS00025003

present illnesses, tests, treatments, and outcomes. Medical record entries should be documented at the time service is provided. Medical record entries should be authenticated. If subsequent additions to documentation are needed, they should be identified as such and dated. (Often these expectations are included in the medical staff or house staff rules and regulations.) Medical record documentation should:

- address the clinical significance of abnormal test results

- support the intensity of patient evaluation and treatment and describe the thought processes and complexity of decision making

- include all diagnostic and therapeutic procedures, treatments, and tests performed, in addition to their results

- include any changes in the patient's condition, including psychosocial and physical symptoms

- include all conditions that coexist at the time of admission, that subsequently develop, or that affect the treatment received and the length of stay. This encompasses all
conditions that affect patient care in terms of requiring clinical evaluation, therapeutic treatment, diagnostic procedures, extended length of hospital stay, or increased nursing care
and monitoring3

- be updated as necessary to reflect all diagnoses relevant to the care or services provided

- be consistent and discuss and reconcile any discrepancies (this reconciliation should be documented in the medical record)

- be legible and written in ink, typewritten, or electronically signed, stored, and printed

### Expectations of Coding Professionals

The AHIMA Code of Ethics sets forth ethical principles for the HIM profession. HIM professionals are responsible for maintaining and promoting ethical practices. This Code of Ethics states, in part: "Health information management professionals promote high standards for health information management practice, education, and research." Another standard in this code states, "Health information management professionals strive to provide accurate and timely information." Data accuracy and integrity are fundamental values of HIM that are advanced by:

- employing practices that produce complete, accurate, and timely information to meet the health and related needs of individuals

- following the guidelines set forth in the organization's compliance plan for reporting improper preparation, alteration, or suppression of information or data by others



http://library.ahima.org/xpedio/groups/public/documents/ahima/bok1_009224.h...

PROPRIETARY AND CONFIDENTIAL/FOIA EXEMPT       2GS00025004

- not participating in any improper preparation, alteration, or suppression of health record information or other organization data

A conscientious goal for coding and maintaining a quality database is accurate clinical and statistical data. AHIMA's Standards of Ethical Coding were developed to guide coding professionals in this process. As stated in the standards, coding professionals are expected to support the importance of accurate, complete, and consistent coding practices for the production of quality healthcare data. These standards also indicate that coding professionals should only assign and report codes that are clearly and consistently supported by physician documentation in the medical record. It is the responsibility of coding professionals to assess physician documentation to assure that it supports the diagnosis and procedure codes reported on claims.

Dialogue between coding professionals and clinicians is encouraged, because it improves coding professionals' clinical knowledge and educates the physicians on documentation practice issues. AHIMA's Standards of Ethical Coding state that coding professionals are expected to consult physicians for clarification and additional documentation prior to code assignment when there is conflicting or ambiguous data in the health record. Coding professionals should also assist and educate physicians by advocating proper documentation practices, further specificity, and resequencing or inclusion of diagnoses or procedures when needed to more accurately reflect the acuity, severity, and the occurrence of events. It is recommended that coding be performed by credentialed HIM professionals.4

It is inappropriate for coding professionals to misrepresent the patient's clinical picture through incorrect coding or add diagnoses or procedures unsupported by the documentation to maximize reimbursement or meet insurance policy coverage requirements. Coding professionals should not change codes or the narratives of codes on the billing abstract so that meanings are misrepresented. Diagnoses or procedures should not be inappropriately included or excluded, because payment or insurance policy coverage requirements will be affected. When individual payer policies conflict with official coding rules and guidelines, these policies should be obtained in writing whenever possible. Reasonable efforts should be made to educate the payer on proper coding practices in order to influence a change in the payer's policy.

## Proper Use of Physician Queries

The process of querying physicians is an effective and, in today's healthcare environment, necessary mechanism for improving the quality of coding and medical record documentation and capturing complete clinical data. Query forms have become an accepted tool for communicating with physicians on documentation issues influencing proper code assignment. Query forms should be used in a judicious and appropriate manner. They must be used as a communication tool to improve the accuracy of code assignment and the quality of physician documentation, not to inappropriately maximize reimbursement. The query process should be guided by AHIMA's Standards of Ethical Coding and the official coding guidelines. An inappropriate queryÑsuch as a form that is poorly constructed or asks leading questionsÑor overuse of the query process can result in quality-of-care, legal, and ethical concerns.

## The Query Process

The goal of the query process should be to improve physician documentation and coding professionals' understanding of the unique clinical situation, not to improve reimbursement. Each facility should establish a policy and procedure for obtaining physician clarification of documentation that affects code assignment. The process of querying physicians must be a patient-specific process, not a general process. Asking "blanket" questions is not appropriate. Policies regarding the circumstances when physicians will be queried should be designed to promote timely, complete, and accurate coding and documentation.

Physicians should not be asked to provide clarification of their medical record documentation without the opportunity to access the patient's medical record. Each facility also needs to determine if physicians will be queried concurrently (during the patient's hospitalization) or after discharge. Both methods are acceptable. Querying physicians concurrently allows the documentation deficiency to be corrected while the patient is still in-house and can positively influence patient care.

