

# Managing an Effective Query Process

*Note:* This practice brief updates the 2001 practice brief "Developing a Physician Query Process," with a continued focus on compliance.

In today's changing healthcare environment, health information management (HIM) professionals face increased demands to produce accurate coded data. Therefore, establishing and managing an effective query process is an integral component of ensuring data integrity. A query is defined as a question posed to a provider to obtain additional, clarifying documentation to improve the specificity and completeness of the data used to assign diagnosis and procedure codes in the patient's health record. Documentation can be greatly improved by a properly functioning query process.

This practice brief offers HIM professionals important components to consider in the management of an effective query process. It is intended to offer guiding principles to implement the query process while in no way prescribing what must be done.

## Background

The "ICD-9-CM Official Guidelines for Coding and Reporting" are the official rules for coding and reporting ICD-9-CM. They are approved by the four organizations that make up the ICD-9-CM Cooperating Parties: the American Hospital Association, the American Health Information Management Association, the Centers for Medicare and Medicaid Services, and the National Center for Health Statistics. The guidelines may be used as a companion document to the official current version of the ICD-9-CM coding conventions and instructions.

The guidelines state:

> A joint effort between the health care provider and the coding professional is essential to achieve complete and accurate documentation, code assignment, and reporting of diagnoses and procedures. These guidelines have been developed to assist both the healthcare provider and the coding professional in identifying those diagnoses and procedures that are to be reported. The importance of consistent, complete documentation in the medical record cannot be overemphasized. Without such documentation accurate coding cannot be achieved. The entire record should be reviewed to determine the specific reason for the encounter and the conditions treated.[1]

A provider is defined as any physician or other qualified healthcare practitioner who is legally accountable for establishing the patient's diagnosis. The guidelines apply to all healthcare providers, organizations, facilities, and entities (referred to throughout this document collectively as "healthcare entities"), regardless of size and function. They are clear in their directive regarding the relationship between documentation and the accurate, consistent coding and reporting of healthcare services.

Individuals who perform the query function should be familiar with the AHIMA Standards of Ethical Coding, which direct coders to "assign and report only the codes and data that are clearly and consistently supported by health record documentation in accordance with applicable code set and abstraction conventions, rules, and guidelines."[2] The standards further state:

> Query provider (physician or other qualified healthcare practitioner) for clarification and additional documentation prior to code assignment when there is conflicting, incomplete, or ambiguous information in the health record regarding a significant reportable condition or procedure or other reportable data element dependent on health record documentation (e.g., present on admission indicator).

Organizations should establish a process for "ensuring that the physician documents in the health record any clarification or additional information resulting from communication with coding staff," according to Sue Bowman, AHIMA director of coding policy and compliance, in the book *Health Information Management Compliance: A Model Program for Healthcare Organizations.* "Communication tools between coding personnel and physicians, such as coding summary sheets, attestation forms, or coding clarification forms (e.g., physician query forms), should never be used as a substitute for appropriate physician documentation in the health record."[3]

The electronic health record creates new challenges for compliance in clinical documentation. The issues to address include the use of electronic templates, generating and responding to electronic queries, and input from the appropriate staff regarding the electronic record documentation process.

## The Expectations for Documentation

The primary purpose of health record documentation is continuity of patient care, serving as a means of communication among all healthcare providers. Documentation is also used to evaluate the adequacy and appropriateness of quality care, provide clinical data for research and education, and support reimbursement, medical necessity, quality of care measures, and public reporting for services rendered by a healthcare entity.[4]

### Documentation and Coding

As a result of the disparity in documentation practices by providers, querying has become a common communication and educational method to advocate proper documentation practices. Queries may be made in situations such as the following:

- Clinical indicators of a diagnosis but no documentation of the condition
- Clinical evidence for a higher degree of specificity or severity
- A cause-and-effect relationship between two conditions or organism
- An underlying cause when admitted with symptoms
- Only the treatment is documented (without a diagnosis documented)
- Present on admission (POA) indicator status

Lack of accurate and complete documentation can result in the use of nonspecific and general codes, which can impact data integrity and reimbursement and present potential compliance risks.

