IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,           *

     PLAINTIFF                                  *

                                                 CIVIL ACTION NO.: RDB-11-2961

          V.                                         *

KERNAN HOSPITAL,                         *

     DEFENDANT.                              *

  *    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM OPINION

The United States Government has filed this False Claims Act[1] case alleging that the Defendant Kernan Hospital of Baltimore, Maryland, orchestrated a scheme whereby it inappropriately and fraudulently coded malnutrition as a secondary diagnosis in order to increase its federally funded health care reimbursement. Kernan Hospital has moved, by separate motions, to dismiss the Government's Complaint pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure. This Court has reviewed the record, as well as the pleadings and exhibits, and conducted a hearing on July 12, 2012 pursuant to Local Rule 105.6 (D. Md. 2011). While the Defendant's motions are predicated on different legal grounds, they are interrelated and will be addressed together. For the reasons that follow, this Court finds that the Government has failed to adequately plead allegations of fraud under the False Claims Act. Accordingly, the Defendant's motions to dismiss (ECF Nos. 6 & 10) will be GRANTED and case will be DISMISSED WITHOUT PREJUDICE.

---

[1] 31 U.S.C. §§ 3729, *et seq.*

BACKGROUND & PROCEDURAL HISTORY

A. FACTS

The Government filed its Complaint on October 17, 2011, alleging five causes of action: (1) presenting false or fraudulent claims under Section 3729(a)(1) of the False Claims Act (Count I); knowingly presenting a false or fraudulent record under Section 3729(a)(2) of the False Claims Act (Count II); breach of fiduciary duty (Count III); unjust enrichment (Count IV); and payment under mistake of fact (Count V).  In ruling on a motion to dismiss, the factual allegations in the plaintiff's complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff.  *See, e.g., E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

Broadly, the Government alleges that between 2005 and 2009, Kernan Hospital ("Kernan") concocted a scheme to increase its Medicare, Medicaid, and Tricare reimbursement by systematically increasing the complexity of its "case mix."  Kernan's reimbursement rate is a function of the nature and complexity of the various cases it treats— the more complex the case mix, the more reimbursement it receives.  Compl. ¶ 2.

To accomplish this increase in case mix complexity, the Government alleges that Kernan engaged in "systematic upcoding"[2] of secondary diagnoses concerning malnutrition. In other words, the Government contends that Kernan artificially inflated the number and

---

[2]  "'Upcoding,' a common form of Medicare fraud, is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided."  *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 637 n.3 (6th Cir. 2003) (citing Bonnie Schreiber *et al.*, *Health Care Fraud*, 39 Am. Crim. L. Rev. 707, 750 n.331 (2002)).

severity of cases in which malnutrition was included as a secondary diagnosis, and did so with the specific intent of defrauding the reimbursement system.

The State of Maryland sets the rate by which hospitals are reimbursed by the Health Services Cost Review Commission[3] ("HSCRC") for services rendered based on the information hospitals provide to the HSCRC regarding the nature and severity of patients treated during the preceding fiscal year. Compl. ¶ 2, ECF No. 1. This "case mix" information is reported to the HSCRC through numerical coding of diagnoses governed by the International Coding of Diseases, Ninth Revision Clinical Modification (hereinafter, "ICD-9-CM"). *Id.* ¶ 10. These ICD-9-CM codes are used by Medicare and Medicaid funding recipients to describe the medical condition or diagnosis for which medical services are rendered. *See* 42 C.F.R. §§ 424.3, 424.32.

In 2005, the HSCRC instituted a new reporting program for hospitals permitting the inclusion of secondary diagnoses. This system, called the All Patient Refined – Diagnosis Related Groups ("APR-DRG") "looks to the principal diagnosis, the main reason the patient was admitted to the hospital, and also captures each applicable secondary diagnosis in a manner to define the severity of the diagnosis on a scale of 1 to 4, with 4 being the most sever." Compl. ¶ 13. According to the Government's Complaint, "these APR-DRG rules placed a premium on hospitals adding secondary diagnoses to each patient's coding profile," because "[t]he more applicable secondary diagnoses that the hospitals successfully entered into the patient's profile, the more complex that patient would appear," and "the case mix