The policy and procedure should stipulate who is authorized to contact the physician for clarifications regarding a coding issue. Coding professionals should be allowed to contact physicians directly for clarification, rather than limiting this responsibility to supervisory personnel or a designated individual.

The facility may wish to use a designated physician liaison to resolve conflicts between physicians and coding professionals. The appropriate use of the physician liaison should be described in the facility's policy and procedures.

## Query Format

Each facility should develop a standard format for the query form. No "sticky notes" or scratch paper should be allowed. Each facility should develop a standard design and format for physician queries to ensure clear, consistent, appropriate queries. The query form should:

- be clearly and concisely written

- contain precise language

- present the facts from the medical record and identify why clarification is needed

- present the scenario and state a question that asks the physician to make a clinical interpretation of a given diagnosis or condition based on treatment, evaluation, monitoring,
  and/or services provided. "Open-ended" questions that allow the physician to document
  the specific diagnosis are preferable to multiple-choice questions or questions requiring
  only a "yes" or "no" response. Queries that appear to lead the physician to provide a particular response could lead to allegations of inappropriate upcoding

- be phrased such that the physician is allowed to specify the correct diagnosis. It should not indicate the financial impact of the response to the query. The form should


http://library.ahima.org/xpedio/groups/public/documents/ahima/bok1_000231...

PROPRIETARY AND CONFIDENTIAL/FOIA EXEMPT       2GS00025006



- not be designed so that all that is required is a physician signature
- include:
  - patient name
  - admission date
  - medical record number
  - name and contact information (phone number and e-mail address) of the coding professional
  - specific question and rationale (that is, relevant documentation or clinical findings)
  - place for physician to document his or her response
  - place for the physician to sign and date his or her response

The query forms should not:

- "lead" the physician

- sound presumptive, directing, prodding, probing, or as though the physician is being led to make an assumption

- ask questions that can be responded to in a "yes" or "no" fashion

- indicate the financial impact of the response to the query

- be designed so that all that is required is a physician signature

## When Is a Query Appropriate?

Physicians should be queried whenever there is conflicting, ambiguous, or incomplete information in the medical record regarding any significant reportable condition or procedure. Querying the physician only when reimbursement is affected will skew national healthcare data and might lead to allegations of upcoding.

Every discrepancy or issue not addressed in the physician documentation should not necessarily result in the physician being queried. Each facility needs to develop policies and procedures regarding the clinical conditions and documentation situations warranting a request for physician clarification. For example, insignificant or irrelevant findings may not warrant querying the physician regarding the assignment of an additional diagnosis code. Also, if the maximum number of codes that can be entered in the hospital information system has already been assigned, the facility may decide that it is not necessary to query the physician regarding an additional code. Facilities need to balance the value of marginal data being collected against the administrative burden of obtaining the additional documentation.



Members of the medical staff in consultation with coding professionals should develop the specific clinical criteria for a valid query. The specific clinical documentation that must be present in the patient's record to generate a query should be described. For example, anemia, septicemia, and respiratory failure are conditions that often require physician clarification. The medical staff can assist the coding staff in determining when it would be appropriate to query a physician regarding the reporting of these conditions by describing

PROPRIETARY AND CONFIDENTIAL/FOIA EXEMPT                    2GS00025007

the specific clinical indications in the medical record documentation that raise the possibility that the condition in question may be present.

## When Is a Query Not Necessary?

Queries are not necessary if a physician involved in the care and treatment of the patient, including consulting physicians, has documented a diagnosis and there is no conflicting documentation from another physician. Medical record documentation from any physician involved in the care and treatment of the patient, including documentation by consulting physicians, is appropriate for the basis of code assignment. If documentation from different physicians conflicts, seek clarification from the attending physician, as he or she is ultimately responsible for the final diagnosis.

Queries are also not necessary when a physician has documented a final diagnosis and clinical indicator—such as test results—do not appear to support this diagnosis. While coding professionals are expected to advocate complete and accurate physician documentation and to collaborate with physicians to realize this goal, they are not expected to challenge the physician's medical judgment in establishing the patient's diagnosis. However, because a discrepancy between clinical findings and a final diagnosis is a clinical issue, a facility may choose to establish a policy that the physician will be queried in these instances.

## Documentation of Query Response

The physician's response to the query must be documented in the patient's medical record. Each facility must develop a policy regarding the specific process for incorporating this additional documentation in the medical record. For example, this policy might stipulate that the physician is required to add the additional information to the body of the medical record. As an alternative, a form, such as a medical record "progress note" form, might be attached to the query form and the attachment is then filed in the medical record. However, another alternative is to file the query form itself in the permanent medical record. Any documentation obtained post-discharge must be included in the discharge summary or identified as a late entry or addendum.

Any decision to file this form in the medical record should involve the advice of the facility's corporate compliance officer and legal counsel, due to potential compliance and legal risks related to incorporating the actual query form into the permanent medical record (such as its potential use as evidence of poor documentation in an audit, investigation, or malpractice suit, risks related to naming a nonclinician in the medical record, or quality of care concerns if the physician response on a query form is not clearly supported by the rest of the medical record documentation).