### Expectation of the Provider

According to the Centers for Medicare and Medicaid Services and the Joint Commission, providers are expected to provide legible, complete, clear, consistent, precise, and reliable documentation of the patient's health history, present illness, and course of treatment. This includes observations, evidence of medical decision-making in determining a diagnosis, and treatment plan, as well as the outcomes of all tests, procedures, and treatments. This documentation should be as complete and specific as possible, including information such as the level of severity, specificity of anatomical sites involved, and etiologies of symptoms.

Providers are expected to follow medical staff bylaws and assist in developing documentation and query policies and procedures. The query policy may include a statement regarding timely response and consequences for noncompliance or lack of response to queries.

### Expectation of Individuals Performing the Query Function

Individuals performing the query function should follow their healthcare entity's internal policies related to documentation, querying, coding, and compliance, keeping in mind that data accuracy and integrity are fundamental HIM values. Only diagnosis codes that are clearly and consistently supported by provider documentation should be assigned and reported. A query should be initiated when there is conflicting, incomplete, or ambiguous documentation in the health record or additional information is needed for correct assignment of the POA indicator.

**Expectation of the Healthcare Entity**

The query process improves the quality of documentation and coding for complete clinical data capture. Queries may be initiated for all payer types regardless of the impact on reimbursement or quality reporting. The healthcare entity's documentation or compliance policies can address situations such as unnecessary queries, leading queries, repetitive overuse of queries without measureable improvement in documentation, and methods for provider education.

A provider's response to a query can be documented in the progress note, discharge summary, or on the query form as a part of the formal health record. Addendums to the discharge summary or the progress note should include appropriate date and authentication.

Permanence and retention of the completed query form should be addressed in the healthcare entity's policy, taking into account applicable state and quality improvement organization guidelines. The policy should specify whether the completed query will be a permanent part of the patient's health record. If it will not be considered a permanent part of the patient's health record (e.g., it might be considered a separate business record for the purpose of auditing, monitoring, and compliance), it is not subject to health record retention guidelines.

It is recommended that healthcare entities employ, educate, and train qualified individuals to perform the query process who have strong competencies in the following areas:

- Knowledge of healthcare regulations, including reimbursement and documentation requirements
- Clinical knowledge with training in pathophysiology
- Ability to read and analyze all information in a patient's health record
- Established channels of communication with providers and other clinicians
- Demonstrated skills in clinical terminology, coding, and classification systems
- Ability to apply coding conventions, official guidelines, and *Coding Clinic* advice to health record documentation

## The Query Process

### Who to Query

A healthcare entity's query policy should address the question of who to query. The query is directed to the provider who originated the progress note or other report in question. This could include the attending physician, consulting physician, or the surgeon. In most cases, a query for abnormal test results would be directed to the attending physician.

Documentation from providers involved in the care and treatment of the patient is appropriate for code assignment; however, a query may be necessary if the documentation conflicts with that of another provider. If such a conflict exists, the attending physician is queried for clarification, as that provider is ultimately responsible for the final diagnosis.

### When to Query

Providers should be queried whenever there is conflicting, ambiguous, or incomplete information in the health record regarding any *significant* reportable condition or procedure.

Queries are not necessary for every discrepancy or unaddressed issue in physician documentation. Healthcare entities should develop policies and procedures that clarify which clinical conditions and documentation situations warrant a request for physician clarification. Insignificant or irrelevant findings may not warrant a query regarding the assignment of an additional diagnosis code, for example. Entities must balance the value of collecting marginal data against the administrative burden of obtaining the additional documentation.

Healthcare entities could consider a policy in which queries may be appropriate when documentation in the patient's record fails to meet one of the following five criteria:

- **Legibility.** This might include an illegible handwritten entry in the provider's progress notes, and the reader cannot determine the provider's assessment on the date of discharge.
- **Completeness.** This might include a report indicating abnormal test results without notation of the clinical significance of these results (e.g., an x-ray shows a compression fracture of lumbar vertebrae in a patient with osteoporosis and no evidence of injury).
- **Clarity.** This might include patient diagnosis noted without statement of a cause or suspected cause (e.g., the patient is admitted with abdominal pain, fever, and chest pain and no underlying cause or suspected cause is documented).
- **Consistency.** This might include a disagreement between two or more treating providers with respect to a diagnosis (e.g., the patient presents with shortness of breath. The pulmonologist documents pneumonia as the cause, and the attending documents congestive heart failure as the cause).
- **Precision.** This might include an instance where clinical reports and clinical condition suggest a more specific diagnosis than is documented (e.g., congestive heart failure is documented when an echocardiogram and the patient's documented clinical condition on admission suggest acute or chronic diastolic congestive heart failure).