---

[3] *See* MD. CODE ANN., HEALTH-GEN. §§ 19-201 *et seq.*; *see also Insurance Com'r of State v. CareFirst of Maryland Inc.*, 816 A.2d 126, 130 (Md. Ct. Spec. App. 2003) (discussing history and operation of the Health Services Cost Review Commission).

would accordingly change and would lead to greater compensation for the hospital in the coming year." *Id.* ¶ 14. In other words, "by making secondary diagnoses more important the APR-DRG system gave hospitals the incentive to capture as many secondary diagnoses as possible." Gov. Opp'n at 5, ECF No. 14.

According to the Government, "Kernan reacted aggressively to the new system, recognizing that its self interest lay in capturing as many secondary diagnoses as it could." Gov. Opp'n at 5. At issue in this case, are secondary diagnoses related to malnutrition, and in particular, a severe form of malnutrition known as Kwashiorkor.[4] In this regard, the Complaint alleges that Kernan singled out malnutrition and Kwashiorkor for attention, and developed a scheme to fraudulently report Kwashiorkor and malnutrition as secondary diagnoses to the HSCRC in order to make its case mix appear more severe for reimbursement purposes. Compl. ¶ 15.

The scheme, as alleged in the Complaint, was not a simple one. Rather, it included numerous steps and moving pieces. To wit: first, Kernan's Coding Documentation Specialist ("CDS") reviewed every chart for evidence consistent with malnutrition. *Id.* ¶ 19. When such evidence was found, as for example where a laboratory test result was consistent with malnutrition, the CDS would use a sticky note affixed to the chart to query the

---

[4] The Oxford English Dictionary defines Kwashiorkor as:

> A wasting disease that is caused by an insufficient intake of protein by the body and chiefly affects young children in tropical countries, producing apathy, edema of the extremities, desquamation, and partial loss of pigmentation (and is generally associated with diarrhea and stunted growth), and leading in severe cases to death.

*Oxford English Dictionary* (2d ed. 1989; online version June 2012), *available at* http://www.oed.com/view/Entry/104622.

physician. *Id.* The sticky note would indicate that the patient may have "Protein Malnutrition" and would prompt the physician to include the secondary diagnosis if he or she agreed with it. *Id.* Treating physicians did frequently agree with the query, and "wrote the words 'Protein Malnutrition' in the chart in answer to the query and threw the sticky note away." *Id.* The coders would then code malnutrition for the patient by typing the words "Protein Malnutrition" into the computer system that included the ICD-9-CM information. *Id.* ¶ 20. This led the coders to a drop down screen that listed Kwashiorkor as the first choice at the top of the list. *Id.* The government alleges that coders were "not to independently assess the quality of the evidence that led to the coding of 'Kwashiorkor,'" and "were instructed to select it automatically instead of considering any of the other choices." *Id.* In so doing, Kernan expected the coders to "suspend [their] independent judgment and code the most severe form of malnutrition as a default just because the computer lists that most severe form at the top of a list of possible choices." *Id.* ¶ 22. "In this way, a chart with a stray laboratory value—for example, a low prealbumin score, which is not unique to malnutrition—could be falsely and fraudulently translated into a diagnosis of the most severe kind of malnutrition." *Id.* ¶ 21.

The coding of Kwashiorkor as a secondary diagnosis in Kernan's patient population went from zero cases in 2004 to 287 cases in 2007. *Id.* ¶ 17. Lesser degrees of malnutrition, coded as secondary diagnoses, saw similar increases. *Id.* ¶ 3. This sudden increase caused the government to investigate. Through its investigation, the government determined that twenty-three percent of the cases in which Kernan coded malnutrition as a secondary diagnosis were inappropriate. *Id.* ¶ 18. By "inappropriate," the Government argues that

Kwashiorkor was coded when the medical evidence in the chart: (a) did not justify that diagnosis (i.e., the patient was not malnourished); or (b) contained contradictory, incomplete, or ambiguous information. *Id.* ¶¶ 3, 18.