If the query form will serve as the only documentation of the physician's clarification, the use of "open-ended" questions (that require the physician to specifically document the additional information) are preferable to multiple choice questions or the use of questions requiring only a "yes" or "no" answer. The query form would need to be approved by the medical staff/medical records committee before implementation of a policy allowing this form to be maintained in the medical record. Also keep in mind that the Joint Commission hospital accreditation standards stipulate that only authorized individuals may make entries in medical records (IM.7.1.1). Therefore, the facility needs to consider modifying the



medical staff bylaws to specify coding professionals as individuals authorized to make medical record entries prior to allowing query forms to become a permanent part of the medical record.

## Auditing, Monitoring, and Corrective Action

Ideally, complete and accurate physician documentation should occur at the time care is rendered. The need for a query form results from incomplete, conflicting, or ambiguous documentation, which is an indication of poor documentation. Therefore, query form usage should be the exception rather than the norm. If physicians are being queried frequently, facility management or an appropriate medical staff committee should investigate the reasons why.

A periodic review of the query practice should include a determination of what percentage of the query forms are eliciting negative and positive responses from the physicians. A high negative response rate may be an indication that the coding staff are not using the query process judiciously and are being overzealous.



A high positive response rate may indicate that there are widespread poor documentation habits that need to be addressed. It may also indicate that the absence of certain reports (for example, discharge summary, operative report) at the time of coding is forcing the coding staff to query the physicians to obtain the information they need for proper coding. If this is the case, the facility may wish to reconsider its policy regarding the availability of certain reports prior to coding. Waiting for these reports may make more sense in terms of turnaround time and productivity rather than finding it necessary to frequently query the physicians. The question of why final diagnoses are not available at the time of discharge may arise at the time of an audit, review by the peer review organization, or investigation.

The use of query forms should also be monitored for patterns, and any identified patterns should be used to educate physicians on improving their documentation at the point of care. If a pattern is identified, such as a particular physician or diagnosis, appropriate steps should be taken to correct the problem so the necessary documentation is present prior to coding in the future and the need to query this physician, or to query physicians regarding a particular diagnosis, is reduced. Corrective action might include targeted education for one physician or education for the entire medical staff on the proper documentation necessary for accurate code assignment.

Patterns of poor documentation that have not been addressed through education or other corrective action are signs of an ineffective compliance program. The Department of Health and Human Services Office of Inspector General has noted in its Compliance Program Guidance for Hospitals that "accurate coding depends upon the quality of completeness of the physician's documentation" and "active staff physician participation in educational programs focusing on coding and documentation should be emphasized by the hospital."[5]

The format of the queries should also be monitored on a regular basis to ensure that they are not inappropriately leading the physician to provide a particular response. Inappropriately written queries should be used to educate the coding staff on a properly written query. Patterns of inappropriately written queries should be referred to the corporate compliance officer.

PROPRIETARY AND CONFIDENTIAL/FOIA EXEMPT                    2GS00025009

**Prepared by**

Sue Prophet, RHIA, CCS

**Acknowledgments**

AHIMA Advocacy and Policy Task Force
AHIMA's Coding Practice Team
AHIMA Coding Policy and Strategy Committee
AHIMA Society for Clinical Coding
Dan Rode, MBA, FHFMA

**Notes**

1. Joint Commission on Accreditation of Healthcare Organizations. *Comprehensive Accreditation Manual for Hospitals: The Official Handbook.* Oakbrook Terrace, IL: Joint Commission, 2000.

2. Health Care Financing Administration, Department of Health and Human Services. "Conditions of Participation for Hospitals." Code of Federal Regulations, 2000. 42 CFR, Chapter IV, Part 482.

3. Official ICD-9-CM Guidelines for Coding and Reporting developed and approved by the American Hospital Association, American Health Information Management Association, Health Care Financing Administration, and the National Center for Health Statistics.

4. AHIMA is the professional organization responsible for issuing several credentials in health information management: Registered Health Information Administrator (RHIA), Registered Health Information Technician (RHIT), Certified Coding Specialist (CCS), and Certified Coding SpecialistÑPhysician-based (CCS-P).

5. Office of Inspector General, Department of Health and Human Services. "Compliance Program Guidance for Hospitals." Washington, DC: Office of Inspector General, 1998.

**References**

AHIMA Code of Ethics, 1998.

AHIMA Standards of Ethical Coding, 1999.

AHIMA Coding Policy and Strategy Committee. "Practice Brief: Data Quality." *Journal of AHIMA* 67, no. 2 (1996).

**Article citation:**
Prophet, Sue. "Developing a Physician Query Process (AHIMA Practice Brief)." *Journal of AHIMA* 72, no.9 (2001): 88I-M.

Copyright ©2001 American Health Information Management Association. All rights reserved. All contents,

http://library.ahima.org/xpedio/groups/public/documents/ahima/bok1_000224.hcsp?dDocN...

PROPRIETARY AND CONFIDENTIAL/FOIA EXEMPT                    2GS00025010