Healthcare entities may design their query programs to be concurrent, retrospective, post-bill, or a combination of any of these. Concurrent queries are initiated while the patient is still present. Retrospective queries are initiated after discharge and before the bill is submitted; post-bill queries are initiated after the bill has been submitted.

Concurrent queries are initiated "real time," during the course of the patient encounter or hospitalization, at the time the documentation is naturally done. They thus encourage more timely, accurate, and reliable responses. Retrospective queries are effective in cases where additional information is available in the health record, in short stays where concurrent review was not completed, or whenever a concurrent query process is not feasible.

Post-bill queries are initiated after the claim is submitted or remittance advice is paid. Post-bill queries generally occur as a result of an audit or other internal monitor. Healthcare entities can develop a policy regarding whether they will generate post-bill queries and the timeframe following claims generation that queries may be initiated. They may consider the following three concepts in the development of a post-bill (including query) policy:

- Applying normal course of business guidelines[5]
- Using payer-specific rules on rebilling timeframes
- Determining reliability of query response over time

## When Not to Query

Codes assigned to clinical data should be clearly and consistently supported by provider documentation. Providers often make clinical diagnoses that may not appear to be consistent with test results. For example, the provider may make a clinical determination that the patient has pneumonia when the results of the chest x-ray may be negative. Queries should not be used to question a provider's clinical judgment, but rather to clarify documentation when it fails to meet any of the five criteria listed above—legibility, completeness, clarity, consistency, or precision.

A query may not be appropriate simply because the clinical information or clinical picture does not appear to support the documentation of a condition or procedure (e.g., documentation of acute respiratory failure in a patient whose laboratory findings do not appear to support this diagnosis). In situations where the provider's documented diagnosis does not appear to be supported by clinical findings, a healthcare entity's policies can provide guidance on a process for addressing the issue without querying the attending physician.

## The Query Format

It is recommended that the healthcare entity's policy address the query format. A query generally includes the following information:

- Patient name
- Admission date and/or date of service
- Health record number

- Account number
- Date query initiated
- Name and contact information of the individual initiating the query
- Statement of the issue in the form of a question along with clinical indicators specified from the chart (e.g., history and physical states urosepsis, lab reports WBC of 14,400. Emergency department report fever of 102)

It is not advisable to record queries on handwritten sticky notes, scratch paper, or other notes that can be removed and discarded. The preferred formats for capturing the query include facility-approved query form, facsimile transmission, electronic communication on secure e-mail, or secure IT messaging system.

Verbal queries have become more common as a component of the concurrent query process. The desired result of a verbal query is documentation by the provider that supports the coding of a condition, diagnosis, or procedure. Therefore entities should develop specific policies to clearly address this practice and avoid potential compliance risks.

It is recommended that queries be written with precise language, identifying clinical indications from the health record and asking the provider to make a clinical interpretation of these facts based on his or her professional judgment of the case. Queries that appear to lead the provider to document a particular response could result in allegations of inappropriate upcoding. The query format should not sound presumptive, directing, prodding, probing, or as though the provider is being led to make an assumption.

Examples of leading queries include:

> Dr. Smith—Based on your documentation, this patient has anemia and was transfused 2 units of blood. Also, there was a 10 point drop in hematocrit following surgery. Please document "Acute Blood Loss Anemia," as this patient clearly meets the clinical criteria for this diagnosis.

> Dr. Jones—This patient has COPD and is on oxygen every night at home and has been on continuous oxygen since admission. Please document "Chronic Respiratory Failure."

In these examples the provider is not given any documentation option other than the specific diagnosis requested. The statements are directive in nature, indicating what the provider should document, rather than querying the provider for his or her professional determination of the clinical facts. In the first example, the statement "the patient has anemia" may be presumptive, and the statement "please document 'acute blood loss anemia'" is directive and clearly leading the provider. In the second example, the provider is inappropriately asked to document chronic respiratory failure.