The Government alleges that Kernan took none of the industry-recognized steps to monitor for quality control.  More specifically, the Government contends that the above-described scheme, and the resultant twenty-three percent error rate in malnutrition and Kwashiorkor diagnoses, violated "industry norms" and "applicable standards" established by the American Health Information Management Association ("AHIMA"). *Id.* ¶ 23.  An AHIMA compliant system requires auditing, which the Government contends did not occur at Kernan. *Id.* ¶ 24.  According to the Government, the dramatic increase in secondary diagnoses of Kwashiorkor and malnutrition should have triggered an inquiry by the hospital, but in reality "there was no effort at quality control, in complete violation of AHIMA standards and guidelines," and "Kernan was deliberately indifferent to the operation of its query process." *Id.* ¶ 27.  Moreover, the Government alleges that Kernan's query system was leading—that is, the sticky note attached to the chart by the CDS was "presumptive" in that it "told the doctor what the desired result was." *Id.* ¶ 26.  The leading nature of Kernan's query system violated "Coding Clinic precepts," insofar as coders were supposed to query the treating physician when a diagnosis for malnutrition or Kwashiorkor appeared in patient's chart but not in the discharge summary. *Id.* ¶¶ 28, 30.  According to the Government, "Kernan Hospital's practice of deliberately disregarding this industry standard rendered the coding [at Kernan] false and fraudulent." *Id.* ¶ 30.  In sum, the Government alleges that:

> [T]he Kernan Hospital computer system and the query process inappropriately
> caused the inappropriate, false and fraudulent coding of malnutrition as a
> secondary diagnosis in 23% of the cases at Kernan Hospital from 2005-20009
> [sic] and caused the United States through the federally funded health benefit
> programs administered by the Department of Health and Human Services and
> the Department of Defense to pay Kernan Hospital $1,606,742 to which it
> was not entitled.

*Id.* ¶ 32.

## B. PROCEDURAL HISTORY

As previously noted, Kernan filed two separate motions to dismiss. The first, predicated on Federal Rule of Civil Procedure 9(b), seeks dismissal on the ground that the Government's Complaint fails to satisfy Rule 9(b)'s heightened pleading requirement for allegations of fraud because the Complaint fails to: (1) identify a single false claim actually submitted to the government; (2) identify any specific employee involved in the submission of false claims; and (3) detail the contents of any false representations. Def.'s 9(b) Mot., ECF No. 6.

The second motion to dismiss, predicated on Federal Rule of Civil Procedure 12(b)(6), seeks dismissal of Counts I, II, and III on the ground that the Complaint as pleaded fails to state a cause of action under the False Claims Act. More specifically, the 12(b)(6) motion argues that (1) any alleged noncompliance with industry standards by Kernan does not amount to a false claim under the False Claims Act; (2) the Complaint fails to allege the requisite scienter to establish liability under the False Claims Act; and (3) Count III, which alleges a cause of action for breach of fiduciary duty, fails because Maryland does not recognize such a cause of action. Def.'s 12(b)(6) Mot., ECF No. 10.

In support of its argument that the Complaint fails to state a claim under the False Claims Act, Kernan attached four medical records to its motion to dismiss.  These medical records were not attached to the Government's Complaint, but were specifically referenced therein.  *See* Compl. ¶ 29.   In response, the Government argued that because Kernan attached those medical records, Rule 12(d) provides that Kernan's motion to dismiss should be considered one seeking summary judgment.[5]   Gov't Opp'n at 21-25, ECF No. 10. Accordingly, the Government treated Kernan's motion as one requesting summary judgment, and attached over 500 pages of exhibits to its opposition brief.

Kernan contends that its pending motion should not be viewed as a motion for summary judgment.  The Hospital maintains that because the Government's Complaint specifically described the four patients for which Kernan attached medical records, those records were "central" to the Government's case and therefore could be attached without converting the motion to one seeking summary judgment.  Kernan thereafter filed a motion to strike, arguing that the entire Government submission, including its brief, must be stricken insofar as the 500 pages of exhibits, and references to those exhibits contained in the brief, were not properly before the Court.  *See* Kernan Mot. to Strike, ECF No. 16.