Examples of the above queries correctly written could include the following:

> Dr. Smith—In your progress note on 6/20, you documented anemia and ordered transfusion of 2 units of blood. Also, according to the lab work done on xx/xx, the patient had a 10 point drop in hematocrit following surgery. Based on these indications, please document, in the discharge summary, the type of anemia you were treating.

> Dr. Jones—This patient has COPD and is on oxygen every night at home and has been on continuous oxygen since admission. Based on these indications, please indicate if you were treating one of the following diagnoses:

> - Chronic Respiratory Failure
> - Acute Respiratory Failure
> - Acute on Chronic Respiratory Failure
> - Hypoxia
> - Unable to determine
> - Other:_____

The introduction of new information not previously documented in the medical record is inappropriate in a provider query. For example:

> Dr. Harvey—According to the patient's emergency room record from last week, the patient was placed on antibiotics for cellulitis of her leg. If the patient is still taking antibiotics, please document the cellulitis.

In this case, if this diagnosis was not documented in the current admission and is not affecting the patient's care, it does not meet the definition of a secondary diagnosis. [6] Querying for this new information, which does not meet coding and reporting requirements, is inappropriate.

In general, query forms should not be designed to ask questions about a diagnosis or procedure that can be responded to in a yes/no fashion. The exception is present on admission (POA) queries when the diagnosis has already been documented.

It is recommended that healthcare entities should address the issue of yes/no queries in their policies. When setting this policy, the entity should consider the compliance risk. In general, it is a much safer practice to ask the provider to document the diagnosis he or she is agreeing to. Concerns about yes/no queries are less of an issue if the entity requires the provider to document the diagnosis in the health record rather than relying on the query form for the final documentation.

Multiple choice formats that employ checkboxes may be used as long as all clinically reasonable choices are listed, regardless of the impact on reimbursement or quality reporting. The choices should also include an "other" option, with a line that allows the provider to add free text. Providers should also be given the choice of "unable to determine." This format is designed to make multiple choice questions as open ended as possible.

A single query form can be used to address multiple questions. If it is, a distinct question should be asked for each issue (e.g., if three questions exist based on clinical indications in the health record, there should be three distinct questions clearly identified on the query form).

For example, insulin-dependent diabetes with high blood sugars on admission is documented in a patient with renal failure. The three questions identified on the query might be related to type of diabetes (type I or II, or secondary); relationship of diabetes to renal failure; and whether the diabetes is controlled or uncontrolled.

Finally, the query should never indicate that a particular response would favorably or unfavorably affect reimbursement or quality reporting.

## Methods of Auditing and Monitoring

Healthcare entities should consider establishing an auditing and monitoring program as a means to improve their query processes. They can consider several methods for this ongoing process.

Queries can be reviewed retrospectively to ensure that they are completed according to documented policies. This might include reviewing:

- That the query was necessary
- That the language used in the query was not leading or otherwise inappropriate
- That the query did not introduce new information from the health record

Based on the results of this review, the healthcare entity may need to identify follow-up actions. For example, cases identified as inappropriate queries resulting in inaccurate code assignment will require that codes be corrected at the level supported by the documentation without the leading query. Inappropriate queries should be tracked and trended, followed by appropriate education and training.

In order for the query process to be effective, auditing and monitoring should be conducted on a regular basis. This process can include a representative sample of total queries as well as a sampling by individuals initiating the query. Effective elements of an auditing and monitoring program include:

- Auditing for percentage of negative and positive provider responses. A high negative response rate may indicate overuse of the query by the coding staff; a high positive response rate may indicate a pattern of incomplete documentation that needs further investigation.
- Auditing the format of query forms. Discovery of inappropriate query formats can be used as an educational tool for coding staff.

- Auditing of individual providers to indicate improvement in health record documentation. Improvement in documentation should result in a decreased number of queries for an individual provider.
- Auditing of high-risk or problem diagnoses. The results may determine whether additional education resulted in a decreased number of queries for a particular diagnosis.

Auditing and monitoring programs should establish the data fields to be collected and reported. When reviewing both performance measures and compliance monitors, the errors related to documentation will become apparent.