---

[5]  Under Federal Rule of Civil Procedure 12(d), if "matters outside of the pleading are presented to and not excluded by the court," then "the motion must be treated as one for summary judgment under Rule 56."  *Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). In such a situation, the court must provide all parties a "reasonable opportunity to present all material made pertinent to such a motion." Fed. R. Civ. P. 12(d).   When a party is aware that material outside the pleadings is before the court, the party is on notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious.").

At the hearing, conducted on July 12, 2012, this Court heard argument on Kernan's motion to strike, and denied it as moot.  *See* July 12 Order, ECF No. 22.  It is well established that under certain circumstances, a court may consider the type of documents Kernan attached to its motion to dismiss without converting it to a motion for summary judgment.  As this Court explained in *Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678 (D. Md. 2001), it may "consider any documents referred to in the complaint and relied upon to justify a cause of action—even if the documents are not attached as exhibits to the complaint."  *Id.* at 683 (finding defendant's attaching correspondence and an agreement that was relied upon in plaintiff's complaint to its motion to dismiss to be proper); *see also New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1164 (4th Cir. 1994) (deeming a complaint "to include . . . any statements or documents incorporated in it by reference" and permitting a defendant to produce such materials when attacking the complaint)).  In *Fisher v. Maryland Dept. of Public Safety and Correctional Servs.*, No. JFM-10-0206, 2010 WL 2732334 (D. Md. July 8, 2010), this Court detailed the three options it has when a defendant attaches documents to a motion to dismiss:

> First, if the documents meet certain requirements, the court may consider them when evaluating the motion to dismiss.  If the documents do not qualify for consideration at the motion to dismiss stage, the court has two other alternatives: (1) it can either entirely disregard the attached documents; or (2) under limited circumstances, it may convert the motion into a motion for summary judgment and consider all attached documents.

*Id.* at *2.

In denying Kernan's motion to strike as moot, this Court essentially took the second option and determined that it would disregard the attached documents (the Defendant's four

medical records and the Government's voluminous exhibits).  While the Court indicated that the medical records attached to the Defendant's motion to dismiss were likely "central" or "integral" to the Government's Complaint insofar as they are referenced and relied upon in that document, they were of little moment in analyzing the sufficiency of the Complaint.  As will be discussed *infra*, the Court's concerns with the Complaint do not stem from factual disputes regarding the four medical records at issue—instead, the more fundamental inquiry is whether the Government has sufficiently alleged that Kernan submitted false claims under the False Claims Act.

Finally, in apparent response to questions posed to counsel during the July 12 hearing by the Court, both parties submitted what can be termed "position" letters clarifying issues that were not exhaustively discussed at the hearing.  *See* Gov. Ltr., ECF No. 24; Kernan Ltr., ECF No. 25.  These letters, as well as the relevant briefing and argument made by the parties have been considered, and the Court will proceed to analyze the remaining pending motions.

## STANDARD OF REVIEW

### A.  RULE 12(B)(6)

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted; therefore, "the purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  In ruling on such a motion, this Court is guided by the Supreme Court's

instructions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) which "require complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, __ F.3d __, __, 2012 WL 2589229, at *2 (4th Cir. July 5, 2012) (citation omitted).   The Supreme Court's *Twombly* decision articulated "[t]wo working principles" courts must employ when ruling on Rule 12(b)(6) motions to dismiss.  *Iqbal*, 556 U.S. at 678.

First, while a court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference.  *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim.)  Second, a complaint must be dismissed if it does not allege "a plausible claim for relief."  *Id.* at 679.  Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  Although the plausibility requirement does not impose a "probability requirement," *id.* at 556, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 663; *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, __ (4th Cir. May 14, 2012) ("A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim.  It need only *allege facts* sufficient to *state* elements of the claim.") (emphasis in original) (internal quotation marks and citation omitted).  In short, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief."  *Iqbal*, 556 U.S. at 664.