Healthcare entities should have a process in place to support and educate the staff involved in conducting provider queries. Ongoing education and training is a key component of the auditing and monitoring process.

## Conclusion

HIM professionals are constantly challenged to improve the accuracy of coded data to meet regulatory, state, and federal requirements. In addition, electronic records pose new challenges in the collection and maintenance of quality data.

The quality of coding is driven directly by the documentation contained in the patient's health record. Establishing and managing a query process can be an effective tool to improve clinical documentation and thereby increase the accuracy of coded data. Typically, both concurrent and retrospective query processes are needed. An effective query process, using an appropriate format, will enable the facility to obtain needed documentation without compromising coding compliance standards.

Since the query process has become a tool to improve provider documentation, it is critical that the design of these processes be maintained with legal, regulatory, and ethical issues in mind. Healthcare entities can create and maintain a compliant query process by:

- Creating comprehensive policies and procedures for query processes
- Generating queries only when documentation is conflicting, incomplete, or ambiguous
- Conducting auditing and monitoring activities to determine the effectiveness of the query process
- Providing education and training for the staff involved in conducting provider queries

## Notes

1. Centers for Medicare and Medicaid Services and the National Center for Health Statistics. "ICD-9-CM Official Guidelines for Coding and Reporting." Available online at www.cdc.gov/nchs/datawh/ftpserv/ftpicd9/ftpicd9.htm#guidelines.
2. American Health Information Management Association. "Standards of Ethical Coding." 2008. Available online at www.ahima.org/infocenter/guidelines.
3. Prophet, Sue. *Health Information Management Compliance: A Model Program for Healthcare Organizations.* 2d edition. Chicago, IL: AHIMA, 2002.
4. For the purposes of this practice brief, *healthcare entity* encompasses all providers: short-term acute care hospitals; long-term acute care hospitals; skilled nursing facility and hospice; inpatient and outpatient psychiatric and rehabilitation; home-health; hospital-based outpatient and clinic; and all professional providers such as physician practice as well as any other healthcare entity or professional provider that serves patient care solo or part of a corporation. The healthcare entity uses the same policies and procedures throughout the components of the organization.
5. Normal course of business guidelines include ensuring that the post-bill query process is conducted in the healthcare entity's normal timeframe for completing health records in accordance with medical staff bylaws and rules and regulations for health record completion.
6. For reporting purposes, the term *other diagnoses* is interpreted as additional conditions that affect patient care in terms of requiring clinical evaluation, therapeutic treatment, diagnostic procedures, extended length of hospital stay, or increased nursing care and/or monitoring. UHDDS item 11-b defines other diagnoses as "all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or the length of stay. Diagnoses that related to an earlier episode which have no bearing on the current hospital stay are to be excluded."

## Reference

Prophet, Sue. "Developing a Physician Query Process." *Journal of AHIMA* 72, no. 9 (Oct. 2001): 88I–M.

## Prepared by

Sue Bowman, RHIA, CCS

Patricia Collins Smith, RHIA

Kathy DeVault, RHIA, CCS

Linda Hyde, MA, RHIA

Teri Jorwic, MPH, RHIA, CCS

Christine Lewis, MHA, RHIA, CCS, CCS-P

Krystal Lloyd, RHIA, CCS

Anita Majerowicz, MS, RHIA

Janie Miller, RHIT, CCS

Ruthann Russo, PhD, JD, MPH, RHIT

Shelley Safian, CCS-P, NCICS, CHA

Carol Spencer, RHIA

## Acknowledgment

Lisa M. Horning, Esq.

---

The information contained in this practice brief reflects the consensus opinion of the the professionals who developed it. It has not been validated through scientific research.

---

**Article citation:**
AHIMA. "Managing an Effective Query Process" *Journal of AHIMA* 79, no.10 (October 2008): 83-88.

Copyright ©2008 American Health Information Management Association. All rights reserved. All contents, including images and graphics, on this Web site are copyrighted by AHIMA unless otherwise noted. You must obtain permission to reproduce any information, graphics, or images from this site. You do not need to obtain permission to cite, reference, or briefly quote this material as long as proper citation of the source of the information is made. Please contact Publications to obtain permission. Please include the title and URL of the content you wish to reprint in your request.