## B. RULE 9(B)

A false claim allegation is an averment of fraud.  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999) ("*Harrison I*").  Therefore, a complaint alleging false claims must comply with the heightened standard of Federal Rule of Civil Procedure 9(b), which requires a pleader to "state with particularity circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).[6]  The United States Court of Appeals for the Fourth Circuit has held that "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby" are the circumstances that must be pled with particularity.  *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison I*, 176 F.3d at 784).  This set of information is often referred to as the "who, what, when, where, and how" of the alleged fraud.  *Id.* at 379 (internal quotation marks omitted).  For example, a complaint is insufficient if it fails to allege specific claims submitted to the government and the dates on which those claims were submitted.  *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002); *U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 526-27 (D. Md. 2006).  Moreover, as to the "what" requirement, "a plaintiff must show a link between allegedly wrongful conduct and a claim for payment actually submitted to the government."

---

[6]  Four justifications for Rule 9(b)'s heightened pleading standards are often invoked:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of. . . .  Second, Rule 9(b) exists to protect defendants from frivolous suits.  A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery.  Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison I*, 176 F.3d at 784 (4th Cir. 1999); *see also Banca Cremi, S.A. v. Alex Brown & Sons, Inc.*, 132 F.3d 1017, 1036 n.25 (4th Cir. 1997).

*U.S. ex rel. Dugan v. ADT Security Services, Inc.*, No. DKC-03-3485, 2009 WL 3232080, at *14 (D. Md. Sept. 29, 2009) (citing *Clausen*, 290 F.3d at 1311).  By requiring a plaintiff to plead circumstances of fraud with particularity and not by way of general allegations, Rule 9(b) screens "fraud actions in which all the facts are learned through discovery after the complaint is filed." *Harrison I*, 176 F.3d at 789 (citation omitted).

ANALYSIS

## I.  PRELIMINARY ISSUES

### A.  All Counts Are Subject to Rule 9(b)'s Heightened Pleading Standard

The Government's Complaint alleges five causes of action, of which only two are asserted under the False Claims Act.  As noted, it is clear that allegations arising under the False Claims act are subject to Rule 9(b)'s heightened pleading standard.  *See, e.g.*, *Harrison I*, 176 F.3d at 783-84; *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008).  However, Kernan's Rule 9(b) motion argues that because all five counts alleged in the Government's Complaint are predicated on alleged false claims submitted by Kernan, they are all subject to Rule 9(b)'s heightened pleading standard.  For example, Count III alleges that Kernan breached a fiduciary duty owed to the government when it "submitted or caused to be submitted false and fraudulent claims."  Compl. ¶ 49.  Count IV alleges unjust enrichment resulting from the submission of "false and fraudulent claims" in "connection with a scheme to defraud" government programs.  *Id.* ¶¶ 53-54.  Kernan argues that because these counts are directly based on the alleged false claims at issue in Counts I and II, they "sound in fraud" and necessarily rise and fall with those counts.

At the July 12 hearing, counsel for the Government conceded that all counts of the Complaint are essentially based on its False Claims Act allegations.   Essentially, because every cause of action is directly predicated on the False Claims Act violations, Rule 9(b) applies to the Government's common law claims as well.  Accordingly, for reasons that will become clear, this Court will focus on Kernan's motion to dismiss based on Rule 9(b).[7]

### B.  Recent Amendments to the False Claims Act

The Government's Complaint alleges that Kernan violated 31 U.S.C. § 3729(a)(1) (Count I), and 31 U.S.C. § 3729(a)(2) (Count II) of the False Claims Act.  As noted by Kernan, these statutory citations refer to the 1986 version of the False Claims Act.  The Fraud Enforcement Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, § 386, 123 Stat. 1617 (2009), amended certain sections of the False Claims Act, including the sections at issue in this case.  FERA became law on May 20, 2009, and contains a retroactivity provision that states:

> The amendments made by this section shall take effect on the date of enactment of this Act and shall apply to *conduct* on or after the date of enactment, except that (1) subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all *claims* under the False Claims Act (31 U.S.C. 3729 *et seq.*) that are pending on or after that date.

FERA § 4(f), 123 Stat. 1625 (emphasis added).

---

[7]   While Kernan filed separate motions to dismiss, Rules 9(b) and 8 are not to be considered in isolation.   Instead, "[t]he particularity requirement of Rule 9(b) does not render the general principals announced in Rule 8 entirely inapplicable in pleadings alleging fraud: both rules must be read in conjunction with each other."  *Kerby v. Mortgage Funding Corp.*, 992 F. Supp. 787, 800 (D. Md. 1998).   Because both of Kernan's motions seek dismissal of the Government's Complaint on the ground that it fails to adequately plead a claim on which relief may be granted, and because this Court finds that the Government has *not* pleaded it's False Claims Act violations with the requisite particularity, both motions will be granted.

The Government filed its Complaint on October 17, 2011, but the conduct complained of spans the time period 2005 through 2009.  *See* Compl. ¶ 32.  The specific examples of alleged upcoding provided by the Government are not meant to be exhaustive and generally occurred in 2007 and 2008.  *See id.* ¶¶ 29-31.  Accordingly, it is not clear whether the amended or earlier version of 31 U.S.C. § 3729 applies.  Although the statute's retroactivity provision does not apply to Count I of the Complaint, the Complaint alleges that Kernan engaged in conduct violative of the False Claims Act in 2009—and although the Government provides no specific dates, it is possible that some of the "conduct" complained of occurred after FERA's enactment.

Pursuant to FERA's Section 4(f), the amendment to § 3729(a)(2), now found at 31 U.S.C. § 3729(a)(1)(B), was made retroactive to June 7, 2008, and applies to "all claims under the False Claims Act . . . that [were] pending on or after that date."  FERA § 4(f), 123 Stat. 1625.  Accordingly, the post-FERA amendments to the False Claims Act apply to Count II of the Complaint if the "claims" at issue were pending after that date.  As Kernan aptly notes, there appears to be a split of authority regarding whether the word "claims" refers to the alleged false claims at issue in the litigation, or whether "claims" refers to the *case* or cause of action under the False Claims Act.  *Compare United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010) (applying the amended § 3729(a)(1)(B) to a "complaint" pending on June 7, 2008) *with Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009) (construing FERA's "claims" language to mean the alleged false claims submitted to the government for payment).  The Government did not address this issue in

its opposition brief, and has not sought to clarify which version of the False Claims Act applies.

The weight of authority appears to tip in favor of applying the post-FERA version of § 3729(a)(2), 31 U.S.C. § 3729(a)(1)(B), only if the actual false *claims* at issue were pending after June 7, 2008. *See United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 763-64 (S.D. Tex 2010) (collecting cases). However, this Court need not make that determination today. First, this Court can discern no material difference between the earlier or post-FERA versions of § 3729(a)(1) as the statute applies to *this* litigation. *See id.* at 764 n.17 (describing the differences between the pre- and post-FERA versions of § 3729). Second, as will be discussed *infra*, the Complaint does not allege any dates on which false claims were allegedly submitted by Kernan Hospital—thereby making a determination as to when the claims were pending impossible. Accordingly, for purposes of the pending motions to dismiss, this Court will not differentiate between the different versions of the False Claims Act. However, if and when the Government re-files its Complaint, this issue may be revisited.

## II. THE FALSE CLAIMS ACT

In pertinent part, the False Claims Act subjects to civil liability "[a]ny person who knowingly presents or causes to be presented, to . . . the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), as well as "[a]ny person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C.

§ 3729(a)(2).[8]  To state a claim under the False Claims Act, a plaintiff must prove "(1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due."  *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003) ("*Harrison II*").

The False Claims Act was enacted "during the Civil War in response to overcharges and other abuses by defense contractors [with the expectation that it] would help the government uncover fraud and abuse by unleashing a posse of *ad hoc* deputies to uncover and prosecute frauds against the government."  *United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 528 F.3d 292, 298 (4th Cir. 2008) (quoting *Harrison I*, 176 F.3d at 784).  The False Claims Act imposes civil liability in the form of treble damages and penalties of up to $10,000 per false claim claim for persons who knowingly submit false claims to the government or use a false record to get a false claim paid by the government. 31 U.S.C. § 3729.

Given the "essentially punitive"[9] nature of the damages available in False Claims Act cases, "[t]he Supreme Court has cautioned that the False Claims Act was not designed to

---

[8]  The quoted language from the False Claims Act corresponds to the pre-FERA amendments.  As previously noted, the parties have not argued, and this Court cannot discern, any material difference between the two versions of the Act that would affect this litigation.  *See supra* Section I.B.  Because the Government's Complaint references the earlier version of the statute, this Court will cite that version for ease of reference.

[9]  *Vermont Agency of Nat. Res. v. Stevens*, 529 U.S. 765, 784 (2000) ("[T]he current version of the FCA imposes damages that are essentially punitive in nature . . . ."); *see also Texas Indus., Inc. v. Radcliffe Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers."); *United*

punish every type of fraud committed upon the government." *Harrison I*, 176 F.3d at 785 (citing *United States v. McNinch*, 356 U.S. 595, 599 (1958)).  The Act "imposes liability not for defrauding the government generally; it instead only prohibits a narrow species of fraudulent activity: 'present[ing], or caus[ing] to be presented . . . a false or fraudulent claim for payment or approval." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (citation omitted); *see also Harrison I*, 176 F.3d at 785 ("The statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the '*claim for payment*.'") (citation omitted, emphasis added).   "Therefore, a central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government." *Harrison I*, 176 F.3d at 785.  In the oft-quoted parlance of the United States Court of Appeals for the Eleventh Circuit, "[t]he submission of a [false] claim is . . . the *sine qua non* of a False Claims Act violation." *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (citation omitted).

In *Wilson*, the Fourth Circuit stated that the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby" are the circumstances that must be pled with particularity under Rule 9(b).  *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison I*, 176 F.3d at 784).   Here, the primary failure of the Government's Complaint is its lack of specificity as to the precise false claims at issue in this litigation—in fact, the Complaint does not identify a single false claim actually submitted to the government for payment.

---

*States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 734 (10th Cir. 2006) (Hartz, J., concurring) ("[T]he False Claims Act is a punitive statute . . . .").

The Complaint alleges a complicated scheme in which the Government contends Kernan sought to boost its case mix index in an effort to garner greater federal reimbursement, but utterly fails to link this scheme with any claims actually submitted.  At the July 12 hearing, after being asked what specific false claims were at issue, counsel for the Government proffered that the false claims were the cost reports submitted by Kernan to the HSCRC.  However, the Complaint does not identify a single cost report submitted to the HSCRC, nor does it even explain the circumstances under which such reports are submitted. Instead, the Complaint generally alleges that Kernan developed a scheme to increase government funding, engaged in the fraudulent upcoding of Kwashiorkor and malnutrition diagnoses, but is silent as to the next step or link in the False Claims Act liability mechanism—namely, that these fraudulent diagnoses made their way to cost reports submitted to the HSCRC and actually caused the HSCRC to pay Kernan for services not rendered.

Two similar cases from the Eleventh Circuit serve to illustrate the Government's failure to state with particularity the nature of the false claims it contends were submitted by Kernan.  In *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301 (11th Cir. 2002), the Eleventh Circuit concluded that allegations regarding a detailed scheme to defraud, absent specific allegations regarding the actual presentment of false claims, fail to satisfy Rule 9(b)'s particularity requirement.  In that case, the complaint "allege[d] that [the company] engaged in a multi-faceted, decade-long campaign to defraud the Government," insofar as it "performed unauthorized, unnecessary or excessive medical tests . . . and knowingly submitted bills for [that] work to . . . the Government."  *Id.* at 1303.  The *qui tam* relator

described in great detail the scheme allegedly engaged in by the defendant, identified specific facilities at issue, patients, dates of testing, and testing procedures. *Id.* at 1315. However, his complaint ultimately "failed to meet the minimum pleading requirements for the *actual presentment of any false claims.*" *Id.* (emphasis added). "No amounts of charges were identified. No actual dates were alleged. No policies about billing or even second-hand information about billing practices were described . . . [and not one] copy of a single bill or payment was provided." *Id.* at 1312. In making this determination, the *Clausen* court noted that:

> Rule 9(b)'s directive that "the circumstances constituting fraud or mistake shall be stated with particularity" does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.

*Id.* at 1311. The court went on to conclude that "if Rule 9(b) is to be adhered to, some indicia of reliability must be given *in the complaint* to support the allegation of *an actual false claim* for payment being made to the Government." *Id.* (emphasis added).

In another case, *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006), the allegations involved an elaborate upcoding scheme. The Eleventh Circuit affirmed the district court's dismissal because "the complaint fail[ed] rule 9(b) for want of sufficient indicia of reliability to support the assertion that the defendants submitted false claims." *Id.* at 1358-59. Even though the plaintiff "cite[d] particular patients, dates and corresponding medical records for services that he contends were not eligible for government reimbursement," he "fail[ed] to provide *the next link* in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes. Instead,

he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement." *Id.* at 1359 (first emphasis added).

As in *Clausen* and *Atkins*, the Government's Complaint in this case fails to provide the crucial link between the alleged scheme and ultimate False Claims Act liability.  In a telling moment of candor, Government counsel at the July 12 hearing conceded that by including a secondary diagnosis of Kwashiorkor in a patient's chart—even if the medical record did not support that diagnosis—the hospital's funding would not necessarily increase.  In other words, some secondary diagnoses do not affect the hospital's compensation rate.  The Government explained this as "an artifact of Kernan's case mix,"[10] but this fact is important and further underscores the failure of the Government's Complaint to adequately identify the false claims at issue.

As it stands, if some Kwashiorkor coding would not result in higher reimbursement, then the Complaint utterly fails to explain under what circumstances the miscoding or upcoding of malnutrition *does* result in a false claim being submitted to the government.  The Complaint avers that the Government's expert reviewed Kernan's billing records and found that twenty-three percent of the cases in which Kernan coded malnutrition as a secondary diagnosis were "inappropriate."  Compl. ¶ 18.  The rest of the Complaint does not explain how the Government's expert conducted her analysis, what precisely makes a malnutrition code "inappropriate," and generally does not provide enough information for Kernan to identify which claims the Government contends were false.  Put simply, the Complaint fails

---

[10]  According to both parties, Kernan Hospital, at least traditionally, was primarily a "rehabilitation" hospital.  In this regard, its patients differ from other hospitals insofar as Kernan's patients are often sent to the hospital to recuperate or rehabilitate from serious injury, surgery, or illness.

to identify the "who, what, when, where, and how" of the alleged fraud. *Wilson*, 525 F.3d at 379.

As the Fourth Circuit noted in *Wilson*, "[t]o satisfy the first element of an FCA claim, the statement or conduct alleged must represent an *objective falsehood*." *Id.* at 376-77 (emphasis added). "As a result, mere 'allegations of poor and inefficient management of contractual duties' are 'not actionable under the False Claims Act.'" *Id.* at 377 (quoting *Wilson I*, 176 F.3d at 789). Without the missing link in the chain—the objective and verifiable falsehood—the Government has failed to sufficiently allege that by engaging in an upcoding scheme, Kernan *caused* the submission of false claims and is liable under the False Claims Act. The False Claims Act does not punish a system that *might* allow false claims to be sent to the government—instead, it punishes actual claims containing objective falsehoods. To state a claim under the Act in this case, the Government must describe *what* false statements were submitted to the government, and more importantly, *how* those submissions affected the hospital's reimbursement.[11]

## CONCLUSION

Because this Court finds that the Government has failed to adequately plead allegations of fraud under the False Claims Act, the Defendant's motions to dismiss (ECF

---

[11] Because this Court concludes that the Government has failed to adequately plead the first element of a False Claims Act violation—that a false of fraudulent claim was submitted to the government—it need not conclusively evaluate the Defendant's other arguments for dismissal. The Court only notes, however, that Kernan's argument that the Complaint must be dismissed because it fails to identify the specific employee at Kernan alleged to have submitted false claims, is unpersuasive. *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506-10 (6th Cir. 2007) (holding that where a corporation is a defendant in a False Claims Act action, the identity of the natural person that submitted the false claim is not a mandatory pleading requirement.).

Nos. 6 & 10) will be GRANTED, and the Government's Complaint will be DISMISSED WITHOUT PREJUDICE.

A separate Order follows.

Dated:  July 30, 2012

/s/_____
Richard D. Bennett
United States District Judge